1

FILED - CLERK
U.S. DISTRICT COURT

2004 DEC -5 PM 12: 01

TX EASTERN-BEAUMONT

BY_____

2          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF TEXAS
3               BEAUMONT DIVISION

4
   UNITED STATES OF AMERICA      )   CRIMINAL ACTION
5                                )   NO. 1:03CR173
            PLAINTIFF,           )
6                                )
        V.                       )
7                                )   BEAUMONT, TEXAS
                                 )
   SHANNON WAYNE AGOFSKY         )
8                                )   JULY 6, 2004
            DEFENDANT.           )   9:14 O'CLOCK A.M.
9

10  ===============================================================

                   TRANSCRIPT OF TRIAL
11                       PHASE I
           VOLUME 1 OF 3, PAGES 1 THROUGH 173
12         BEFORE THE HONORABLE THAD HEARTFIELD
           UNITED STATES DISTRICT JUDGE, AND A JURY
13
    ===============================================================
14  APPEARANCES:

15  FOR THE GOVERNMENT:          JOHN BURCH STEVENS, JR.
                                 JOSEPH BATTE
16                               ASSISTANT U.S. ATTORNEYS
                                 U.S. ATTORNEY'S OFFICE
17                               350 MAGNOLIA, SUITE 150
                                 BEAUMONT, TEXAS   77701-2237
18
    FOR THE DEFENDANT,           DOUGLAS MILTON BARLOW
19  SHANNON WAYNE AGOFSKY:       ATTORNEY AT LAW
                                 485 MILAM
20                               BEAUMONT, TEXAS   77701
                                         AND
21                               GEORGE PATRICK BLACK
                                 FEDERAL PUBLIC DEFENDER
22                               110 NORTH COLLEGE, STE. 1122
                                 TYLER, TEXAS   75702
23
    COURT REPORTER:              C. FRANK MCMILLAN
24                               P. O. BOX 2664
                                 BEAUMONT, TEXAS   77704
25  PROCEEDINGS RECORDED BY STENOGRAPH SHORTHAND; TRANSCRIPT
    PRODUCED BY CAT SYSTEM.

209

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

2

1                    I N D E X

2                                                        PAGES
    OPENING STATEMENTS:
3      BY MR. STEVENS                                       22
       BY MR. BLACK                                         29
4
    WITNESS:  CHRISTOPHER MATT
5      DIRECT EXAMINATION BY MR. STEVENS                    33
       CROSS-EXAMINATION BY MR. BLACK                       71
6      REDIRECT EXAMINATION BY MR. STEVENS                  87

7   WITNESS:  RUSSELL HASS
       DIRECT EXAMINATION BY MR. STEVENS                    90
8      CROSS-EXAMINATION BY MR. BLACK                       96

9   WITNESS:  WALTER MOSS
       DIRECT EXAMINATION BY MR. STEVENS                    98
10     CROSS-EXAMINATION BY MR.                            105

11  WITNESS:  NINA HOLLAND
       DIRECT EXAMINATION BY MR. STEVENS                   106
12     CROSS-EXAMINATION BY MR. BLACK                      111

13  WITNESS:  DENNIS ARTHUR HILL
       (OUTSIDE THE PRESENCE OF THE JURY)
14     DIRECT EXAMINATION BY MR. STEVENS                   114
       CROSS-EXAMINATION BY MR. BLACK                      116
15
    WITNESS:  DENNIS ARTHUR HILL
16     DIRECT EXAMINATION BY MR. STEVENS                   124
       CROSS-EXAMINATION BY MR. BLACK                      128
17     REDIRECT EXAMINATION BY MR. STEVENS                 130
       RECROSS-EXAMINATION BY MR. BLACK                    131
18
    WITNESS:  DEANNA STEVENS
19     DIRECT EXAMINATION BY MR. STEVENS                   132

20  WITNESS:  RICKEY MILLER
       DIRECT EXAMINATION BY MR. STEVENS                   136
21
    WITNESS:  TOMMY BROWN, M.D.
22     DIRECT EXAMINATION BY MR. STEVENS                   147
       CROSS-EXAMINATION BY MR. BLACK                      163
23
    WITNESS:  MICHAEL KOLCUM, M.D.
24     DIRECT EXAMINATION BY MR. STEVENS                   168
       CROSS-EXAMINATION BY MR. BLACK                      170
25     REDIRECT EXAMINATION BY MR. STEVENS                 172

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

3

```
 1              [JURY OUT]

 2              [DEFENDANT PRESENT]

 3              THE COURT:  BE SEATED, PLEASE.

 4              THE COURT CALLS THE CASE OF THE UNITED STATES OF

 5      AMERICA VERSUS SHANNON WAYNE AGOFSY.  IS THE GOVERNMENT READY?

 6              MR. STEVENS:  UNITED STATES IS READY TO PROCEED, SIR.

 7              THE COURT:  DEFENSE READY?

 8              MR. BLACK:  READY TO PROCEED, YOUR HONOR.

 9              THE COURT:  I WILL CALL THIS CASE, AT THIS TIME,

10      OUTSIDE THE PRESENCE OF THE JURY FOR TWO MAIN REASONS, ONE IS

11      TO ADDRESS FIRST SUBJECT AND THAT IS, IT IS MY UNDERSTANDING

12      THAT THE PARTIES HAVE ENTERED INTO AN AGREED STIPULATION OF

13      CERTAIN FACTS AND THAT IS THAT, QUOTE, SHANNON WAYNE AGOFSKY,

14      DEFENDANT HEREIN, WAS CONFINED IN A FEDERAL CORRECTIONAL

15      INSTITUTION UNDER A SENTENCE OF FOR A TERM OF LIFE IMPRISONMENT

16      FOR HIS NATURAL LIFE AT THE TIME LUTHER PLANT WAS KILLED; AND

17      TWO, THIS STIPULATION IS ENTERED INTO KNOWINGLY, VOLUNTARILY,

18      UPON THE ADVICE AND DISCUSSION OF LEGAL COUNSEL.

19              IS THAT THE CORRECT RENDITION OF THE STIPULATION, MR.

20      STEVENS?

21              MR. STEVENS:  YES, YOUR HONOR.

22              THE COURT:  MR. BLACK.

23              MR. BLACK:  YES, IT IS, YOUR HONOR.

24              THE COURT:  AND MR. AGOFSKY, LET ME ASK YOU, SIR,

25      JUST FOR PURPOSES OF THIS HEARING: CAN YOU CONFIRM THAT THIS IS
```

4

1  A STIPULATION THAT YOU ARE IN AGREEMENT WITH?

2        DEFENDANT AGOFSKY: YES, IT IS.

3        THE COURT: ALL RIGHT. THE COURT WILL THEREFORE

4  AUTHORIZE THE INTRODUCTION OF THAT STIPULATION ON THE RECORD,

5  IF YOU HAVE A SIGNED COPY.

6        AND THE COURT ALSO ENTERS ITS ORDER ON A MOTION IN

7  LIMINE, WHICH I SIGN THIS DATE REFERRING -- LET'S SEE. IT IS

8  ORDERED THAT THE DEFENDANT, DEFENSE COUNSEL AND DEFENSE

9  WITNESSES SHALL REFRAIN FROM MENTIONING OR REFERRING TO ANY

10 REFERENCE TO THE CRIMINAL RECORD OF LUTHER PLANT; TWO, ANY

11 REFERENCE TO THE BUREAU OF PRISON'S DISCIPLINARY HISTORY OF

12 LUTHER PLANT; THREE, ANY STATMENT PURPORTEDLY MADE BY LUTHER

13 PLANT, UNTIL SUCH TIME AS THE COURT HAS FIRST CONSIDERED SUCH

14 MATTERS OUT OF THE PRESENCE OF THE JURY SO AS TO RULE ON THE

15 ADMISSIBILITY OF SUCH MATTERS. THAT IS A LIMINE WHICH I ENTER

16 AT THIS TIME, A STIPULATION IF -- OFF THE RECORD.

17        (OFF THE RECORD DISCUSSION)

18        THE COURT: DOES COUNSEL HAVE THE ORIGINAL COPY OF

19 THE STIPULATION TO BE FILED?

20        IS THAT A JOINT EXHIBIT BY THE GOVERNMENT AND

21 DEFENSE?

22        MR. BLACK, DO YOU AGREE THAT'S A JOINT EXHIBIT?

23        MR. BLACK: YES, YOUR HONOR, I DO.

24        THE COURT: JOINT EXHIBIT GOVERNMENT'S. AND

25 DEFENDANT'S JOINT EXHIBIT NO. 1, WHICH -- IS IT OFFERED, MR.

5

1   BLACK?

2           MR. BLACK:  YES, IT IS, YOUR HONOR.

3           THE COURT:  NO OBJECTION, THAT EXHIBIT IS ADMITTED.

4           SECONDLY, THE COURT INVOKES RULE 615.  AND LET ME

5   JUST RECITE THIS FOR THE RECORD SO THAT I DO NOT LEAVE ANYTHING

6   OUT.

7           AT THE REQUEST OF THE PARTIES, THE COURT SHALL ORDER

8   WITNESSES EXCLUDED SO THAT THEY CANNOT HEAR THE TESTIMONY OF

9   OTHER WITNESSES; AND IT MAY MAKE THE ORDER ON ITS OWN MOTION,

10  WHICH THE COURT IS SO DOING.

11          THIS RULE DOES NOT AUTHORIZE EXCLUSION OF, ONE, A

12  PARTY WHO IS A NATURAL PERSON OR A REPRESENTATIVE OF A PARTY,

13  WHICH THE GOVERNMENT IS ENTITLED TO ONE REPRESENTATIVE; AND A

14  PERSON AUTHORIZED BY STATUTE TO BE PRESENT.

15          WHAT THAT MEANS IS THAT THE RULE HAS BEEN INVOKED.

16  AND THOSE WHO HAVE BEEN DESIGNATED AS WITNESSES, WHO MAY BE

17  WITNESSES, IF YOU ARE IN THE COURTROOM AT THIS TIME, I ORDER

18  YOU TO REMOVE YOURSELF FROM THE COURTROOM DURING ANY OF THE

19  PROCEEDINGS IN THIS CASE UNTIL YOU ARE CALLED BY YOUR

20  RESPECTIVE ATTORNEYS OR BY THE COURT.

21          YOU ARE NOT TO DISCUSS ANY OF THE PROCEEDINGS WITH

22  ANYONE, BEFORE OR AFTER YOU MAY HAVE TESTIFIED, OR TALK TO

23  ANYONE WHO HAS TESTIFIED OR WILL TESTIFY.

24          THE EXCEPTION TO THAT RULE IS THAT YOU MAY DISCUSS

25  THE MATTER WITH THE ATTORNEYS IN THIS CASE, ANY PROCEEDINGS OR

6

1    ASPECT OF THE PROCEEDINGS WITH YOUR ATTORNEYS.

2          IS THERE ANYTHING ELSE THAT COUNSEL MAY THINK OF

3    BEFORE WE BRING THE JURY IN?

4          MR. STEVENS, MR. BLACK?

5          MR. STEVENS:  NO, SIR.

6          MR. BLACK:  NO.  NO, YOUR HONOR.

7          THE COURT:  ALL RIGHT.  I WILL RETIRE.  THEN WE WILL

8    BRING THE JURY IN AND I WILL CALL THE CASE AND WE WILL SWEAR

9    THEM IN.  AND I WILL THEN READ -- WE WILL THEN READ THE

10   INDICTMENT.  AND AFTER THAT I WILL GO INTO THE PRELIMINARY

11   CHARGE, AND IN THAT ORDER.

12          (RECESS AT 9:22 A.M. UNTIL 9:23 A.M.)

13                (JURY IN THE BOX)

14          THE COURT:  THE COURT CALLS THE CASE OF THE UNITED

15   STATES OF AMERICA VERSUS SHANNON WAYNE AGOFSKY.

16          IS THE UNITED STATES READY TO PROCEED?

17          MR. STEVENS:  UNITED STATES IS READY, SIR.

18          THE COURT:  IS THE DEFENSE READY TO PROCEED?

19          MR. BLACK:  READY TO PROCEED, YOUR HONOR.

20          THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.  THANK

21   YOU VERY MUCH FOR BEING HERE.

22          THE COURT WILL NOW AUTHORIZE THE DEPUTY CLERK TO

23   SWEAR YOU IN, WHICH WE WILL DO AT THIS TIME.

24                (JURY PANEL SWORN)

25          THE COURT:  MEMBERS OF THE JURY, THE TRIAL OF THE

7

1   CASE OF THE UNITED STATES OF AMERICA VERSUS SHANNON WAYNE

2   AGOFSKY BEGINS NOW.

3        WE HAVE 12 JURORS AND WE HAVE THREE ALTERNATE JURORS.

4   THE ALTERNATE JURORS IN THIS CASE AS -- DO YOU KNOW WHO YOU ARE

5   BY RAISING YOUR HANDS -- WOULD BE DAVIDSON, BOWMAN AND

6   ROBINSON.  I BRING THAT TO THE ATTENTION OF THE ENTIRE JURY AND

7   THE ALTERNATE JURORS FOR A REASON.  THE ALTERNATE JURORS SHOULD

8   KEEP IN MIND THAT THEY HAVE THE EXACT SAME DUTIES AS THE OTHER

9   12 JURORS.  AND THAT IS, TO LISTEN VERY CAREFULLY TO ALL OF THE

10  EVIDENCE AND TO ABIDE BY ALL OF THE INSTRUCTIONS GIVEN BY THE

11  COURT.  YOU WILL SHARE THE COMMON SPACE, THE SAME FACILITIES.

12  YOU WILL COME AND GO, BE EXCUSED, RETURN, BE ON TIME, AND ALL

13  OF THE OTHER ORDERS AND DIRECTIONS GIVEN BY THE COURT EQUALLY

14  APPLY TO YOU.  YOUR PRESENCE, AND I CAN'T OVEREMPHASIZE THIS.

15  YOUR PRESENCE IS OF EQUAL IMPORTANCE AS ANY OTHER JUROR

16  BECAUSE YOU MAY BE CALLED UPON TO REPLACE ONE OF THE 12 JURORS,

17  AND ULTIMATELY -- AND KEEP THIS IN MIND, ULTIMATELY DELIBERATE

18  THE GUILT OR INNOCENCE AT THE CLOSE OF THE EVIDENCE.  YOU CAN

19  SEE BY YOUR NUMBER THAT THAT EVENT HAS ALREADY OCCURRED.  ONE

20  OF THE 12 HAS BEEN REPLACED.  SOMEONE HAD TO GO OFF TO TRAINING

21  IN THE UNITED STATES ARMY, I AM NOT SURE IF HE IS ON HIS WAY TO

22  IRAQ OR NOT.

23        I NOW CALL UPON THE UNITED STATES GOVERNMENT TO READ

24  THE INDICTMENT.  THE DEFENDANT AND HIS ATTORNEYS WILL STAND

25  DURING THE READING OF THE INDICTMENT.

8

1        I ASK, AS TO EACH COUNT, THE DEFENDANT WILL ENTER HIS

2   PLEA OF GUILTY OR NOT GUILTY.

3        MR. STEVENS, IF YOU WOULD, PLEASE.

4        AFTERWARDS I WILL READ THE STIPULATIONS.

5        MR. STEVENS:  MAY IT PLEASE THE COURT.

6        IN THE CASE OF THE UNITED STATES OF AMERICA VERSUS

7   SHANNON WAYNE AGOFSKY, IN THE SUPERSEDING INDICTMENT THE UNITED

8   STATES GRAND JURY CHARGES: COUNT I, ON OR ABOUT JANUARY 5TH,

9   2001, IN THE EASTERN DISTRICT OF TEXAS, SHANNON WAYNE AGOFSKY,

10  DEFENDANT HEREIN, WHILE CONFINED IN A FEDERAL CORRECTIONAL

11  INSTITUTION UNDER A SENTENCE FOR A TERM OF LIFE IMPRISONMENT,

12  UNLAWFULLY KILLED LUTHER PLANT WILLFULLY, DELIBERATELY,

13  MALICIOUSLY AND UNDER PREMEDITATION AND MALICE AFORETHOUGHT, AS

14  MURDER IS DEFINED IN TITLE 18, UNITED STATES CODE, SECTION

15  1111, ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION

16  1118.

17       THE COURT:  HOW DOES THE DEFENDANT PLEAD TO COUNT 1

18  OF THE INDICTMENT, GUILTY OR NOT GUILTY?

19       MR. BLACK:  NOT GUILTY, YOUR HONOR.

20       THE COURT:  ALL RIGHT.  THE GOVERNMENT WILL READ

21  COUNT 2 OF THE INDICTMENT.

22       MR. STEVENS:  COUNT 2.  ON OR ABOUT JANUARY 5TH,

23  2001, IN THE EASTERN DISTRICT OF TEXAS, SHANNON WAYNE AGOFSKY,

24  DEFENDANT HEREIN, AT THE FEDERAL CORRECTIONAL INSTITUTION IN

25  BEAUMONT, A PLACE WITHIN THE SPECIAL MARITIME AND TERRITORIAL

9

1   JURISDICTION OF THE UNITED STATES AS DEFINED IN TITLE 18,

2   UNITED STATES CODE, SECTION 7 SUB-PART 3, DEFENDANT WILLFULLY,

3   DELIBERATELY, MALICIOUSLY AND UNDER PREMEDITATION AND MALICE

4   AFORETHOUGHT DID UNLAWFULLY KILL LUTHER PLANT BY STRIKING HIM

5   WITH DEFENDANT'S ARMS, HANDS AND FEET, IN VIOLATION OF TITLE

6   18, UNITED STATES CODE, SECTION 1111.

7        THE COURT:  HOW DOES THE DEFENDANT PLEAD TO COUNT 2

8   OF THE INDICTMENT, GUILTY OR NOT GUILTY?

9        MR. BLACK:  NOT GUILTY.

10       THE COURT:  ALL RIGHT.  ALL MAY BE SEATED.

11       THE PLEA IS ACCEPTED AND IS DULY RECORDED.

12       THE COURT NOW GIVES THE JURY WHAT IS DESCRIBED AS A

13  PRELIMINARY INSTRUCTION.  AND I SAY "PRELIMINARY" WITH THE

14  UNDERSTANDING THAT AT THE END OF THIS TRIAL, YOU WILL RECEIVE

15  VERY DETAILED INSTRUCTIONS COVERING THE LAW AND YOUR

16  RESPONSIBILITIES.  DON'T BE INTIMIDATED OR ALARMED BY MY USAGE

17  OF THE WORD "DETAILED" BUT BY THE TIME THAT YOU GET FROM HERE

18  TO THE END OF THE TRIAL AND WE HAVE GONE OVER THE LAW, YOU

19  WILL, I THINK, FULLY UNDERSTAND THE INSTRUCTIONS THAT THE COURT

20  WILL GIVE YOU ON THE LAW AND YOUR RESPONSIBILITY.

21       NOW, LET'S TALK ABOUT YOUR DUTIES JUST A MINUTE.

22  YOUR PRIMARY FUNCTION IS TO FIND FROM THE EVIDENCE WHAT THE

23  FACTS ARE.  THAT'S WHAT YOU ARE CONCERNED WITH ENTIRELY.

24       YOU AND YOU ALONE ARE THE JUDGES OF THE FACTS, ONLY

25  YOU.

1      AT THE END OF THE TRIAL YOU WILL THEN HAVE TO APPLY

2  THOSE FACTS TO THE LAW THAT THE COURT GIVES TO YOU.  YOU MUST

3  FOLLOW THE LAW WHETHER YOU AGREE WITH IT OR NOT.

4      NOTHING THAT THE COURT MAY SAY OR DO DURING THE TRIAL

5  IS TO INDICATE TO ANY OF YOU WHAT YOUR VERDICT SHOULD BE.

6  NOTHING I SAW OR DO SHOULD GIVE YOU THAT INDICATION.  YOU ALONE

7  WILL MAKE THAT DECISION IN CONNECTION WITH YOUR FINDINGS OF

8  FACT.

9      LET'S TALK ABOUT EVIDENCE.

10     THE EVIDENCE FROM WHICH YOU WILL FIND THE FACTS WILL

11 CONSIST OF TESTIMONY OF WITNESSES, DOCUMENTS AND OTHER THINGS

12 READ INTO THE RECORD AS EXHIBITS, AND ANY FACT THAT THE LAWYERS

13 AGREE TO OR STIPULATE AND THAT THE COURT INSTRUCTS YOU TO FIND

14 AS EVIDENCE.  THAT IS WHAT IS CALLED EVIDENCE.

15     IT IS EQUALLY IMPORTANT TO KNOW WHAT IS NOT EVIDENCE.

16 AND CERTAIN THINGS ARE CERTAINLY NOT EVIDENCE.  AND LET ME LIST

17 A FEW OF THOSE FOR YOU.  AND YOU HAVE TO KEEP THOSE SEPARATED

18 IN YOUR MIND.  BUT I JUST SAY TESTIMONY, EXHIBITS, DOCUMENTS

19 AND STIPULATIONS, THAT'S EVIDENCE.  WHAT IS NOT EVIDENCE, ON

20 THE OTHER HAND, IS STATEMENTS, ARGUMENTS AND QUESTIONS BY

21 LAWYERS ARE NOT EVIDENCE.  OBJECTIONS TO QUESTIONS ARE NOT

22 EVIDENCE.

23     LAWYERS HAVE AN OBLIGATION TO THEIR CLIENT TO MAKE

24 OBJECTIONS WHEN THEY BELIEVE THE EVIDENCE OFFERED IS IMPROPER

25 UNDER THE LAW.  AND YOU SHOULD NOT BE INFLUENCED BY THE

11

1   OBJECTION OR BY THE COURT'S RULING ON IT.

2       IF THE OBJECTION IS SUSTAINED, IGNORE THE QUESTION.

3   AND IF YOU ARE INSTRUCTED THAT SOME ITEM OF EVIDENCE IS

4   RECEIVED FOR LIMITED PURPOSES ONLY, YOU MUST FOLLOW THAT

5   INSTRUCTION.  IN OTHER WORDS, YOU MAY HEAR EVIDENCE AND I WOULD

6   SAY BUT WHEN YOU HAVE HEARD THAT EVIDENCE ONLY CONSIDER IT FOR

7   A VERY LIMITED PURPOSE.  THAT MAY HAPPEN.  I DON'T KNOW IF IT

8   WILL OR NOT.

9       TESTIMONY THAT THE COURT HAS EXCLUDED OR TOLD YOU TO

10   DISREGARD IS NOT EVIDENCE, IT MUST NOT BE CONSIDERED.  ANYTHING

11   YOU MAY SEE OR HEAR OUTSIDE OF THE COURTROOM IS NOT EVIDENCE

12   AND MUST BE DISREGARDED.

13       YOU ARE TO DECIDE THE CASE SOLELY UPON THE EVIDENCE

14   PRESENTED IN THIS COURTROOM.  WHILE YOU SHOULD CONSIDER ONLY

15   THE EVIDENCE, YOU ARE PERMITTED TO DRAW SUCH REASONABLE

16   INFERENCES FROM THE TESTIMONY AND EXHIBITS AS YOU FEEL ARE

17   JUSTIFIED IN LIGHT OF COMMON EXPERIENCES.  IN OTHER WORDS, YOU

18   MAY MAKE DEDUCTIONS AND REACH CONCLUSIONS THAT REASON AND

19   COMMON SENSE LEADS YOU TO BELIEVE FROM THE FACTS WHICH ARE

20   ESTABLISHED BY THE EVIDENCE.

21       AND THERE ARE TWO KINDS OF EVIDENCE.  WE'VE TALKED

22   ABOUT THAT AT ANOTHER TIME.  THERE IS DIRECT EVIDENCE SUCH AS

23   EVIDENCE OF AN EYEWITNESS, FOR INSTANCE, SOMEBODY WITH PERSONAL

24   KNOWLEDGE.  THERE IS CIRCUMSTANTIAL EVIDENCE, AND THAT IS PROOF

25   OF A CHAIN OF FACTS AND CIRCUMSTANCES INDICATING THAT THE

1    DEFENDANT IS EITHER GUILTY OR NOT GUILTY.

2         IN CONSIDERING THE EVIDENCE, YOU MAY MAKE DEDUCTIONS

3    AND REACH CONCLUSIONS WHICH REASON ADD COMMON SENSE LEAD YOU TO

4    MAKE.  AND YOU SHOULD NOT BE CONCERNED ABOUT WHETHER THE

5    EVIDENCE IS DIRECT OR CIRCUMSTANTIAL.  THE LAW MAKES NO

6    DISTINCTION BETWEEN THE WEIGHT YOU MAY GIVE EITHER DIRECT OR

7    CIRCUMSTANTIAL EVIDENCE.

8         IT WILL BE UP TO YOU TO DECIDE WHICH WITNESS TO

9    BELIEVE AND WHICH WITNESS NOT TO BELIEVE, AND HOW MUCH OF ANY

10   WITNESS' TESTIMONY YOU WILL ACCEPT OR REJECT.  AND I WILL GIVE

11   YOU YOUR GUIDELINES ON DETERMINING -- ACTUALLY THERE ARE VERY

12   GOOD GUIDELINES ON DETERMINING THE CREDIBILITY OF WITNESSES AT

13   THE END OF THE CASE, HOW TO AND WHAT TO LOOK FOR -- EXAMPLES OF

14   WHAT TO LOOK FOR AS TO CREDIBILITY.

15        BUT FOR THESE PRELIMINARY INSTRUCTIONS, JUST REMEMBER

16   YOU ARE THE FACT FINDERS AND IN ANY FINDINGS OF FACT YOU MUST

17   WEIGH THE CREDIBILITY OF THE WITNESSES AND YOU WILL, IN YOUR

18   MIND, DETERMINE WHO TO BELIEVE AND WHO NOT TO BELIEVE.

19        DURING THE COURSE OF THE TRIAL I MAY ASK A QUESTION

20   OF A WITNESS.  AGAIN, I DON'T KNOW IF I WILL OR NOT, I'M NOT

21   SURE IF THAT WILL ARISE.  IF I DO, THAT DOES NOT INDICATE THAT

22   I HAVE AN OPINION ABOUT THE FACTS IN THE CASE.  NOTHING I SAY

23   OR DO SHOULD LEAD YOU TO BELIEVE THAT I HAVE AN OPINION ABOUT

24   THE FACTS IN THE CASE.

25        AND DURING THE TRIAL I MAY HAVE TO INTERRUPT THE

1    PROCEEDINGS FROM TIME TO TIME TO CONFER WITH THE LAWYERS ON

2    POINTS OF LAW OR MATTERS THAT ARE THE SUBJECT OF AN OBJECTION.

3    AND INSTEAD OF EXCUSING THE ENTIRE JURY AND SENDING YOU BACK TO

4    THE JURY ROOM, WE MAY TAKE A BREAK IN THE CORNER OF THE

5    COURTROOM NEXT TO THE BENCH.  THAT'S CALLED A BENCH CONFERENCE.

6    AND WE WILL DO THAT IN A TIMELY FASHION.  WE WILL TRY TO KEEP

7    IT AT A MINIMUM.  BUT WHEN WE DO, LET ME JUST SAY THIS TO YOU:

8    IT'S YOUR OPTION.  IT'S SOMETIMES A GOOD OPPORTUNITY FOR

9    JURORS, WHEN YOU SEE US MOVE OVER TO THE SIDE OF THE ROOM, TO

10   STAND AND STRETCH.  AND WHEN WE RETURN YOU SIT BACK DOWN LIKE

11   THE REST OF US.  BUT TAKE THAT OPPORTUNITY TO STRETCH A LITTLE

12   BIT.

13          LET ME GIVE YOU SOME BASIC CRIMINAL CASE RULES.

14   THERE ARE SOME VERY BASIC RULES, AND YOU HAVE HEARD THEM AND

15   YOU WILL HEAR THEM AGAIN, AND YOU HAVE PROBABLY HEARD THEM ALL

16   OF YOUR LIFE; BUT THEY ARE SO IMPORTANT THEY ARE WORTHY OF

17   REPETITION AT ALMOST ANY STAGE.

18          THE DEFENDANT IS PRESUMED INNOCENT UNTIL PROVEN

19   GUILTY.  THE INDICTMENT AGAINST THE DEFENDANT BROUGHT BY THE

20   GOVERNMENT IS ONLY AN ACCUSATION, NOTHING MORE.  IT IS NOT

21   PROOF OF GUILT OR ANYTHING ELSE.  THE DEFENDANT THEREFORE

22   STARTS WITH A CLEAN SLATE.

23          THE BURDEN OF PROOF IS ON THE GOVERNMENT UNTIL THE

24   VERY END OF THE CASE.  THE DEFENDANT HAS NO BURDEN TO PROVE HIS

25   INNOCENCE OR TO PRESENT ANY EVIDENCE OR TO TESTIFY.  AND SINCE

1  THE DEFENDANT HAS A RIGHT TO REMAIN SILENT, THE LAW PROHIBITS

2  YOU FROM ARRIVING AT YOUR VERDICT BY CONSIDERING THAT THE

3  DEFENDANT MAY HAVE OR MAY NOT HAVE TESTIFIED.  YOU HAVE GOT TO

4  JUST TAKE THAT COMPLETELY OUT OF YOUR MIND.  AND REMEMBER --

5  ALWAYS REMEMBER THIS: THAT THE GOVERNMENT MUST PROVE THE

6  DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT.  THAT'S IN ANY

7  CRIMINAL CASE.

8       AND A FEW WORDS ABOUT JUROR CONDUCT.  WE'VE ALREADY

9  GONE OVER THAT ON JUNE 14TH AND WE WENT OVER THAT DURING YOUR

10 INDIVIDUAL VOIR DIRE SESSIONS WHEN WE HAD YOU HERE AS A GROUP

11 AND THEN WE VISITED WITH YOU AS AN INDIVIDUAL; AND NOW, ONCE

12 AGAIN, I'M GOING TO REPEAT IT BECAUSE IT IS SO VERY IMPORTANT.

13 AND WHY IS IT IMPORTANT?  WHAT I'M ABOUT TO SAY: IF THESE RULES

14 ARE JEOPARDIZE AND IT COMES TO THE ATTENTION OF THE COURT, THEN

15 THERE'S ALWAYS THE POSSIBILITY, NOT THAT IT WILL HAPPEN, BUT

16 THERE'S A POSSIBILITY THAT THE WHOLE CASE WILL BE TRAIN

17 WRECKED, STOPPED, CALLED OFF, CONTINUED.  OR THERE COULD BE AN

18 INCREDIBLE INCONVENIENCE TO YOU, THE PARTIES, TO THE COURT, THE

19 COURT'S DOCKET, TO THE WHOLE SYSTEM THAT WE ARE WORKING WITH.

20 IT WOULD BE LIKE TAKING SPARK PLUGS OUT OF AN ENGINE UNTIL YOU

21 GET TO THE NEXT GARAGE.  WE COULD LITERALLY BE CRIPPLED IF YOU

22 BREACH THESE RULES.

23      AND I INSTRUCT YOU THAT DURING THE TRIAL YOU ARE NOT

24 TO DISCUSS THE CASE WITH ANYONE OR PERMIT ANYONE TO DISCUSS IT

25 WITH YOU.  UNTIL YOU RETIRE TO THE JURY ROOM AT THE END OF THE

```
 1   CASE TO DELIBERATE ON YOUR VERDICT, YOU SIMPLY ARE NOT TO TALK
 2   ABOUT IT, NOT EVEN WITH YOUR FELLOW JURORS.  AND THAT IS AN
 3   INCREDIBLY DIFFICULT THING TO DO.  IT IS INSTINCTIVE TO SHARE
 4   QUESTIONS AND THOUGHTS AND FEELINGS AND PERCEPTIONS THAT YOU
 5   MIGHT HAVE ABOUT WHAT'S GOING ON, WITH A JUROR AT LUNCH OR
 6   WALKING IN OR WITH ANYONE.  BUT IN DOING THAT, IF YOU DO THAT
 7   AND IT COMES TO THE ATTENTION OF THE COURT AND THE RESPONSE
 8   THAT YOU OR THE OTHER JUROR GIVES TO ONE ANOTHER CAN PRESENT AN
 9   INCREDIBLY DIFFICULT PROBLEM FOR THIS TRIAL, ANY TRIAL, FOR
10   YOU, FOR US, FOR THE ENTIRE PROCESS.
11            AND DO NOT READ OR LISTEN TO ANYTHING TOUCHING ON
12   THIS CASE IN ANY WAY.  IF ANYONE SHOULD TRY TO TALK TO YOU
13   ABOUT THE CASE, BRING IT TO THE COURT'S ATTENTION PROMPTLY.
14   YOU CAN TALK TO A COURT SECURITY OFFICER AND TELL THEM THAT
15   SOMEONE MAY HAVE TRIED TO TALK TO YOU.  I DON'T THINK THAT'S
16   GOING TO HAPPEN.  IN MY OVER NINE YEARS ON THE BENCH, IT JUST
17   -- IT'S ONLY HAPPENED A FEW TIMES.  I DON'T THINK IT WOULD
18   HAPPEN, BUT IF IT DOES LET ME KNOW.
19            WHATEVER YOU DO, DO NOT RESEARCH, DO NOT GET ON THE
20   INTERNET, DO NOT INVESTIGATE ON YOUR OWN PART ANY ASPECT OF
21   THIS CASE.  LET IT ALL BE PRESENTED TO YOU HERE AND ONLY HERE
22   BY THE ATTORNEYS AND BY THE COURT AND THE WITNESSES.  MOST OF
23   ALL, DO NOT FORM AN OPINION UNTIL ALL OF THE EVIDENCE IS IN.
24   KEEP AN OPEN MIND UNTIL YOU START YOUR DELIBERATIONS, UNTIL THE
25   VERY LAST LAWYER SAYS "I REST," AND THE COURT SAYS "NOW GO TO
```

1   THE JURY ROOM AND DELIBERATE." KEEP YOUR MIND OPEN UNTIL THAT

2   POINT. KEEP OPEN-MINDED INTO THE DELIBERATIONS. YOU WILL HEAR

3   MORE ABOUT THAT LATER. LISTEN TO THE OTHER JURORS BUT DECIDE

4   IT ON YOUR OWN REASONING AND THOUGHTS.

5        YOU WILL NOT BE ALLOWED TO TAKE NOTES DURING THE

6   TRIAL. SOME PEOPLE THINK THAT IS A GREAT INHIBITION -- OR

7   GREAT OBSTACLE, RATHER. BUT THERE'S SEVERAL REASONS FOR THIS.

8        IT'S DIFFICULT TO TAKE NOTES AND AT THE SAME TIME PAY

9   ATTENTION TO WHAT A WITNESS IS SAYING AND TO OBSERVE THAT

10  WITNESS' DEMEANOR.

11       I HAVE A FIRM BELIEF THAT A LOT OF PEOPLE CAN SPEAK,

12  BUT THE WORD SPOKEN IS ONLY ONE WAY OF COMMUNICATION. AND WE

13  IN OUR -- WITH OUR HUMAN INSTINCTS AND COMMON SENSE, AND YOU AS

14  JURORS, HAVE THE ABILITY TO WEIGH AND SEE AND DETERMINE

15  CREDIBILITY OF WITNESSES BY THEIR TOTAL MAKEUP. FURTHERMORE,

16  IN A GROUP THE SIZE OF YOURS CERTAIN PERSONS WILL TAKE -- THIS

17  IS ONE REASON NOT TO TAKE NOTES: SOME PEOPLE TAKE BETTER NOTES

18  THAN OTHERS. I EXPERIENCED THAT BETTER IN LAW SCHOOL THAN I

19  DID ANYWHERE ELSE. I WAS MOST PLEASED TO HAVE SOMEBODY ELSE

20  TAKING NOTES BECAUSE I WAS ABLE TO USE THEM.

21       THERE'S A RISK THAT THE JUROR WHO DOES NOT TAKE GOOD

22  NOTES WILL DEPEND UPON THE JUROR WHO DOES TAKE GOOD NOTES, AND

23  YOU WILL NOTE THAT WE DO NOT SUPPLY YOU WITH NOTEBOOKS. IT'S

24  FOR THAT VERY REASON. FURTHER, SOMEBODY THAT'S TAKING NOTES,

25  AS I SAID, MAY TAKE BETTER NOTES AND THEY WILL LEAN YOU TOWARDS

1  THEIR THINKING INSTEAD OF YOUR OWN.

2      WE HAVE A COURT REPORTER PRESENT.  EVERYTHING THAT IS

3  SAID IN THIS COURTROOM IS BEING TRANSCRIBED INTO WHAT IS

4  EVENTUALLY GOING TO BE A FAIRLY LARGE TRANSCRIPT.  IT IS NOT MY

5  PRACTICE, GENERALLY, TO ALLOW THAT TRANSCRIPT TO GO INTO THE

6  JURY ROOM.  THE JURY SYSTEM DEPENDS UPON ALL 12 JURORS PAYING

7  CLOSE ATTENTION IN ARRIVING AT A UNANIMOUS DECISION.

8      AND REMEMBER THAT AT THE END OF THE TRIAL IF YOU ARE

9  WORRIED ABOUT YOUR BEING ABLE TO REMEMBER ALL THAT'S BEING

10 SAID, REMEMBER THAT AT THE END OF THE TRIAL THE COURT IS GOING

11 TO GIVE YOU VERY GOOD INSTRUCTIONS ON THE LAW; THE ATTORNEYS

12 ARE GOING TO PRESENT YOU WITH FINAL ARGUMENTS.  YOU WILL TAKE

13 INTO THE JURY ROOM EXHIBITS THAT HAVE BEEN INTRODUCED INTO

14 EVIDENCE.  YOU WILL HAVE A SUMMATION DEVELOPED IN YOUR MIND

15 SUCH THAT NOTES WOULD BE SUPERFLUOUS, I THINK, AS WOULD ANY

16 TIME TO TAKE A WHOLE TRANSCRIPT IN.  IT'S NOT TO SAY THAT I

17 WOULD NOT ALLOW THAT -- A PART OF THE TRANSCRIPT, BUT IT IS NOT

18 A GOOD PRACTICE, IN MY ESTIMATION.  THAT'S WHY I GIVE YOU FULL

19 WARNING TO EXERCISE THE GREATEST FOCUS AND MEMORY DISCIPLINE

20 THAT YOU CAN POSSIBLY MUSTER AT THIS PARTICULAR TIME.

21     THIS CASE WILL BE CONDUCTED MONDAY THROUGH FRIDAY

22 FROM 9:00 A.M. TO APPROXIMATELY FIVE OR 5:30.  THERE MAY BE

23 TIMES WHEN WE BREAK AT 4:30.  I CANNOT PREDICT WHERE THAT WILL

24 GO BECAUSE THINGS OCCUR.  WE HAVE TO MARSHAL WITNESSES FROM

25 DIFFERENT PLACES, AT TIMES.  IT'S UNFORESEEN EVENTS CAN OCCUR

18

1   THAT WILL CHANGE THAT -- NOT THE 9:00 O'CLOCK TIME.  I DON'T

2   WANT ANY UNFORESEEN EVENT CHANGING THAT TIME BECAUSE WE REALLY

3   NEED TO GET STARTED ON TIME.  BUT THE AFTERNOON TIME WILL

4   PROBABLY BE UP TO FIVE OR 5:30.

5         NOW, I MENTIONED AT ONE POINT IN TIME THAT

6   APPROXIMATELY AROUND THURSDAY I WILL CHECK WITH THE JURY AND I

7   WILL CHECK WITH THE ATTORNEYS AND WE WILL DISCUSS THE

8   POSSIBILITY OF GOING THROUGH SATURDAY.  BUT IF I HAVE ANY

9   OBJECTION TO THAT THAT IS OF SIGNIFICANCE, THEN I WILL

10  CERTAINLY LISTEN TO IT AND WE'LL TAKE THAT UP AT A LATER TIME.

11  JUST KEEP THAT IN MIND THAT THAT PART IS NOT SET IN STONE.

12        AND IF A SPECIAL NEED OCCURS DURING THE COURSE OF THE

13  TRIAL, YOU MAY DIRECT THAT TO THE COURT'S ATTENTION BY

14  CONTACTING A COURT SECURITY OFFICER OR ADVISE THE DEPUTY CLERK

15  OF THE COURT.  AND IF AN ISSUE COMES UP THAT YOU BELIEVE

16  REQUIRES THE COURT'S ATTENTION, YOU MAY DIRECT THAT ALSO TO A

17  COURT SECURITY OFFICER.  HE WILL BRING IT DIRECTLY TO ME, I

18  WILL SHARE IT WITH THE ATTORNEYS AND WILL EITHER BRING YOU IN

19  OR RESPOND TO IN SOME WAY OR FASHION.

20        LET ME GIVE YOU JUST A VERY BRIEF OUTLINE OF THE

21  TRIAL.  THE FIRST STEP IN THE TRIAL WILL BE THE OPENING

22  STATEMENTS.  THE GOVERNMENT, IN ITS OPENING STATEMENT, WILL

23  TELL YOU ABOUT THE EVIDENCE IT INTENDS TO PUT BEFORE YOU SO

24  THAT YOU WILL HAVE AN IDEA OF WHAT THE GOVERNMENT'S CASE IS

25  GOING TO BE.  AND JUST AS THE INDICTMENT IS NOT EVIDENCE,

1  NEITHER IS THE OPENING STATEMENT BY ANY ATTORNEY EVIDENCE.

2  IT'S JUST AN OUTLINE, AN OVERVIEW, A MAP OF WHERE THEY INTEND

3  TO GO IN THIS TRIAL.  ITS PURPOSE IS TO HELP YOU TO UNDERSTAND

4  WHAT THE EVIDENCE WILL BE AND WHAT THE GOVERNMENT WILL TRY TO

5  PROVE.  AND AFTER THE GOVERNMENT HAS MADE THEIR OPENING

6  STATEMENT, THE DEFENSE ATTORNEY MAY MAKE AN OPENING STATEMENT.

7  AND YOU MUST REMEMBER THAT AT THIS POINT IN THE CASE NO

8  EVIDENCE HAS BEEN OFFERED BY EITHER SIDE.

9      NEXT THE GOVERNMENT WILL OFFER EVIDENCE THAT IT

10  CLAIMS WILL SUPPORT THE CHARGES AGAINST THE DEFENDANT.

11      THE GOVERNMENT'S EVIDENCE MAY CONSIST OF TESTIMONY OF

12  WITNESSES AS WELL AS EXHIBITS.

13      AFTER THE GOVERNMENT'S EVIDENCE THE DEFENDANT'S

14  LAWYER MAY PRESENT EVIDENCE IN THE DEFENDANTS'S BEHALF, BUT THE

15  LAWYER IS NOT REQUIRED TO DO SO.

16      I REMIND YOU THAT THE DEFENDANT, AGAIN, IS PRESUMED

17  INNOCENT AND THAT THE GOVERNMENT MUST PROVE THE GUILT OF THE

18  DEFENDANT BEYOND A REASONABLE DOUBT.  THE DEFENDANT DOES NOT

19  HAVE TO PROVE HIS INNOCENCE, DOES NOT HAVE TO TESTIFY.

20      IF THE DEFENDANT DECIDES TO PRESENT EVIDENCE, THE

21  GOVERNMENT MAY INTRODUCE REBUTTAL EVIDENCE.

22      AND AFTER YOU HAVE HEARD ALL OF THE EVIDENCE ON BOTH

23  SIDES, THE GOVERNMENT AND THE DEFENSE WILL EACH BE GIVEN TIME

24  FOR FINAL ARGUMENTS.

25      AND I HAVE TOLD YOU ABOUT THE OPENING STATEMENT BY

20

1    THE ATTORNEYS.  THAT SAME RULING ABOUT IT NOT BEING EVIDENCE,

2    OF COURSE, APPLIES TO FINAL ARGUMENTS.  BUT YOU, NEVERTHELESS,

3    SHOULD PAY VERY CLOSED ATTENTION TO THE OPENING STATEMENTS AND

4    THE FINAL ARGUMENTS.  IT'S AN OPENING AND A CLOSURE.

5         THE FINAL PART OF THE TRIAL OCCURS WHEN I INSTRUCT

6    ABOUT THE RULE OF LAW WHICH YOU ARE TO USE IN REACHING YOUR

7    VERDICT.  AND AFTER HEARING MY INSTRUCTIONS AND AFTER HEARING

8    THE FINAL ARGUMENTS, YOU WILL LEAVE THE COURTROOM TOGETHER TO

9    MAKE YOUR DECISION.

10        YOUR DELIBERATIONS WILL BE SECRET.  YOU WILL NOT HAVE

11   TO EXPLAIN YOUR VERDICT TO ANYONE.

12        NOW THAT I HAVE DESCRIBED THE TRIAL ITSELF, LET ME

13   EXPLAIN THE JOB THAT YOU'RE NOW TO PERFORM DURING THE TRIAL.

14        I WILL DECIDE WHICH RULES OF LAW APPLY TO THE CASE.

15   IN RESPONSE TO QUESTIONS OR OBJECTIONS RAISED BY THE ATTORNEYS

16   AS WE GO ALONG AND IN THE FINAL INSTRUCTION GIVEN TO YOU AFTER

17   THE EVIDENCE AND ARGUMENTS ARE COMPLETED, YOU MUST FOLLOW THE

18   LAW AS I EXPLAIN IT TO YOU, WHETHER YOU AGREE WITH IT OR NOT.

19        YOU AND YOU ALONE, AGAIN, ARE THE JUDGES OF THE

20   FACTS.  THERE ARE TWO JUDGES HERE.  I'M THE JUDGE OF THE LAW,

21   YOU'RE THE JUDGE OF THE FACTS.

22        YOU SHOULD BE CAREFUL AND YOU SHOULD GIVE CAREFUL

23   ATTENTION TO THE TESTIMONY AND EXHIBITS, BECAUSE BASED UPON

24   THIS EVIDENCE YOU WILL DECIDE WHETHER THE GOVERNMENT HAS PROVED

25   BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAS COMMITTED THE

21

1   CRIMES CHARGED IN THE INDICTMENT.  YOU MUST BASE THAT DECISION

2   ONLY ON THE EVIDENCE IN THE CASE AND MY INSTRUCTIONS ABOUT THE

3   LAW.

4           THAT IS THE GENERAL OUTLINE OF THE NATURE OF THIS

5   CASE AND WHERE YOU WILL BE GOING AND WE HAVE COME A LONG WAY TO

6   GET TO THIS POINT TO THE POINT WHERE YOU'RE SITTING IN THIS

7   JURY BOX.  AND REMEMBER, HOWEVER, THAT WE ARE NOW IN THE TRIAL.

8   YOU HAVE BEEN SWORN IN, WE ARE IN TRIAL; AND IT IS AN IMPORTANT

9   TRIAL.

10          AND I THANK YOU, AGAIN, FOR BEING HERE.

11          AND I NOW WILL DO ONE THING BEFORE WE PROCEED WITH

12  THE OPENING STATEMENTS, AND THAT IS TO READ A STIPULATION BY

13  THE PARTIES.  THE PARTIES HAVE STIPULATED TO A FACT.  AND THE

14  PARTIES ENTERED INTO THIS STIPULATION ON THE ADMISSION OF

15  EVIDENCE IN THE CASE AND THEY AGREE TO STIPULATE TO THE

16  FOLLOWING FACTS WHICH ARE AGREED TO BE ADMITTED WITHOUT

17  OBJECTION AND FOR THE PURPOSE OF THE TRIAL IN THIS CASE:

18          ONE:  THAT SHANNON WAYNE AGOFSKY, THIS DEFENDANT, WAS

19  CONFINED IN A FEDERAL CORRECTIONAL INSTITUTION UNDER A SENTENCE

20  FOR A TERM OF LIFE IMPRISONMENT FOR HIS NATURAL LIFE AT THE

21  TIME LUTHER PLANT WAS KILLED.

22          TWO:  THIS STIPULATION IS ENTERED INTO KNOWINGLY,

23  VOLUNTARILY, AND UPON ADVISE AND DISCUSSION OF LEGAL COUNSEL IN

24  THIS CASE.

25          I THANK YOU, AGAIN; AND I NOW TURN IT OVER TO THE

22

1    UNITED STATES.

2              MR. STEVENS, WILL YOU MAKE THE OPENING STATEMENT?

3              MR. STEVENS:  YES, SIR.

4              THE COURT:  HE WILL BE FOLLOWED BY MR. BLACK, WHO

5    WILL MAKE THE OPENING STATEMENT FOR THE DEFENSE.

6              MR. STEVENS:  MAY IT PLEASE THIS COURT.  GOOD MORNING

7    TO YOU.

8              AS THE COURT TOLD YOU, THIS IS OUR OPENING

9    STATEMENTS, AND WE SHALL NOT TAKE TOO LONG.  IT IS GOING TO

10   PROVIDE YOU AN OVERVIEW OF WHAT WE EXPECT THE EVIDENCE TO SHOW,

11   THE PRESENTATION OF OUR CASE.  YOU'VE ALREADY HEARD THE

12   BEGINNING OF THE CASE, BECAUSE THE FIRST THING WE WILL DO WHEN

13   WE BEGIN OUR EVIDENCE, AFTER THIS IS CONCLUDED, THE OPENING

14   STATEMENTS ARE FINISHED, I WILL MOVE INTO EVIDENCE IN THE CASE,

15   THE AGREED STIPULATION WHICH IS -- HAS BEEN AGREED UPON BY ALL

16   PARTIES, WHICH SHOWS THAT THE DEFENDANT WAS SERVING A LIFE

17   SENTENCE FOR HIS WHOLE NATURAL LIFE AT THE TIME HE KILLS LUTHER

18   PLANT.

19             THERE ARE A COUPLE OF THINGS I WANT TO JUST PRESENT

20   TO YOU BEFORE I BEGIN MY PRESENTATION INTO WHAT I BELIEVE THE

21   EVIDENCE WILL SHOW.

22             AT OUR COUNSEL TABLE, SO YOU ARE NOT CURIOUS ABOUT

23   WHO IS HERE AND WHAT'S GOING ON, GLENDA MARTIN IS ONE OF OUR

24   PARALEGALS AND SHE WILL BE OPERATING OUR COMPUTER SYSTEM.  WE

25   WILL BE PRESENTING SOME OF THE EVIDENCE THROUGH THE COMPUTER ON

1   TO THE OVERHEAD THERE SO IT WILL BE MORE CONVENIENT FOR YOU TO

2   SEE.   ALSO THOSE ITEMS WILL BE REPRESENTED WITH ACTUAL HARD

3   ITEMS LIKE A VIDEOTAPE YOU WILL BE ABLE TO HAVE FOR YOU TO

4   REVIEW, IF YOU WISH.   BUT THAT VIDEOTAPE HAS BEEN INCLUDED IN

5   THE PRESENTATION IN THE COMPUTER AND WE WILL SHOW IT THROUGH

6   THAT MEDIUM FOR YOUR REVIEW.

7           JASON FICK IS WITH THE FEDERAL BUREAU OF

8   INVESTIGATION, YOU REMEMBERED HIM THROUGH VOIR DIRE.   PAUL

9   NAMAN IS GOING TO BE ASSISTING ME IN THIS CASE.   HE'S AN

10  ASSISTANT UNITED STATES ATTORNEY.   JOE BATTE HAD TO LEAVE FOR A

11  FEW DAYS ON SOME PERSONAL MATTERS; AND HE, HOPEFULLY, WILL BE

12  BACK IN A FEW DAYS.

13          ALSO ONE OTHER THING IS THE CLOCK IS NOT WORKING

14  RIGHT.   SO I KNOW THAT'S A LOT -- SOMETIMES THAT'S SOMETHING

15  THAT YOU MIGHT LOOK AT AND TRY TO NOTE AS WE PROCEED HERE, BUT

16  IT IS NOT WORKING CORRECTLY.   SO THAT'S NOT SOMETHING TO PAY

17  ATTENTION TO, DON'T RELY ON THAT.

18          THE FIRST THING I AM GOING TO REVIEW WITH YOU ARE THE

19  ELEMENTS WHICH WE TALKED ABOUT IN VOIR DIRE, BECAUSE THESE ARE

20  THE SUBJECT MATTER FOR WHICH WE ARE GOING TO HAVE TO PROVE OUR

21  CASE.

22          THE ELEMENTS, YOU REMEMBER, CONSISTED OF THE

23  DIFFERENT VITAL POINTS IN COUNTS 1, 2 AND 3; AND THE ELEMENTS

24  FOR COUNT 1 INCLUDING THAT THE DEFENDANT UNLAWFULLY KILLED

25  LUTHER PLANT.   SECOND, THIRD AND FOURTH IS THAT THE DEFENDANT

1   KILLED LUTHER PLANT WITH MALICE AFORETHOUGHT AND THE KILLING

2   OCCURRED WHILE THE DEFENDANT WAS CONFINED IN A FEDERAL

3   CORRECTIONAL INSTITUTION UNDER A SENTENCE FOR A TERM OF LIFE

4   IMPRISONMENT.  AND IF THE EVIDENCE RAISES THIS ISSUE THEN WE

5   MUST PROVE THAT THE DEFENDANT WAS NOT ACTING IN SELF-DEFENSE.

6        NOW YOU ALREADY KNOW THAT THE THIRD ELEMENT IS AGREED

7   UPON AND MANY OF THESE ELEMENTS WILL NOT BE ISSUES, I BELIEVE,

8   FOR YOUR PERUSAL.  THE REAL QUESTION WILL BE DID THE DEFENDANT

9   KILL LUTHER PLANT WITH MALICE AFORETHOUGHT AND DID HE ACT IN

10  SELF-DEFENSE OR NOT, IS WHAT I PRESUME WILL BE THE REAL HEARTS

11  OF THE ISSUE FOR COUNT 1.

12       NOW COUNT 2, YOU REMEMBER WE REVIEWED THOSE.  THOSE

13  HAVE SOME DIFFERENT ELEMENTS IN THEM AND THEY CONTRAST A LITTLE

14  BIT WITH COUNT 1.  IT'S THE SAME THAT THE DEFENDANT UNLAWFULLY

15  KILLED LUTHER PLANT; SECOND, THIRD AND FOURTH IS THAT THE

16  DEFENDANT KILLED LUTHER PLANT WITH MALICE AFORETHOUGHT AND

17  THAT'S ALSO THE SAME AS COUNT 1.  BUT THE THIRD ELEMENT, THE

18  KILLING WAS PREMEDITATED OR PLANNED AND THAT THE KILLING TOOK

19  PLACE WITHIN THE TERRITORIAL JURISDICTION OF THE UNITED STATES;

20  AND FINALLY, AGAIN, FOR THIS ELEMENT AS WELL, THAT THE

21  DEFENDANT DID NOT ACT IN SELF-DEFENSE.

22       NOW, AGAIN, SOME ELEMENTS HERE, I BELIEVE, WILL NOT

23  BE IN DISPUTE.  I DON'T THINK THAT IT'S GOING TO BE DEBATED

24  UPON THAT THE KILLING TOOK PLACE ANYWHERE ELSE BUT IN THE

25  TERRITORIAL JURISDICTION OF THE UNITED STATES.  THIS HAPPENED

1    IN THE UNITED STATES PENITENTIARY WHERE THE DEFENDANT WAS AN

2    INMATE AND THE VICTIM, LUTHER PLANT, WAS AN INMATE.

3         THOSE ARE THE ELEMENTS OF COUNTS I AND 2, AND I'M

4    GOING TO PRESENT PROOF RIGHT OFF THE BAT, WE'RE GOING TO GO

5    RIGHT TO THE HEART OF THIS CASE WITH OUR FIRST WITNESS WHO IS

6    CHRISTOPHER MATT.  CHRISTOPHER MATT IS A BUREAU OF PRISONS

7    EMPLOYEE.  HE IS A CORRECTIONAL OFFICER AND HE WAS ON DUTY IN

8    THE RECREATIONAL CAGE ON THE DAY, JULY 5TH, 2001, WHEN THIS

9    HAPPENED.  IN FACT, YOU WILL NOTE, YOU WILL DETERMINE AND YOU

10   WILL SEE THAT HE WAS THE ONLY BUREAU OF PRISONS OFFICIAL AT THE

11   TIME THIS HAPPENED WHO WAS PRESENT.  HE SAW THE DEFENDANT, HE

12   WILL TESTIFY RIGHT THERE THAT HE SAW THE DEFENDANT BEATING

13   LUTHER PLANT UNMERCIFULLY.  HE GRABBED A VIDEO RECORDER AND

14   VIDEOED LUTHER PLANT LAYING IN THE REC CAGE, AND YOU WILL SEE

15   THIS VIDEO, AND YOU SEE LUTHER PLANT DYING.

16        WHEN THIS FIRST HAPPENED, THE DEFENDANT WAS IN CAGE

17   NO. 3.  AND WE WILL SHOW YOU A CHART OF HOW THE RECREATIONAL

18   CAGES ARE ALIGNED IN THIS RECREATIONAL AREA.  THERE ARE SIX

19   CAGES, AND THEY ARE SEPARATED BY A FENCE.  AND THE DEFENDANT

20   LUTHER PLANT AND SOME OTHER INMATES WERE IN RECREATIONAL CAGE

21   NO. 3, ABOUT IN THE MIDDLE OF THIS AREA.  AND THE WAY IT WORKED

22   TO PLACE THE INMATES INTO EACH OF THESE REC CAGES IS THAT ONE

23   AT A TIME WAS PLACED INTO EACH CASE.  AND AFTER FIVE OR SO WERE

24   PLACED IN EACH CAGE, THEY WOULD FILL UP THE NEXT CAGE.  AND

25   THEY BEGAN WITH CAGE 1 FILING INMATES, TWO, AND THEN THERE WERE

1   INMATES IN CAGE 3, INCLUDING THE DEFENDANT AND THE VICTIM.  AND

2   THE INMATES CONTINUED TO BE FILLED INTO THE CAGES UNTIL THE

3   WITNESS, CHRISTOPHER MATT, IS AT THE EDGE OR THE END OF THE

4   AREA IN CAGE 6, THE FARTHEST CAGE.  AND THAT'S WHEN HE HEARD

5   THE SOUNDS BEING MADE FROM CAGE 3, AND HE COULD HEAR GRUNTINGS

6   AND MOANS.  HE APPROACHES CAGE 3 AND THEN SEES THE DEFENDANT

7   BEATING LUTHER PLANT.  THEN THE WITNESS GRABS THE VIDEO

8   RECORDER -- AND THIS TAKES A LITTLE BIT OF TIME, AND THEN WHEN

9   THE RECORDER IS TURNED ON THE BEATING HAS STOPPED.

10        LUTHER PLANT WAS TRANSPORTED TO THE HEALTH FACILITY

11   THERE AND HE WAS ATTENDED TO BY SOME PERSONNEL.  BUT HE HAD

12   FATAL INJURIES; HE HAD SERIOUS INJURIES THAT KILLED HIM.  HE

13   WAS SUBSEQUENTLY TRANSPORTED TO MID-JEFFERSON HOSPITAL BY

14   AMBULANCE WHERE HE WAS PRONOUNCED DEAD AND THE NEXT DAY AN

15   AUTOPSY WAS PERFORMED BY OUR COUNTY MEDICAL EXAMINER, AND YOU

16   WILL HEAR THAT TESTIMONY.

17        IT WAS DETERMINED BY THE COUNTY EXAMINER THAT LUTHER

18   PLANT DIED OF A CRUSHED THROAT AND SEVERE INJURIES TO HIS FACE

19   AND HIS THROAT, AND DIED OF ASPHYXIATION AS WELL.  IN ESSENCE

20   HE DROWNED ON HIS OWN BLOOD.

21        LATER CHRISTOPHER MATT WAS APPROACHED BY THE

22   DEFENDANT A FEW DAYS LATER AND THE DEFENDANT STRUCK UP A

23   CONVERSATION WITH CHRISTOPHER MATT.  AND THIS IS SO IMPORTANT

24   IN THE CASE.  HE TELLS CHRISTOPHER MATT "YOU DIDN'T GET IN

25   TROUBLE, DID YOU?"  AND MATT RESPONDS "NO, WHY WOULD I?"  AND

27

1  HE SAID, "WELL, YOU DIDN'T SEE THE BEGINNING.  BECAUSE I WAITED

2  FOR YOU TO BE DOWN THERE."  AND YOU WILL HEAR MATT BELIEVES

3  WHAT THAT MEANS TO HIM WAS HE WAS DOWN AT THE FAR END OF THE

4  CAGES.

5        AND THEN THE DEFENDANT WENT ON TO SAY, "WELL, THERE'S

6  NOTHING YOU COULD HAVE DONE.  IT WOULD HAVE HAPPENED ANYWAY."

7        HE ALSO TOLD CHRISTOPHER MATT AS WELL AT A DIFFERENT

8  OCCASION THAT YOU KNOW WHAT MY DEFENSE IS GOING TO BE, THE

9  BERNIE CONSPIRACY AFTER THE MOVIE "WEEKEND AT BERNIE'S," IN

10  THAT, LUTHER PLANT WAS ALREADY DEAD AND WAS PLACED IN THE CAGE

11  WITH THE DEFENDANT.

12        THE VIDEO THAT YOU'RE GOING TO SEE IS A DISTURBING

13  ONE AND IT LAST FOR ABOUT 14 MINUTES AND YOU SEE LUTHER PLANT

14  DYING FROM HIS INJURIES AND BEING TREATED BY THE ATTENDING

15  OFFICIALS AT THE BUREAU OF PRISONS.  YOU WILL SEE PHOTOGRAPHS

16  OF THE RECREATIONAL CAGE WHERE THIS EVENT OCCURRED AND YOU WILL

17  BE ABLE TO SEE THE WAY THE CAGES ARE FIXED AND YOU WILL BE ABLE

18  TO SEE THE DISTANCE THAT CHRISTOPHER MATT HAD TO GO TO GET TO

19  THE RECORDER, AND YOU WILL BE ABLE TO NOTE THE LENGTH OF TIME

20  THAT THIS ASSAULT IS OCCURRING.

21        YOU WILL ALSO HEAR TESTIMONY FROM THE BUREAU OF

22  PRISONS OFFICIALS THAT THIS IS A UNITED STATES PENITENTIARY AND

23  IT IS PART OF THE FEDERAL CORRECTIONAL INSTITUTION HERE IN THIS

24  CITY, PART OF THE BUREAU OF PRISONS; AND IT IS OWNED BY THE

25  FEDERAL GOVERNMENT.  THIS HAPPENED ON FEDERAL LAND AND IT IS

1     UNDER THE JURISDICTION OF THE UNITED STATES FEDERAL GOVERNMENT.

2        YOU WILL ALSO HEAR EVIDENCE FROM MARTIAL ARTS

3     EXPERTS.  THERE'S A ROBERT DUGGAN, WHO IS THE LEADING AUTHORITY

4     ON THE MARTIAL ARTS OF HAWA RANG DO, A KOREAN STYLE OF MARTIAL

5     ARTS, HE TAUGHT THE DEFENDANT THAT SKILL.  THE DEFENDANT WENT

6     TO -- ATTENDED A BODY GUARD SCHOOL THAT IS OWNED BY MR. DUGGAN

7     WHERE NOT ONLY HWA RANG DO WAS TAUGHT TO THE STUDENTS LIKE THE

8     DEFENDANT, BUT THE DEFENDANT LEARNED OTHER SKILLS IN

9     SELF-DEFENSE.

10        THE ISSUES, THE KEY ISSUES WILL BE MALICE

11     AFORETHOUGHT AND PREMEDITATION.  AND THE WITNESSES AND THE

12     EVIDENCE WILL SHOW, WITHOUT A DOUBT, THAT THE DEFENDANT, WITH

13     PREMEDITATION AND WITH MALICE AFORETHOUGHT, KILLED LUTHER PLANT

14     IN COLD, COLD BLOOD RUTHLESSLY AND NOT UNDER SELF-DEFENSE.

15        WE LOOK FORWARD TO PRESENTING THIS CASE TO YOU.  AT

16     THE END WE WILL ASK YOU TO GO DELIBERATE AND FIND THE DEFENDANT

17     GUILTY ON BOTH COUNTS 1 AND COUNT 2 OF THIS INDICTMENT.

18        THANK YOU FOR YOUR ATTENTION.

19        THE COURT:  ALL RIGHT, MR. BLACK IF YOU WOULD,

20     PLEASE.

21        MR. BLACK:  THANK YOU, YOUR HONOR.

22        MAY IT PLEASE THE COURT.

23        THE COURT:  YES, SIR.

24        MR. BLACK:  LADIES AND GENTLEMEN OF THE JURY, AT THIS

25     TIME THE COURT GIVES ME AN OPPORTUNITY TO MAKE AN OPENING

1  STATEMENT OR TO MAKE SOME OPENING REMARKS TO YOU.  AND AS THE

2  COURT HAS ALREADY TOLD YOU, ONE OF THE PURPOSES OF AN OPENING

3  STATEMENT IS TO GIVE YOU AN OVERVIEW OF THE ANTICIPATED

4  EVIDENCE AND THE ANTICIPATED ISSUES THAT MAY ARISE IN THIS

5  CASE.  AND THE PURPOSE FOR THAT IS TO HELP PUT YOU IN THE BEST

6  POSSIBLE POSITION AS A JURY TO LISTEN TO THE EVIDENCE SO THAT

7  AT THE CONCLUSION YOU WILL BE ABLE TO MAKE THE CORRECT DECISION

8  IN THIS CASE.

9       NOW, I DO HAVE SOME OPENING REMARKS THAT I WANT TO

10  MAKE TO YOU.  BUT BEFORE I DO MAKE THOSE BRIEF REMARKS, I WANT

11  TO INTRODUCE MR. DOUG BARLOW OVER TO MY LEFT WHO IS SEATED AT

12  COUNSEL TABLE WHO'S AN ATTORY FROM BEAUMONT WHO ALSO IS

13  REPRESENTING MR. AGOFSKY.  MR. AGOFSKY IS SEATED TO MR.

14  BARLOW'S LEFT.  AFTER INTRODUCING HIM, MR. JAY BENNETT IS

15  SEATED AT THE FAR LEFT OF THE TABLE, HE IS AN INVESTIGATOR THAT

16  IS INVOLVED IN WORKING OF THIS CASE.

17       NOW, THE GOVERNMENT HAS ALLEGED THAT MR. AGOFSKY ON

18  JANUARY THE 5TH OF 2001, WILLFULLY, DELIBERATELY IN A

19  PREMEDITATED MANNER WITH MALICE AFORETHOUGHT KILLED MR. LUTHER

20  PLANT.  THE ISSUE IN THIS CASE IS NOT WHETHER MR. LUTHER PLANT

21  DIED ON JANUARY THE 5TH OF 2001, BECAUSE HE DID DIE.  THE ISSUE

22  IN THIS CASE IS NOT WHETHER MR. AGOFSKY WAS SERVING A SENTENCE

23  OF LIFE IMPRISONMENT ON JANUARY THE 5TH, 2001, BECAUSE HE WAS.

24  THE ISSUE IN THIS CASE IS WHAT HAPPENED IN RECREATIONAL CAGE

25  NO. 3 AT 10:30 A.M. IN THE MORNING ON JANUARY THE 5TH, 2001, IN

1    THE BEAUMONT PRISON.  THAT IS THE ISSUE.  THAT IS WHERE YOU

2    SHOULD FOCUS YOUR YOUR ATTENTION AND THAT IS WHERE YOU SHOULD

3    PAY CRITICAL ATTENTION TO THE TESTIMONY OF THE WITNESSES.

4         YOU'VE HEARD THE EXPRESSION "THERE ARE TWO SIDES TO

5    EVERY STORY."  IN THIS CASE THERE'S NO EXCEPTION: THERE ARE

6    CERTAINLY TWO SIDES.

7         AS MR. STEVENS HAS TOLD YOU, I ANTICIPATE THE

8    EVIDENCE WILL SHOW, AND WE AGREE ON THIS ISSUE, THAT ON JANUARY

9    THE 5TH OF 2001, THERE WERE APPROXIMATELY 30 INDIVIDUALS OR 30

10   FEDERAL INMATES IN THE RECREATION AREA AT THE BEAUMONT PRISON.

11   THAT RECREATIONAL AREA WAS BROKEN DOWN OR SUBDIVIDED INTO SIX

12   DIFFERENT CELLS OR CAGES.  EACH CAGE WAS APPROXIMATELY 20 FEET

13   BY 12 FEET IN SIZE.  I ANTICIPATE THE EVIDENCE IS GOING TO SHOW

14   THAT THE FLOOR OF THAT CELL WAS CONCRETE, THAT ALL FOUR SIDES

15   OF THAT RECREATIONAL CAGE WAS CONSTRUCTED OF CYCLONE OR

16   HURRICANE TYPE FENCE, THE TYPE THAT YOU CAN SEE THROUGH, AND

17   THE TOP OF THE CAGE, OR THE CEILING, WAS ALSO CONSTRUCTED OF A

18   CYCLONE-HURRICANE TYPE FENCE; IT WAS A TRUE CAGE.

19        I ANTICIPATE THE EVIDENCE IS GOING TO SHOW THAT THERE

20   WERE FIVE INDIVIDUALS THAT WERE IN RECREATION CAGE NO. 3.

21   THOSE INDIVIDUAL WERE MR. LUTHER PLANT, MR. SHANNON AGOFSKY,

22   MR. RICHARD WARD, MR. ROBERT ECKER AND MR. EARNEST WILLIAMS.

23        NOW, I ANTICIPATE THAT THE GOVERNMENT WILL CALL

24   APPROXIMATELY 20 WITNESSES IN THIS CASE; AND THEY MAY HAVE AS

25   MANY AS 20 EXHIBITS, I DON'T KNOW.  BUT DO NOT EQUATE QUANTITY

1    OF EVIDENCE WITH QUALITY, BECAUSE QUANTITY AND QUALITY ARE TWO

2    DIFFERENT THINGS.  AND ONCE AGAIN, YOUR FOCUS SHOULD BE ON

3    RECREATIONAL CAGE NO. 3 AND WHAT HAPPENED IN THERE.

4         NOW, THE GOVERNMENT HAS THE BURDEN OF PROOF IN THIS

5    CASE.  THEY HAVE TO PROVE THEIR CASE BEYOND A REASONABLE DOUBT,

6    AND THAT'S A VERY HIGH BURDEN.  AND AT THE CONCLUSION OF ALL OF

7    THE EVIDENCE I ANTICIPATE THAT THIS COURT WILL GIVE YOU CERTAIN

8    INSTRUCTIONS AND CERTAIN DEFINITION.  AND I ANTICIPATE THAT ONE

9    OF THE DEFINITIONS THAT THE COURT IS GOING TO GIVE TO YOU IS

10   THE -- IT WILL DEFINE THE TERM "BEYOND A REASONABLE DOUBT."

11   AND I BELIEVE THE COURT WILL INSTRUCT YOU THAT THAT TERM MEANS

12   PROOF OF SUCH A CONVINCING CHARACTER THAT YOU WOULD ACT ON IT

13   WITHOUT HESITATION IN THE MOST IMPORTANT OF YOUR OWN AFFAIRS.

14   I ALSO BELIEVE THE COURT WILL INSTRUCT YOU THAT YOU ARE NOT TO

15   FIND MR. AGOFSKY GUILTY UNLESS EACH AND EVERY ELEMENT OF THE

16   OFFENSE ALLEGED HAS BEEN PROVEN BEYOND A REASONABLE DOUBT.

17        NOW, I AGREE WITH MR. STEVENS THAT REGARDING THE

18   ELEMENTS OF THE OFFENSE FROM A LEGAL STANDPOINT YOUR FOCUS

19   SHOULD BE ON THE PREMEDITATION AND THE MALICE AFORETHOUGHT AND

20   THE DELIBERATE ISSUE.  THAT IS IMPORTANT, AND WE AGREE ON THAT.

21   SO PAY ATTENTION TO THAT PARTICULAR TESTIMONY.

22        I ANTICIPATE THAT THE COURT MAY PERHAPS CALL FEDERAL

23   INMATES TO TESTIFY AGAINST MR. AGOFSKY IN THIS CASE.  I DON'T

24   KNOW IF THEY WILL OR NOT.  BUT IF A FEDERAL INMATE TESTIFIES

25   AGAINST MR. AGOFSKY, I WOULD SUGGEST TO YOU THAT YOU SHOULD ASK

1    YOURSELF SEVERAL THINGS: WHY IS THAT INMATE TESTIFYING?  WHAT

2    BENEFIT IS HE OBTAINING AS A RESULT OF HIS TESTIMONY IN THIS

3    COURTROOM?  WHAT PROMISES HAVE BEEN MADE TO THAT INMATE TO HAVE

4    HIM APPEAR AND TESTIFY AGAINST MR. AGOFSKY?

5            NOW, THIS IS A CASE WHERE DETAILS ARE VERY IMPORTANT.

6    AND IT'S CRITICAL THAT YOU LISTEN TO THE EVIDENCE.  AND I THINK

7    IT IS CRITICAL THAT YOU LISTEN VERY CLOSELY TO THE TESTIMONY OF

8    MR. MATT, THE FIRST WITNESS THAT THE GOVERNMENT, I ANTICIPATE,

9    WILL CALL IN THIS CASE.  YOU LISTEN TO WHAT HE ACTUALLY SAW AND

10   EVEN MORE IMPORTANTLY, YOU LISTEN TO WHAT OFFICER MATT DID NOT

11   SEE.

12           FACTS DECIDE CASES, NOT SPECULATION, NOT CONJECTURE,

13   NOT WHAT IF'S, FACTS; AND YOU'RE THE JUDGES OF THE FACTS IN

14   THIS CASE.

15           NOW, I ANTICIPATE THAT THIS WILL BE A FAIRLY SHORT

16   TRIAL.  I BELIEVE WE WILL CONCLUDE THE TESTIMONY BY THE END OF

17   THIS WEEK.  AND I ANTICIPATE THE EVIDENCE IN THIS CASE WILL NOT

18   PROVE BEYOND A REASONABLE DOUBT THAT MR. AGOFSKY DELIBERATELY,

19   WILLFULLY, WITH PREMEDITATION AND MALICE AFORETHOUGHT KILLED

20   MR. LUTHER PLANT.  I ANTICIPATE THAT AT THE CONCLUSION OF ALL

21   OF THE EVIDENCE, AFTER YOU'VE HEARD ALL OF THE FACTS AND YOU'VE

22   HEARD BOTH SIDES THAT YOU WILL FIND MR. AGOFSKY NOT GUILTY OF

23   THE OFFENSE CHARGED.  AND I LOOK FORWARD TO TRYING THIS CASE

24   BEFORE YOU.

25           THANK YOU.

33

1          THE COURT:  ALL RIGHT, THAT CONCLUDES THE OPENING

2     STATEMENTS.  LET ME REMIND COUNSEL THAT THE RULE HAS BEEN

3     INVOKED AND, IF YOU WOULD, BE SURE THAT WE DON'T HAVE ANY

4     WITNESSES IN THE ROOM WHO MAY BE LINED UP FOR TESTIMONY THIS

5     MORNING; AND WITH THAT, I WILL AUTHORIZE COUNSEL FOR THE UNITED

6     STATES TO CALL YOUR FIRST WITNESS.

7          MR. STEVENS:  YOUR HONOR, BEFORE WE CALL OUR FIRST

8     WITNESS, WE WILL MOVE INTO EVIDENCE -- WE MAKE MOTION TO MOVE

9     INTO EVIDENCE JOINT STIPULATION NO. 1, THE AGREED STIPULATION

10    OF CERTAIN FACTS WHERE IT STATES THAT SHANNON WAYNE AGOFSKY,

11    THE DEFENDANT, WAS CONFINED IN A FEDERAL CORRECTIONAL

12    INSTITUTION UNDER A SENTENCE FOR A TERM OF LIFE IMPRISONMENT

13    FOR HIS NATURAL LIFE AT THE TIME LUTHER PLANT WAS KILLED.

14          MR. BLACK:  NO OBJECTION, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  THE JOINT MOTION STIPULATION

16    AS EXHIBIT 1 IS ADMITTED.

17          MR. STEVENS:  AND WE CALL CHRISTOPHER MATT.

18          CHRISTOPHER MATT, GOVERNMENT'S WITNESS, SWORN

19                    DIRECT EXAMINATION

20    BY MR. STEVENS:

21    Q.    GOOD MORNING, SIR.

22    A.    GOOD MORNING.

23    Q.    TELL US YOUR FULL NAME AND HOW YOU ARE EMPLOYED.

24    A.    CHRISTOPHER RYAN MATT AND I'M EMPLOYED AT THE UNITED

25    STATES PENITENTIARY IN BEAUMONT, TEXAS.

34

1    Q.    HOW LONG HAVE YOU BEEN EMPLOYED THERE, SIR?

2    A.    APPROXIMATELY SIX AND A HALF YEARS.

3    Q.    AND WHAT DO YOU THERE?

4    A.    I'M A CORRECTION OFFICER.

5    Q.    WHAT DOES THAT MEAN?

6    A.    I SUPERVISE INMATES ON A DAILY BASIS.

7    Q.    BEFORE THAT, SIR, WHAT DID YOU DO?

8    A.    I WORKED AT A -- I WAS A CORRECTION OFFICER AT A PRIVATE

9    PRISON IN LOUISIANA.

10   Q.    AND HOW LONG DID YOU WORK THERE?

11   A.    APPROXIMATELY TWO YEARS.

12   Q.    AND WHAT DID YOU DO FOR THAT PRIVATE CORRECTIONAL

13   FACILITY?

14   A.    I SUPERVISED THE INMATES.

15   Q.    AND BEFORE THAT, SIR, HOW WERE YOU EMPLOYED?

16   A.    I WAS IN THE UNITED STATES MARINE CORPS.

17   Q.    HOW LONG WERE YOU IN THE UNITED STATES MARINE CORPS,

18   SIR?

19   A.    FOUR YEARS.

20   Q.    AND DID YOU ENLIST IN THAT?

21   A.    YES, SIR.

22   Q.    AND DID YOU OBTAIN ANY PARTICULAR RANKS, SIR?

23   A.    CORPORAL.

24   Q.    AND AS A CORPORAL WHAT DID YOU -- DID YOU HAVE ANY

25   RESPONSIBILITY IN LEADERSHIP?

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

1   A.      YES, SIR.  I WAS A SQUAD LEADER AND I WAS ALSO A SECTION

2   LEADER.

3   Q.      WHAT DOES THOSE MEAN, SQUAD LEADER AND SECTION LEADER?

4   A.      AS SQUAD LEADER I WAS IN CHARGE OF ONE SQUAD OF ABOUT

5   FOUR OR FIVE MARINES.  AND AS A SECTION LEADER I WAS IN CHARGE

6   OF LIKE ABOUT THREE OR FOUR SQUADS.

7   Q.      AND TODAY ARE YOU STILL WORKING AT THE BUREAU OF PRISONS

8   AS A CORRECTIONAL OFFICER?

9   A.      YES, SIR.

10  Q.      DO YOU KNOW THE DEFENDANT IN THIS CASE, SHANNON WAYNE

11  AGOFSKY?

12  A.      YES, SIR.

13  Q.      DO YOU SEE HIM IN THE COURTROOM TODAY?

14  A.      YES, SIR.

15  Q.      COULD YOU PLEASE POINT HIM OUT, AND FOR THE PURPOSES OF

16  THIS RECORD THAT'S BEING TRANSCRIBED, CAN YOU DESCRIBE WHERE HE

17  IS SEATED AND WHAT HE IS WEARING?

18  A.      HE IS SEATED IN BETWEEN TWO INDIVIDUALS ON THE RIGHT

19  SIDE OF THAT TABLE, AND HE'S WEARING A GREENISH SUIT.

20  Q.      WHAT COLOR HAIR DOES HE HAVE, SIR?

21  A.      BLACK.  DARK BROWN, BLACK HAIR.

22          MR. STEVENS:  YOUR HONOR, FOR PURPOSES OF THE RECORD,

23  WE WOULD ASK THAT IT REFLECT THAT THE WITNESS HAS IDENTIFIED

24  THE DEFENDANT IN THIS CASE, SHANNON WAYNE AGOFSKY.

25          THE COURT:  THE RECORD WILL SO REFLECT THAT THE

1  WITNESS HAS IDENTIFIED THE DEFENDANT MR. AGOFSKY.

2  Q.     (BY MR. STEVENS)  AND HOW HAVE YOU COME TO KNOW THE

3  DEFENDANT?

4  A.     HE WAS AN INMATE AT THE UNITED STATES PENITENTIARY IN

5  BEAUMONT.

6  Q.     AND BEFORE JANUARY 5TH, 2001, HOW LONG HAD YOU KNOWN

7  HIM?

8  A.     APPROXIMATELY EIGHT MONTHS.

9  Q.     DID YOU ASSOCIATE WITH HIM IN PERFORMING YOUR DUTIES ON

10 A DAILY BASIS?

11 A.     YES, SIR.

12 Q.     AND LUTHER PLANT, DID YOU KNOW LUTHER PLANT?

13 A.     YES, SIR.

14 Q.     HOW LONG HAD YOU KNOWN LUTHER PLANT BY JANUARY 5TH,

15 2001?

16 A.     PROBABLY ABOUT THREE YEARS.

17 Q.     AND ALSO DID YOU DEAL WITH HIM ON A DAILY BASIS?

18 A.     YES, SIR.

19 Q.     NOW, ON JANUARY 5TH, 2001, DO YOU REMEMBER AN INCIDENT

20 THAT OCCURRED WHILE YOU WERE ON DUTY WITH THE BUREAU OF

21 PRISONS?

22 A.     YES, SIR.

23 Q.     WHERE WERE YOU ON 2001?  WHAT LOCATION, WHAT BUREAU OF

24 PRISONS FACILITY WERE YOU LOCATED AT?

25 A.     I WAS AT THE UNITED STATES PENITENTIARY IN BEAUMONT,

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

1    TEXAS.

2    Q.      AND IS THAT PART OF FEDERAL CORRECTIONAL INSTITUTION

3    HERE, PART OF THE UNITED STATES BUREAU OF PRISONS, THE

4    DEPARTMENT OF JUSTICE?

5    A.      YES, SIR.

6    Q.      AND IS IT THE FACILITY, A SET OF FACILITIES THAT'S

7    LOCATED NEAR THE AIRPORT HERE IN JEFFERSON COUNTY, WHICH IS IN

8    THE EASTERN DISTRICT OF TEXAS?

9    A.      YES, SIR.

10   Q.      ON THAT DAY, ABOUT WHAT TIME DID THIS OCCURRENCE HAPPEN?

11   A.      APPROXIMATELY TEN, 10:30.

12   Q.      OKAY.  TELL US WHAT YOU WERE DOING AT THAT TIME.

13   A.      I WAS SUPERVISING THE RECREATION AREA IN THE SPECIAL

14   HOUSING UNIT.

15   Q.      OKAY.  TELL US A LITTLE BIT ABOUT THE SPECIAL HOUSING

16   UNIT AND THE RECREATIONAL AREA SO WE ALL KNOW IN OUR MINDS WHAT

17   WE ARE TALKING ABOUT HERE.

18   A.      THE SPECIAL HOUSING UNIT IS WHERE INMATES GO INSIDE

19   PRISON WHENEVER THEY BREAK THE RULES INSIDE OF GENERAL

20   POPULATION, AND THEY'RE LOCKED DOWN PRETTY MUCH 23 HOURS A DAY,

21   WITH ABOUT AN HOUR OF RECREATION A DAY.  AND THE REC AREA, IT'S

22   A REC YARD WHERE THEY RECREATE AT CERTAIN CAGES INSIDE THE

23   SPECIAL HOUSING UNIT.

24   Q.      NOW, IS THIS SOMETHING THAT IF YOU DROVE BY THE FACILITY

25   YOU COULD SEE THE RECREATIONAL AREA?

1    A.      NO, SIR.

2    Q.      WHERE IS IT LOCATED WITHIN THE PENITENTIARY?

3    A.      IT'S TOWARD THE BACK OF THE PENITENTIARY.

4    Q.      BUT IS IT IN THE MIDDLE PORTION SOMEWHERE?

5    A.      NEGATIVE.  IT'S AT THE END.

6    Q.      AND THE RECREATIONAL CAGE DOES IT HAVE A CEILING ON IT

7    LIKE THE CEILING WE SEE IN THIS COURTROOM?

8    A.      NO, SIR, IT'S LIKE A FENCE.  PRETTY MUCH A FENCE, THE

9    CEILING IS LIKE A FENCE.

10   Q.      CAN YOU LOOK UP AND SEE THE SKY?

11   A.      YES, SIR.

12   Q.      OKAY.  ARE THE CAGES DIVIDED OR SEPARATED BY EACH CAGE

13   BY SOME KIND OF MATERIAL?

14   A.      YES, SIR.  IT'S SIX SEPARATE CAGES.  AND THEY ARE EACH

15   SEPARATED BY A FENCE, CHAIN LINK FENCE.

16   Q.      OKAY.  NOW, WHEN INMATES ARE PLACED IN THIS AREA FOR

17   THEIR ONE HOUR OF RECREATION A DAY, HOW IS THAT DONE?  CAN YOU

18   TELL US HOW THEY ARE MOVED INTO THE FACILITY?

19   A.      YEAH.  WE -- IN THE MORNING WHEN I GET THERE, I GO AND

20   ASK WHICH INMATES WANTED TO GO TO REC.  AND THEN I WOULD SIT

21   DOWN AND MAKE A REC LIST, WHICH I PLACE INMATES IN CERTAIN

22   CAGES WHO KNOW HOW TO -- ACCEPTEES WHO CAN GET ALONG WITH EACH

23   OTHER AND DON'T HAVE A PROBLEM WITH EACH OTHER, I WILL SEPARATE

24   THEM IN EACH CAGE.  AND WHAT I DO IS I START WITH CAGE ONE AND

25   OTHER OFFICERS WOULD ESCORT INMATES TO ME AND I WOULD OPEN UP

39

1   THE CAGES AND LET INMATES ONE BY ONE INTO THE CAGE.

2   Q.    HOW MANY INMATES ARE IN EACH CAGE?

3   A.    IT DEPENDS.  IT HOLDS UP TO SIX INMATES.

4   Q.    ON THIS DAY, HOW MANY WERE IN EACH CAGE, DO YOU RECALL?

5   A.    THERE WAS THREE TO SIX INMATES IN EACH CAGE.  NOT EVERY

6   CAGE HAD SIX INMATES IN IT.

7   Q.    OKAY.  WHEN YOU BEGAN TO PUT THE INMATES IN THE CAGE,

8   THEY ARE COMING FROM WHERE?

9   A.    THEY ARE COMING FROM INSIDE THE SPECIAL HOUSING, INSIDE

10  FROM THEIR CELLS.

11  Q.    FROM THEIR CELL?

12  A.    YES, SIR.

13  Q.    AND THEY MOVE DOWN TO THE RECREATIONAL CAGES?

14  A.    YES, SIR.

15  Q.    DO YOU PUT ONE INMATE AT A TIME IN EACH CAGE?

16  A.    YES, SIR.

17  Q.    AND WHICH CAGE DO YOU BEGIN WITH, OR IS IT RANDOM?

18  A.    I USUALLY BEGIN WITH CAGE 1.

19  Q.    AND THEN HOW MANY WILL YOU NORMALLY PUT IN EACH CAGE?

20  A.    YOU TRY TO PUT SIX INMATES IN A CAGE.  BUT SOMETIMES

21  THAT WASN'T POSSIBLE BECAUSE OF, YOU KNOW, YOU DIDN'T WANT TO

22  PUT INMATES THAT YOU KNEW SOMETHING WAS GOING TO HAPPEN OR A

23  FIGHT WAS GOING TO BREAK OUT.  IF YOU KNEW IT, YOU WOULDN'T PUT

24  THOSE TWO INMATES IN THAT CAGE.  SO SOMETIMES THERE WAS THREE

25  TO FOUR INMATES IN A CAGE.

1    Q.    NOW, AFTER YOU PUT THE APPROPRIATE NUMBER IN CAGE 1,

2    WHERE WOULD YOU BEGIN FILLING THE INMATES INTO?

3    A.    I WOULD START ON CAGE 2.

4    Q.    AND THEN IT WOULD PROCEED TO THREE, FOUR, FIVE AND SIX?

5    A.    YES, SIR.

6    Q.    OKAY.  ON THIS DAY DO YOU REMEMBER WHERE THE DEFENDANT

7    WAS?

8    A.    CAGE 3.

9    Q.    AND WHERE WAS LUTHER PLANT?

10   A.    CAGE 3.

11   Q.    AND WERE THERE OTHER INMATES IN CAGE 3 WITH THEM?

12   A.    YES, SIR.

13   Q.    HOW MANY?

14   A.    I BELIEVE THERE WAS THREE OTHER INMATES WITH THEM IN

15   THAT CAGE.

16   Q.    NOW, WHEN THE OFFICERS WOULD BRING THE INMATES TO YOU,

17   WOULD THEY THEN RETURN BACK TO THE CELLS TO GET MORE INMATES?

18   A.    YES, SIR.

19   Q.    OKAY.  DURING THAT PERIOD OF TIME IS THERE ANY OTHER

20   BUREAU OF PRISONS OFFICIAL THERE WITH YOU OTHER THAN YOU?

21   A.    NO, SIR.

22   Q.    AND ON THIS DAY, YOU'RE FILLING ONE THROUGH SIX.  AND

23   THEN DO YOU HEAR ANYTHING UNUSUAL AT ANY TIME AS YOU'RE FILLING

24   THE INMATES UP IN THESE CAGES?

25   A.    NOT AS I'M FILLING THEM UP.  BUT AS SOON AS I FINISHED

1   FILLING UP CAGE 6, I HEARD A THUMPING AND A GRUNTING SOUND.

2   Q.    ALL RIGHT.  I'M GOING TO SHOW YOU WHAT HAS PREVIOUSLY

3   BEEN MARKED AS GOVERNMENT'S EXHIBIT NO. 1.  AND I'M GOING TO

4   ASK YOU IF YOU CAN IDENTIFY THAT, IF YOU RECOGNIZE IT?  AND WE

5   WILL TALK ABOUT WHAT IT IS.

6   A.    ALL RIGHT.

7         MR. STEVENS:  IF I MAY APPROACH THE WITNESS, PLEASE,

8   SIR?

9         THE COURT:  YES, SIR.

10  Q.    (BY MR. STEVENS)  I'M SHOWING YOU A GIGANTIC WHITE

11  CHART.  DO YOU RECOGNIZE THIS?

12  A.    YES, SIR.

13  Q.    IT'S CALLED GOVERNMENT'S EXHIBIT NO. 4.  CAN YOU

14  IDENTIFY IT?

15  A.    YES, SIR.

16  Q.    WHAT IS IT?

17  A.    THAT'S THE RECREATION AREA, RECREATION CAGES IN THE

18  SPECIAL HOUSING UNIT.

19  Q.    AND IS THIS WHERE THE ASSAULT OF LUTHER PLANT OCCURRED,

20  WHERE HE WAS KILLED?

21  A.    YES, SIR.

22  Q.    IS IT A TRUE AND ACCURATE REPRESENTATION OF WHAT IT IS

23  PICTURING?

24  A.    YES, SIR.

25        MR. STEVENS:  YOUR HONOR, WE MOVE INTO EVIDENCE

42

1    GOVERNMENT'S EXHIBIT NO. 1.

2         MR. BLACK:  NO OBJECTION TO THE CHART NO. 1, YOUR

3    HONOR.

4         THE COURT:  GOVERNMENT'S EXHIBIT NO. 1 IS ADMITTED.

5    Q.   (BY MR. STEVENS)  IF I MAY ASK YOU -- I AM GOING TO PUT

6    THIS RIGHT HERE.  YOU MAY WANT TO REFER TO IT.

7         WE WILL ALSO DISPLAY IT FOR THE CONVENIENCE OF THE JURY

8    HERE ON THE VIDEO.  THE OTHER IS AWFULLY TINY THERE.

9         IS THAT A DUPLICATE REPRESENTATION OF WHAT YOU HAVE IN

10   GOVERNMENT'S EXHIBIT 1?

11   A.   YES, SIR.

12   Q.   AND THE UPPER PORTION -- WELL, CAN YOU PLEASE DESCRIBE

13   FROM LEFT TO RIGHT WHAT WE ARE SEEING?

14        OR MAYBE I SHOULD ASK YOU RIGHT TO LEFT, BECAUSE CAGE

15   NO. 1 STARTS ON THE RIGHT SIDE.

16   A.   YES, SIR.  IT'S CAGE 1 THROUGH 6, GOING FROM LEFT TO

17   RIGHT.   THAT'S CAGE 1.

18   Q.   AND THEN?

19   A.   CAGE 2, CAGE 3, CAGE 4, CAGE 5 AND CAGE 6.

20   Q.   ALL RIGHT.  NOW, WHEN THE INMATES ARE BROUGHT IN, THEY

21   FILL UP CAGE 1 FIRST WHERE THE READ MARK IS?

22   A.   YES, SIR.

23   Q.   WHERE DO THEY COME FROM?  WHERE DO THEY ENTER INTO THIS

24   AREA?

25   A.   FROM THE DOOR RIGHT ACROSS FROM CAGE 6.

43

1    Q.    RIGHT THERE (INDICATING)?

2    A.    RIGHT THERE (INDICATING).

3    Q.    OH, GOOD.  THANK YOU.

4          AND IN THIS PARTICULAR CASE, WHAT IS THIS AREA RIGHT

5    HERE (INDICATING)?

6    A.    THAT'S THE WALKWAY WHERE I WOULD STAND AND WHERE THE

7    OFFICERS WOULD ESCORT THE INMATES TO.  AND IT'S THE OFFICERS

8    WALK, BASICALLY WHERE WE STAND TO SUPERVISE THE REC.

9    Q.    AND WHAT IS TO THE RIGHT OF THOSE LITTLE CIRCLE AREAS?

10   A.    THAT'S THE REC DOOR CAGES.  THAT'S THE GATES TO WHERE I

11   PUT THE INMATES INSIDE.

12   Q.    THAT'S HOW THEY GET INTO THE CAGES?

13   A.    YES, SIR.

14   Q.    ALL RIGHT.  AND THEN YOU THEN FUNCTION ALONG THIS AREA

15   THEN RIGHT HERE (INDICATING)?

16   A.    YES, SIR.

17   Q.    AND THE INMATES ARE ON THE OTHER SIDE IN EACH OF THESE

18   CAGES SEPARATED BY THE FENCE --

19   A.    YES, SIR.

20   Q.    -- FROM YOU.  OKAY.

21         WHAT IS THIS AREA RIGHT THERE (INDICATING)?

22   A.    THAT'S THE INSIDE OF THE SPECIAL HOUSING UNIT, THE

23   OFFICE, THE OFFICERS' STATION WHERE THEY'VE GOT -- WHERE THEY

24   HAVE -- THERE IS GLASS RIGHT HERE TO WHERE YOU COULD PRETTY

25   MUCH SEE OUTSIDE INTO THE REC YARD.

44

1   Q.    ON THIS DAY YOU ARE THE ONLY OFFICER THAT'S OUT THERE,

2   EXCEPT WHEN THE CORRECTIONAL OFFICERS WOULD ESCORT THE INMATES

3   IN?

4   A.    YES, SIR.

5   Q.    AND WHICH CAGE IS THE DEFENDANT AND LUTHER PLANT IN?

6   A.    CAGE 3.

7   Q.    ON THAT DAY HAD YOU SENSED ANY PROBLEM BETWEEN LUTHER

8   PLANT OR THE DEFENDANT?

9   A.    NO, SIR.

10  Q.    DID YOU SENSE ANY HOSTILITY BETWEEN THEM IN ANY WAY AT

11  THIS TIME?

12  A.    NO, SIR.

13  Q.    LUTHER PLANT, ON THAT DAY, WAS HE ACTING STRANGE?

14  A.    NO, SIR.

15  Q.    ALL RIGHT.  WHERE ARE YOU WHEN YOU HEAR THE FIRST

16  NOISES?

17  A.    APPROXIMATELY RIGHT HERE (INDICATING).

18  Q.    ALL RIGHT, I'LL JUST -- IS THAT ABOUT RIGHT

19  (INDICATING)?

20  A.    A LITTLE CLOSER TO THE CAGE.  ABOUT RIGHT HERE

21  (INDICATING).

22  Q.    I'M GETTING THERE.  SOMEWHERE AROUND THERE (INDICATING)?

23  A.    YEAH, MAYBE A LITTLE CLOSER TO THE REC DOOR CAGE ITSELF.

24  SOMEWHERE AROUND THERE.  SOMEWHERE AROUND THERE.

25  Q.    WHAT DID YOU HEAR?

45

1    A.    I HEARD -- THE REC YARD GOT QUIET, REAL QUIET.  AND I

2    HEARD A THUMPING SOUND AND A GRUNTING SOUND.

3    Q.    WHAT DID YOU DO WHEN YOU HEARD THAT?

4    A.    I PROCEEDED TOWARD THE SOUND TO FIND OUT WHERE IT WAS

5    COMING FROM.

6    Q.    OKAY.  CAN YOU SHOW US WITH THE LASER PEN WHAT YOU DID?

7    A.    I STARTED ABOUT RIGHT HERE (INDICATING) AND THEN I

8    WALKED OVER HERE.  AND WHEN I GOT TO ABOUT RIGHT HERE

9    (INDICATING), I COULD SEE INMATE AGOFSKY PRETTY MUCH STOMPING

10   WITH HIS FOOT, COMING STRAIGHT DOWN ON ANOTHER INMATE.

11   Q.    HOW LONG HAD IT TAKEN YOU TO GET FROM 6 TO THIS PORTION

12   AT ABOUT CAGE 4?

13   A.    APPROXIMATELY 9 SECONDS.

14   Q.    DURING THAT TIMFE COULD YOU HEAR ANYTHING OR SEE

15   ANYTHING AS YOU WERE WALKING CLOSER TOWARDS THE SOUNDS?

16   A.    I COULD STILL HEAR IT, BUT I DIDN'T SEE NOTHING UNTIL I

17   GOT TO THAT SPOT RIGHT HERE (IDICATING).

18   Q.    OKAY.  BUT YOU COULD HEAR SOMETHING?

19   A.    YEAH, I COULD STILL HEAR IT; YES, SIR.

20   Q.    WHAT COULD YOU HEAR?

21   A.    A GRUNTING SOUND.

22   Q.    WHEN YOU GOT TO THIS POINT, DID YOU SEE ANYTHING?

23   A.    YES, SIR.

24   Q.    AND THAT WAS WHEN YOU SAID YOU SAW THE DEFENDANT HITTING

25   LUTHER PLANT OR AN INMATE?

46

1  A.    YES, SIR.

2  Q.    CAN YOU DESCRIBE WHAT YOU SAW THE DEFENDANT DOING, HOW

3  WAS HE STRIKING THIS INMATE?

4  A.    HE WAS STRIKING -- HE WAS STANDING OVER HIM AND HE WAS

5  LIFTING HIS FOOT UP AND COMING STRAIGHT DOWN ON THE INMATE'S

6  FACIAL AND NECK AREA.

7  Q.    AND HOW MANY TIMES DID YOU SEE THIS OCCUR?

8  A.    I SAW APPROXIMATELY THREE TO FOUR, FOUR TIMES.  THREE TO

9  FOUR TIMES.

10  Q.    NOW, THE PERSON HE WAS STRIKING, WHAT WERE THEY DOING?

11  A.    JUST HE WAS LAYING DOWN FACE UP ON HIS BACK ON THE

12  GROUND.

13  Q.    WAS HE -- WAS THIS INMATE PUTTING HIS HANDS UP TO DEFEND

14  HIMSELF?

15  A.    NO, SIR.

16  Q.    WAS HE STRIKING BACK AT THE DEFENDANT IN ANY WAY?

17  A.    NO, SIR.

18  Q.    HE WAS JUST TAKING IT?

19  A.    YES, SIR.

20  Q.    WHAT DID YOU DO?

21  A.    I HAD A VIDEO CAMERA WE USE THAT WAS APPROXIMATELY RIGHT

22  HERE SOMEWHERE, THAT I HAD IN CASE AN INCIDENT WOULD HAPPEN TO

23  START VIDEOTAPING.  AND I IMMEDIATELY WENT AND GRABBED THE

24  VIDEOTAPE AND PUT IT ON MY SHOULDER AND CALLED FOR ASSISTANCE

25  IN THE REC YARD AND BEGAN TAPING.

47

1    Q.    AND WHEN YOU BEGAN TAPING WHAT WAS THE DEFENDANT DOING?

2    A.    SOON AS I STARTED TAPING HE HAD ALREADY CEASED HIS

3    ASSAULT, HE CEASED HIS ACTIVITIES.

4    Q.    AND DID YOU VIDEOTAPE WHAT YOU SAW THROUGH THE MACHINE?

5    A.    YES, SIR.

6    Q.    NOW, THERE IS A VIDEOTAPE THAT WE REVIEWED WITH YOU

7    EARLIER THAT LAST ABOUT 14 MINUTES.  DO YOU REMEMBER THAT?

8    A.    YES, SIR.

9    Q.    IS THAT THE VIDEOTAPE THAT YOU VIDEOED WITH THE MACHINE

10   THAT DAY?

11   A.    YES, SIR.

12   Q.    AND IS THAT A TRUE AND ACCURATE REPRESENTATION OF WHAT

13   IT WAS SHOWING?

14   A.    YES, SIR.

15   Q.    AND ESSENTIALLY IS IT SHOWING LUTHER PLANT LAYING ON THE

16   GROUND DYING OF HIS INJURIES?

17   A.    YES, SIR.

18   Q.    AND SUBSEQUENTLY SOME BUREAU OF PRISONS OFFICIALS COME

19   IN AND RETRIEVE HIM AND TAKE HIM TO A HEALTH CENTER?

20   A.    YES, SIR.

21   Q.    AND THEN HE IS ATTENDED THERE AT THE HEALTH CENTER AT

22   THE FACILITY AND THEN LATER TRANSPORTED BY AMBULANCE TO

23   MID-JEFFERSON HOSPITAL?

24   A.    YES, SIR.

25   Q.    OKAY.  FROM THE TIME YOU BEGAN HEARING THE NOISE, THE

1   GRUNTING, TO THE TIME YOU BEGAN VIDEOTAPING, DURING THAT PERIOD

2   OF TIME COULD YOU HEAR THE NOISES CONTINUING TO OCCUR?

3   A.    I COULD HEAR IT UNTIL I PICKED UP THE CAMERA.  AND SOON

4   AS I PICKED THE CAMERA UP AND PLACED IT ON MY SHOULDER HE HAD

5   ALREADY STOPPED.

6   Q.    OKAY.

7   A.    SO IT WAS NO MORE NOISES.

8   Q.    ALL RIGHT.

9         AND THE NOISES THAT YOU WERE -- YOU HEARD, WHAT DID THEY

10  SOUND LIKE?

11  A.    IT WAS A GRUNTING SOUND.

12  Q.    AND HOW LONG DID YOU HEAR THAT?

13  A.    EIGHT, NINE SECONDS.

14  Q.    AT ANY TIME DID YOU SEE LUTHER PLANT STRIKE AT, SWING

15  AT, OR EVEN IN ANY WAY ATTEMPTED TO DEFEND HIMSELF FROM THE

16  BLOWS OF THE DEFENDANT?

17  A.    NO, SIR.

18  Q.    OKAY.  DID YOU ASK FOR SOME HELP TO GET THIS FIGHT

19  STOPPED OR THE DEFENDANT ATTENDED TO OR THE VICTIM ATTENDED TO?

20  A.    YES, SIR.

21  Q.    OKAY.

22        MR. STEVENS:  IF I MAY APPROACH, YOUR HONOR?

23        THE COURT:  YES, SIR.  AND COUNSEL MAY APPROACH AT

24  WILL.

25  Q.    (BY MR. STEVENS)  I'M GOING TO SHOW YOU WHAT HAS BEEN

49

1   PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT NO. 2, IT'S A

2   VIDEOTAPE.  DO YOU RECOGNIZE THAT VIDEOTAPE?

3   A.    YES, SIR.

4   Q.    IS THAT THE VIDEOTAPE THAT YOU MADE ON JANUARY 5TH OF

5   THE CAGE IMMEDIATELY AFTER THE FIGHT ENDED, AND IT'S THE VIDEO

6   OF LUTHER PLANT?

7   A.    YES, SIR.

8   Q.    IS IT A TRUE AND ACCURATE REPRESENTATION OF WHAT YOU

9   WERE SEEING?

10  A.    YES, SIR.

11       MR. STEVENS:  YOUR HONOR, AT THIS TIME WE MOVE INTO

12  EVIDENCE GOVERNMENT'S EXHIBIT NO. 2.

13       MR. BLACK:  NO OBJECTION, YOUR HONOR.  I BELIEVE THIS

14  TO BE THE TAPE THAT'S PREVIOUSLY BEEN PROVIDED TO ME BY THE

15  GOVERNMENT.  WE HAVE REVIEWED IT AND HAVE NO OBJECTION TO ITS

16  ADMISSIBILITY.

17       THE COURT:  GOVERNMENT'S EXHIBIT 2 IS ADMITTED.

18  Q.    (BY MR. STEVENS)  AND IN THIS VIDEO THERE IS NO SOUND.

19  YOU JUST SEE THE VIDEO AND WE WILL ASK YOU SOME QUESTIONS FROM

20  TIME TO TIME AS THIS VIDEO PROCEEDS FOR CLARIFICATION.

21       MR. STEVENS:  YOUR HONOR, AT THIS TIME --

22       THE COURT:  DO YOU NEED THE LIGHTS LOWERED OR DO YOU

23  WANT THEM AS IS?

24       MR. STEVENS:  IT MIGHT BE A GOOD IDEA TO DIM THEM

25  JUST A LITTLE BIT, YOUR HONOR.  THANK YOU.

50

1           THE COURT:  CAN YOU OPERATE AS IS?

2           MR. STEVENS:  YES, SIR, THAT'S FINE.

3           THE COURT:  GO AHEAD, MR. STEVENS.

4           MR. STEVENS:  THANK YOU.

5               (VIDEO BEING PLAYED)

6    Q.    (BY MR. STEVENS)  IN THE FOREGROUND, WHO IS THAT IN THE

7    ORANGE COVERALLS THAT YOU SAW?

8    A.    THE ONE STANDING UP?

9    Q.    YES, SIR..

10   A.    THAT'S INMATE AGOFSKY.

11   Q.    HE IS -- IT APPEARED AS THOUGH HE WAS PICKING AT

12   SOMETHING ON HIS ARM.  DID YOU NOTICE THAT?

13   A.    YES, SIR.

14   Q.    NOW, LAYING ON THE GROUND YOU SEE IS WHO?

15   A.    THAT'S INMATE PLANT.

16   Q.    COULD YOU RECOGNIZE HIM AT THE TIME?

17   A.    NO, SIR.  NOT WHEN I FIRST SAW IT I DIDN'T KNOW WHO IT

18   WAS.

19   Q.    WHY NOT?

20   A.    BECAUSE I COULDN'T TELL BECAUSE HIS FACE WAS FULL OF

21   BLOOD AND IT WAS -- YOU JUST COULDN'T TELL WHO IT WAS.  HIS

22   FACE WAS REAL MESSED UP.

23   Q.    RIGHT NOW THERE ARE SOME INMATES CROSSING OVER.  WHAT IS

24   GOING ON HERE CROSSING IN FRONT OF THE SCREEN?

25   A.    WELL, THEY'VE GOT STAFF OUT THERE.  AND WHAT WE'RE DOING

51

1  IS ORDERING INMATE AGOFSKY TO CUFF UP SO THEY CAN COME IN THE

2  CAGE AND PUT HANDCUFFS ON HIM.

3  Q.    ARE THEY ALLOWED BY PROCEDURE TO GO IN AND JUST GET HIM

4  IMMEDIATELY WITH THE INMATES IN THERE?

5  A.    NO, SIR, NOT UNLESS YOU'VE GOT ENOUGH STAFF WITH YOU.

6  AND THERE'S OTHER INMATES IN THERE, SO IT WOULDN'T BE A GOOD

7  IDEA TO GO IN THERE AND JUST TRY TO GET ALL OF THE INMATES

8  WITHOUT DOING RESTRAINING, RESTRAINT.

9  Q.    NOW, RIGHT NOW WE SEE LUTHER PLANT LAYING ON THE GROUND.

10 DID HE SEEM -- DID HE APPEAR TO BE INJURED?

11 A.    YES, SIR.

12 Q.    DID HIS INJURIES APPEAR TO BE SERIOUS?

13 A.    YES, SIR.

14 Q.    THE DEFENDANT, DID HE APPEAR IN ANY WAY TO BE INJURED?

15 A.    NO, SIR.

16 Q.    NOW, THESE PEOPLE HERE, WHO ARE THEY?

17 A.    THOSE ARE THE OTHER STAFF MEMBERS AND OFFICERS AT UNITED

18 STATES PENITENTIARY, BEAUMONT.

19 Q.    NOW, THE LADY WHO IS ON THE FAR SIDE, DO YOU KNOW WHO

20 SHE IS?

21 A.    THAT'S MS. HIGHLAND.

22 Q.    AND WHO IS SHE?

23 A.    SHE IS A NURSE.

24 Q.    AND WHERE ARE THEY GOING NOW?

25 A.    BRINGING HIM TO THE EMERGENCY ROOM INSIDE THE MEDICAL

1    DEPARTMENT INSIDE THE PENITENTIARY.

2    Q.    HOW WERE YOU ABLE TO DETERMINE WHO THAT WAS?

3    A.    BY PROCESS OF ELIMINATION FROM THE OTHER INMATES THAT

4    WERE IN THE CAGE.

5    Q.    NOW, THE LADY ON THE FAR SIDE WITH THE BLOND HAIR, WHO

6    IS SHE?

7    A.    THAT'S MS. ROSS.

8    Q.    AND WHO IS SHE, WHAT DOES SHE DO THERE?

9    A.    SHE WAS ALSO A NURSE.  SHE'S ALSO A NURSE.

10   Q.    DURING THE TIME THAT YOU WERE VIDEOING THIS, DID IT

11   APPEAR TO YOU THAT LUTHER PLANT SPOKE OR SAID ANYTHING?

12   A.    NO, SIR, HE DIDN'T SAY ANYTHING.

13   Q.    THIS GENTLEMAN THERE WITH THE GRAY HAIR, WHO IS HE?

14   A.    I DON'T REMEMBER HIS NAME.  BUT HE WAS ONE OF THE

15   DOCTORS THAT WAS WORKING THERE.  I DON'T REMEMBER WHAT HIS NAME

16   WAS.

17   Q.    NOW, DOES IT APPEAR TO YOU THAT THEY ARE GIVING HIM CPR?

18   A.    YES, SIR.

19   Q.    CARDIOPULMONARY RESUSCITATION HERE.

20   A.    YES, SIR.

21   Q.    THIS PARTICULAR TAPE GOES FOR ABOUT ANOTHER FIVE MORE

22   MINUTES.  BUT DO WE SEE THE MEDICAL PERSONNEL CONTINUING TO

23   ATTEND TO LUTHER PLANT AND TRY TO SAVE HIM?

24   A.    YES, SIR.

25   Q.    OKAY.  WAS LUTHER PLANT SHORTLY THEREAFTER TRANSFERRED

53

1   TO MID-JEFFERSON HOSPITAL?

2   A.     YES, SIR.

3          MR. STEVENS:   ALL RIGHT.  I THINK THAT IS ENOUGH FOR

4   THE VIDEO PRESENTATION.

5                          (END OF VIDEO)

6   Q.     (BY MR. STEVENS)  NOW, DID YOU GO BACK AND AFTER THIS,

7   AFTER THE RECORDING WAS DONE, DID YOU GO BACK TO CHECK THE AREA

8   AND DO ANY OTHER TYPE OF INVESTIGATION OR GO BACK ABOUT YOUR

9   JOB DUTIES OR WHAT?

10  A.     YES, SIR.  I WENT BACK TO BEGIN THE INCIDENT REPORT,

11  STARTED WRITING THE INCIDENT REPORT.

12  Q.     DID YOU GO CHECK THE RECREATIONAL CAGES AS WELL?

13  A.     YES, SIR.

14  Q.     OKAY.  NOW, I SAW ON THE VIDEO AND WE SAW ON THE VIDEO

15  THE DEFENDANT DOING SOMETHING WITH HIS ARM.  DO YOU KNOW WHAT

16  THAT WAS ALL ABOUT?

17  A.     HE HAD A MARK ON IT, ON HIS FOREARMS, A LITTLE SCRATCH

18  OR LIKE A LITTLE HOLE OR SOMETHING.

19  Q.     I'M GOING TO SHOW YOU SOME PHOTOGRAPHS WHICH ARE MARKED

20  GOVERNMENT'S EXHIBITS 3, 4, 5, 6, 7 AND 8.  CAN YOU IDENTIFY

21  THOSE, SIR?

22  A.     YES, SIR.

23  Q.     ARE EACH OF THEM TRUE AND ACCURATE REPRESENTATIONS OF

24  WHAT THEY ARE SHOWING?

25  A.     YES, SIR.

54

1    Q.    AND ARE YOU FAMILIAR WITH WHAT THEY ARE PICTURING?   DO

2    THEY SHOW SOMETHING THAT YOU SAW AND WITNESSED --

3    A.    YES, SIR.

4    Q.    -- REGARDING THIS PARTICULAR INCIDENT?

5    A.    YES, SIR.

6         MR. STEVENS:  YOUR HONOR, WE MOVE INTO EVIDENCE

7    GOVERNMENT'S EXHIBITS 3 THROUGH 8.

8         MR. BLACK:  IF I COULD EXAMINE THOSE BRIEFLY, YOUR

9    HONOR.

10        THE COURT:  ANY OBJECTION?

11        MR. BLACK:  IF I MAY EXAMINE THEM BRIEFLY, YOUR

12   HONOR.

13        THE COURT:  OH, EXCUSE ME.

14        MR. BLACK:  NO OBJECTION, YOUR HONOR.

15        THE COURT:  ALL RIGHT, GOVERNMENT'S EXHIBITS 3, 4, 5,

16   6, 7 AND 8 ARE ADMITTED.

17   Q.    (BY MR. STEVENS)  THIS IS GOVERNMENT'S EXHIBIT NO. 3,

18   WHAT IS THIS SHOWING?

19   A.    THAT'S INMATE AGOFSKY.

20   Q.    AND WAS THIS A PHOTOGRAPH OF HIM AT OR NEAR THE TIME OF

21   THIS EVENT?

22   A.    YES, SIR.

23   Q.    THE NEXT PHOTOGRAPH IS GOVERNMENT'S EXHIBIT NO. 4.  AND

24   IS THAT ALSO SHOWING THE DEFENDANT?

25   A.    YES, SIR.

1    Q.    AND ON HIS RIGHT ARM, IF WE CAN ZOOM IN TO THE RIGHT

2    FOREARM.

3          THAT WOULD BE THE OTHER RIGHT -- RIGHT THERE.

4          IS THERE A LITTLE PUNCTURE WOUND RIGHT THERE AT THE

5    BOTTOM OF THE FOREARM?

6    A.    YES, SIR.

7    Q.    THE ARROW, IS IT WHERE THE ARROW IS LOCATED?

8    A.    YES, SIR.

9    Q.    OKAY.  ALL RIGHT.

10         AND NEXT GOVERNMENT'S EXHIBIT NO. 5, WHAT IS THIS

11   SHOWING, SIR?

12   A.    THAT'S THE RECREATIONAL AREA INSIDE THE SPECIAL HOUSING

13   UNIT.

14   Q.    OKAY.  NOW, WHERE THIS PHOTOGRAPHER WOULD BE, CAN YOU

15   TELL US WHERE THIS LOCATION IS WHERE THIS PHOTOGRAPHER IS

16   STANDING?

17   A.    THAT'S IN FRONT OF CAGE 6.

18   Q.    WOULD THAT BE ABOUT THE PLACE THAT YOU BEGAN HEARING THE

19   NOISES?

20   A.    YES, SIR, THAT'S APPROXIMATELY ABOUT WHERE I WAS AT.

21   Q.    THEN YOU WOULD BE -- AS YOU WALKED TOWARD THE NOISES,

22   THAT WOULD BE THIS WALKWAY TOWARD THOSE MEN WHO ARE AT THE FAR

23   SIDE?

24   A.    YES, SIR.

25   Q.    ALL RIGHT.  NEXT, GOVERNMENT'S EXHIBIT 6.  AND DOES THIS

1    APPEAR TO BE THE OTHER END OF THE WALKWAY?

2    A.    YES, SIR.

3    Q.    AND THE PHOTOGRAPHER, WHERE WOULD HE BE STANDING, ABOUT

4    CAGE NUMBER WHAT?

5    A.    ABOUT PROBABLY RIGHT BETWEEN CAGE 1 AND 2.

6    Q.    ALL RIGHT.  NOW, THE MEN THAT ARE PICTURED IN THE

7    PICTURE, WHERE ARE THEY STANDING, ADJACENT TO WHAT CAGE?

8    A.    CAGE 3.

9    Q.    ALL RIGHT, NEXT EXHIBIT.  I BELIEVE THAT'S GOING TO BE

10   EXHIBIT 7.  AND WHAT IS THIS SHOWING, SIR?

11   A.    THAT'S THE INSIDE OF CAGE 3.

12   Q.    OKAY.  AND THE LIQUID THAT WE SEE, DOES THAT APPEAR TO

13   BE BLOOD --

14   A.    YES, SIR.

15   Q.    -- AND FLUID?

16   A.    YES, SIR.

17   Q.    AND WE SEE TWO SHOES AS WELL?

18   A.    YES, SIR.

19   Q.    ARE THOSE THE SHOES THAT THE INMATES ARE GIVEN IN THE

20   S.H.U.?

21   A.    YES, SIR.

22   Q.    THE SPECIAL HOUSING UNIT?

23   A.    YES, SIR.

24   Q.    AND IS THIS -- FROM WHAT YOU SAW AND WHAT YOU KNOW, IS

25   THAT THE BLOOD OF LUTHER PLANT THE VICTIM?

57

1   A.      YES, SIR.

2   Q.      DID IT APPEAR TO BE A LOT OF BLOOD THERE?

3   A.      YES, SIR.

4   Q.      NEXT EXHIBIT.

5           THIS IS ANOTHER PHOTO OF THAT CAGE, RIGHT?

6   A.      YES, SIR, SAME CAGE.

7   Q.      I THINK THAT'S IT, ISN'T IT, FOR THOSE EXHIBITS.

8           NOW, SIR, LET'S -- THAT DAY DID YOU HAVE A CHANCE TO

9   TALK TO THE DEFENDANT?

10  A.      NO, SIR, NOT THAT DAY.

11  Q.      OKAY.  AT ANY TIME SUBSEQUENT TO JANUARY 5TH DID THE

12  DEFENDANT TALK TO YOU ABOUT THIS EVENT?

13  A.      YES, SIR.

14  Q.      WHEN?

15          THE COURT:  MR. STEVENS, AT THIS POINT WE'RE GOING TO

16  TAKE A VERY SHORT BREAK BEFORE YOU GET INTO THAT NEXT SUBJECT.

17          MR. STEVENS:  OKAY.

18          THE COURT:  AS I SAID TO YOU EARLIER, MEMBERS OF THE

19  JURY, WE TAKE A BRIEF MORNING BREAK AND A BRIEF AFTERNOON BREAK

20  SO YOU CAN GET UP AND MOVE AROUND.  FIFTEEN MINUTES.

21              (RECESS AT 10:55 A.M. UNTIL 11:10 A.M.)

22                      (JURY OUT)

23          THE COURT:  ALL RIGHT.  BRING THE JURY IN.

24          MR. BLACK:  YOUR HONOR, BEFORE THE JURY COMES IN WE

25  HAVE ONE BRIEF MATTER TO TAKE UP.

1          THE COURT:  ALL RIGHT, MR. BLACK.

2          MR. BLACK:  YES, YOUR HONOR.

3          FOR PURPOSES OF THE RECORD, OUTSIDE THE PRESENCE OF

4   THE JURY, THE DEFENDANT WOULD LIKE TO REURGE THE PREVIOUS

5   MOTION THAT HAS BEEN MADE REGARDING THE ISSUE OF THE ADMISSION

6   OF THE STATEMENTS THAT WERE ALLEGEDLY MADE BY THE DEFENDANT IN

7   THIS CASE.  DEFENDANT IS AWARE OF THE PREVIOUS COURT'S RULING

8   THAT THEY ARE ADMISSIBLE, BUT WOULD REURGE OUR OBJECTION AT

9   THIS TIME IN ORDER TO RESERVE THE APPELLATE POINT, YOUR HONOR.

10         THE COURT:  OKAY.  MR. STEVENS, RESPONSE.

11         MR. STEVENS:  NO RESPONSE, YOUR HONOR, THE COURT'S

12  MADE ITS RULE AND WE HONOR THAT.

13         THE COURT:  REMEMBER THAT IT HAD BEEN ENTERED ON

14  UNDER THE SUPPRESSION HEARING AND I THINK IT WAS ON A

15  CONSTITUTIONAL BASIS, BUT WE HAD NOT GONE OVER THE

16  ADMISSIBILITY FROM THE EVIDENCE STANDPOINT.

17         IS THAT CORRECT, MR. BLACK?

18         MR. BLACK:  I THINK THAT'S CORRECT IN REGARD TO THE

19  LETTERS THAT MAY BE REFERRING TO.  BUT I'M REFERRING

20  SPECIFICALLY TO THE STATEMENTS, THE VERBAL STATEMENTS THAT WERE

21  MADE BY MR. AGOFSKY TO THIS OFFICER.  WE'VE PREVIOUSLY FILED A

22  MOTION TO SUPPRESS, HAD A HEARING, WE'RE JUST RENEWING OUR

23  OBJECTION AT THIS TIME.

24         THE COURT:  NO FURTHER RESPONSE?

25         MR. STEVENS:  NO.

1            THE COURT:  ALL RIGHT, YOUR MOTION IS OVERRULED, YOUR

2    OBJECTION IS OVERRULED.

3            ALL RIGHT, BRING THE JURY IN.

4                    (JURY IN AT 11:15 A.M.)

5            THE COURT:  ALL RIGHT, BE SEATED, PLEASE; AND, MR.

6    STEVENS, YOU MAY PROCEED.

7    Q.    (BY MR. STEVENS)  MR. MATT, I WAS ASKING YOU ABOUT

8    STATEMENTS THE DEFENDANT MAY HAVE MADE TO YOU ON THAT DAY.  AND

9    I THINK YOU SAID HE DIDN'T MAKE ANY STATEMENTS TO YOU?

10   A.    NO, SIR.

11   Q.    LATER, AFTER THAT DAY, DID THE DEFENDANT APPROACH YOU

12   AND MAKE ANY STATEMENTS TO YOU CONCERNING THIS EVENT?

13   A.    YES, SIR.

14   Q.    HOW MANY TIMES, ON HOW MANY OCCASIONS DID HE TALK TO

15   YOU?

16   A.    TWICE.

17   Q.    ALL RIGHT.  LET'S TALK ABOUT THE FIRST ONE.  WHEN DID

18   THAT OCCUR?

19   A.    IT WAS THE NEXT DAY.

20   Q.    WHERE DID IT OCCUR?

21   A.    INSIDE THE SPECIAL HOUSING UNIT.

22   Q.    AND TELL US WHAT YOU WERE DOING WHEN THIS HAPPENED, WHEN

23   THIS STATEMENT WAS MADE?

24   A.    I WAS WALKING THE RANGES.  THE RANGES ARE WHERE ALL OF

25   THE CELLS ARE AT.

60

1    Q.    AND THE CELLS, HOW ARE THE CELLS CONSTRUCTED?  I MEAN

2    ARE THEY ENCLOSED?

3    A.    YES.  THEY ENCLOSE THE -- IT'S A DOOR AND THEY HAVE A

4    GLASS WINDOW.

5    Q.    AND CAN THE INMATES SPEAK TO YOU IN THE RANGE?

6    A.    YES, SIR.

7    Q.    HOW DO THEY DO THAT?

8    A.    THEY JUST TALK THROUGH THE DOOR.  THEY'VE GOT SOME

9    LITTLE HOLES IN THERE OR THROUGH THE CRACK OF THE DOOR.

10   Q.    CAN YOU HEAR PRETTY CLEARLY?

11   A.    YES, SIR.

12   Q.    ALL RIGHT.

13         SO, YOU'RE SAYING THE NEXT DAY --

14   A.    YES, SIR.

15   Q.    -- YOU'RE ON THE RANGE, AND WHAT HAPPENS?

16   A.    HE ASKED ME WHAT I THOUGHT HIS DEFENSE WAS GOING TO BE,

17   AND I SAID, "NO, WHAT?" AND HE SAID THE BERNIE CONSPIRACY.  AND

18   HE SAID THAT WE HAD BROUGHT INMATE PLANT, HE WAS ALREADY DEAD

19   WHEN WE BROUGHT HIM OUT THERE AND PLACED HIM IN THE REC YARD.

20   Q.    OKAY.  NOW, BERNIE CONSPIRACY, WHAT DID YOU TAKE BERNIE

21   CONSPIRACY TO MEAN?

22   A.    PERTAINING TO THE MOVIE "WEEKEND AT BERNIE'S."

23   Q.    HAVE YOU EVER SEEN THAT MOVIE?

24   A.    YES, SIR.

25   Q.    AND WHAT IS THE STORY LINE OF THAT MOVIE?

61

1   A.      IT'S TWO GUYS PRETTY MUCH CARRY AROUND A DEAD GUY ALL

2   WEEKEND TO MAKE PEOPLE BELIEVE THAT HE'S ALIVE.

3   Q.      DID HE SAY ANYTHING ABOUT SELF-DEFENSE TO YOU?

4   A.      NO, SIR.

5   Q.      DID HE SAY ANYTHING ABOUT SELF-DEFENSE TO YOU AT ANY

6   TIME?

7   A.      NO, SIR.

8   Q.      FROM JANUARY 5TH, 2001, UNTIL TODAY?

9   A.      NO, SIR.

10  Q.      OKAY.  WAS ANYTHING MORE SAID ON THAT OCCASION?

11  A.      NO, SIR.

12  Q.      THAT WAS HIS DEFENSE, THE BERNIE CONSPIRACY?

13  A.      YES, SIR.

14  Q.      YOU ALL BROUGHT LUTHER PLANT, WHO HAD ALREADY BEEN

15  KILLED, AND THREW HIM INTO THE CAGE?

16  A.      YES, SIR.

17  Q.      ALL RIGHT.  DID YOU HAVE ANOTHER OCCASION WHERE HE SPOKE

18  TO YOU?

19  A.      YES, SIR.

20  Q.      WHEN WAS THAT?

21  A.      THAT WAS IN THE FOLLOWING WEEKS IN THE RECREATION CAGE.

22  Q.      AND YOU WERE LOCATED WHERE?

23  A.      IN THE SPECIAL HOUSING UNIT, IT'S OUTSIDE ON THE REC

24  YARD.

25  Q.      WOULD THIS HAVE OCCURRED IN THE SAME LOCATION WHERE

62

1    LUTHER PLANT WAS KILLED?

2    A.      APPROXIMATELY.

3    Q.      OKAY.  ON THIS OCCASION WHAT WAS HAPPENING?  HOW DID

4    THIS STATEMENT GET MADE?

5    A.      HE WAS IN THE RECREATION CAGE, AND I WAS OUTSIDE THE

6    RECREATION CAGE SUPERVISING RECREATION.

7    Q.      NOW, WHEN YOU SAY "HE," YOU'RE TALING ABOUT --

8    A.      INMATE AGOFSKY.

9    Q.      -- THE DEFENDANT?

10   A.      YES, SIR.

11   Q.      AND THAT WAS THE SAME MAN WHO TOLD YOU IT WAS THE BERNIE

12   CONSPIRACY WAS HIS DEFENSE, THE DEFENDANT?

13   A.      YES, SIR.

14   Q.      OKAY.  ON THIS SECOND OCCASION, WHAT DID HE SAY TO YOU?

15   A.      HE ASKED IF I HAD GOT IN TROUBLE, AND I RESPONDED "WHY

16   WOULD I?"  AND HE SAID BECAUSE I DIDN'T SEE THE FIRST BLOWS

17   BECAUSE HE WAITED FOR ME TO GET TO THE END.

18   Q.      HE WAITED FOR YOU TO GET TO THE END?

19   A.      YES, SIR.

20   Q.      WHAT DID YOU TAKE THAT TO MEAN?

21   A.      MEANING HE WAITED FOR ME TO GET TO THE END OF THE REC

22   YARD BEFORE HE STARTED HIS ASSAULT.

23   Q.      WHEN YOU SAY EARLIER IN YOUR TESTIMONY YOU WERE AT THE

24   FAR END NEAR CAGE NO. 6 --

25   A.      SIX, YES, SIR.

1   Q.      -- AND THE DEFENDANT WAS IN CAGE NO. 3?

2   A.      YES, SIR.

3   Q.      IS THAT WHAT YOU'RE TALKING ABOUT?

4   A.      YES, SIR.

5   Q.      DID HE SAY ANYTHING ELSE TO YOU?

6   A.      YEAH.  HE SAID IF I WAS STANDING RIGHT THERE IT WAS

7   NOTHING WE COULD HAVE DONE ABOUT IT ANYWAY, IT STILL WOULD HAVE

8   HAPPENED.

9   Q.      THERE'S NOTHING YOU WOULD HAVE BEEN ABLE TO DO, IT STILL

10  WOULD HAVE HAPPENED?

11  A.      YES, SIR.

12  Q.      AND WHAT DID YOU TAKE THAT TO MEAN?

13  A.      THAT EVEN IF WE WERE INSIDE THE CAGE, WE COULDN'T HAVE

14  STOPPED HIM FROM DOING WHAT HE WAS DOING.

15  Q.      WHY?

16  A.      BECAUSE HE WAS GOING TO DO IT ANYWAY.

17  Q.      AND "BECAUSE I WAITED FOR YOU TO BE DOWN THERE," WHAT

18  DOES THAT MEAN TO YOU?

19  A.      THAT HE WAITED FOR ME TO GET DOWN TO THE END OF THE REC

20  YARD SO I WOULDN'T SEE WHAT WAS HAPPENING.

21  Q.      WAS ANYTHING ELSE SAID --

22  A.      NO, SIR.

23  Q.      -- BY HIM ABOUT THIS EVENT?

24  A.      NO, SIR.

25  Q.      OKAY.  ON JANUARY 5TH, 2001, IMMEDIATELY AFTER THE

1  DEFENDANT HAD STOPPED STRIKING LUTHER PLANT -- WE SAW IT ON THE

2  VIDEO -- HOW DID HE APPEAR TO YOU?

3  A.    HE APPEARED PRETTY CALM, REAL CALM.

4  Q.    HAVE YOU HAD AN OCCASION IN THE PAST TO DEAL WITH

5  ALTERCATIONS BETWEEN INMATES?

6  A.    YES, SIR.

7  Q.    AND WHEN THAT -- IS THAT ON MANY OR FEW OCCASIONS?

8  A.    MANY OCCASIONS.

9  Q.    WHEN THAT OCCURS, HOW DO THE INMATES APPEAR?

10  A.    THEY'RE PRETTY JUMPY.  THEIR ADRENALINE'S PUMPING.

11        MR. BLACK:  OBJECTION, YOUR HONOR, AS TO THE

12  RELEVANCY AS TO WHAT OTHER INMATES ON OTHER SITUATIONS ON OTHER

13  OCCASIONS MAY OR MAY NOT HAVE DONE.  OBJECTION ON RULE 402 AND

14  403, YOUR HONOR.

15        MR. STEVENS:  YOUR HONOR, IT GOES TO PREMEDITATION.

16  THAT IS AN ISSUE, AN ELEMENT THAT WE HAVE SO SHOW.  WE INTEND

17  TO SHOW THAT THIS WAS COLD BLOODED AND IT GOES TOWARD THE

18  PLANNING AND THE PREPARATION HE WAS READY TO KILL LUTHER PLANT,

19  THAT'S WHAT THIS IS SHOWING.

20        THE COURT:  OBJECTION OVERRULED.

21  Q.    (BY MR. STEVENS)  OKAY.  DID THE DEFENDANT APPEAR

22  DIFFERENTLY THAN OTHER INMATES THAT YOU HAVE DEALT WITH WHO

23  HAVE HAD ALTERCATIONS?

24  A.    YES, SIR.

25  Q.    AND IN WHAT WAY?

65

1    A.      HE WAS CALM.  HE JUST ACTED NORMAL LIKE HE WOULD ACT ANY

2    OTHER DAY.

3    Q.      THE DAY HE TALKED TO YOU -- THE TWO OCCASIONS HE TALKED

4    TO YOU WHEN HE SAID "MY DEFENSE IS THE BERNIE CONSPIRACY," "I

5    WAITED FOR YOU TO BE DOWN THERE," "NOTHING YOU COULD HAVE DONE,

6    IT WAS GOING TO HAPPEN ANYWAY," HOW DID HE APPEAR TO YOU WHEN

7    HE WAS TALKING TO YOU ON THOSE OCCASIONS?

8    A.      CALM, NORMAL.

9    Q.      LET'S TALK ABOUT THE PHYSICAL CHARACTERISTICS OF EACH OF

10   THESE PEOPLE.  HOW WOULD YOU DESCRIBE THE DEFENDANT IN PHYSIQUE

11   AND PHYSICAL STATURE ON JANUARY 5TH, 2001?

12   A.      IN REAL GOOD SHAPE.  REALLY WORKED OUT A LOT.

13   Q.      DID YOU SEE HIM WORK OUT A LOT?

14   A.      I SEEN HIM WORK OUT A COUPLE OF TIMES, YES, SIR.

15   Q.      AND COMPARED TO OTHER INMATES, HOW DID HE LOOK?

16   A.      HE IS MORE IN SHAPE THAN A LOT OF THE INMATES OUT THERE.

17   Q.      HOW TALL IS THE DEFENDANT?

18   A.      HE'S PRETTY TALL.  OVER 6 FEET TALL.

19   Q.      OKAY.  LUTHER PLANT, DESCRIBE HIM PHYSICALLY.

20   A.      HE WAS A SMALLER INMATE.  I REALLY NEVER SAW HIM WORK

21   OUT MUCH.  HE DIDN'T SEEM LIKE HE WAS IN TOO GOOD A SHAPE.

22   Q.      WAS THE DEFENDANT A BIGGER MAN, A TALLER MAN THAN LUTHER

23   PLANT?

24   A.      YES, SIR.

25   Q.      SIGNIFICANTLY OR JUST AN INCH OR TWO?

1   A.      SIGNIFICANTLY.

2   Q.      AND IN PHYSICAL SHAPE, WAS HE IN MUCH FITTER CONDITION

3   THAN LUTHER PLANT WAS?

4   A.      YEAH.   IT APPEARED TO BE THAT WAY, YES, SIR.

5   Q.      OKAY.   NOW, YOU SAID YOU SAW BOTH THE DEFENDANT AND

6   LUTHER PLANT ON A DAILY BASIS?

7   A.      YES, SIR.

8   Q.      YOU DEALT WITH THEM AND ASSOCIATED WITH THEM JUST DAILY

9   AND PERSONAL FACE-TO-FACE CONTACT ON A DAILY BASIS?

10  A.      YES, SIR.

11  Q.      OKAY.   DID PEOPLE PICK ON THE DEFENDANT?

12  A.      NO, SIR, I'VE NEVER SEEN ANYBODY PICK ON HIM.

13  Q.      DID LUTHER PLANT PICK ON THE DEFENDANT?

14  A.      I'VE NEVER SEEN IT.

15  Q.      WAS LUTHER PLANT THE KIND OF PEOPLE PERSON WHO WOULD

16  PICK A FIGHT WITH THE DEFENDANT?

17  A.      I'VE NEVER SEEN HIM PICK -- ENGAGE IN ANY KIND OF FIGHTS

18  OR PICK FIGHTS.

19  Q.      AND WAS THE DEFENDANT KNOWN AS SOMEONE WHO COULD TAKE

20  CARE OF HIMSELF PHYSICALLY?

21  A.      YES, SIR.

22          MR. STEVENS:  YOUR HONOR, AT THIS TIME WE PASS THIS

23  WITNESS.   THANK YOU.

24          MR. BLACK:  YOUR HONOR, MAY MR. STEVENS AND I

25  APPROACH IN REGARD TO THE MOTION LIMINE AT THIS TIME?

1          THE COURT:  YES.

2          WE'LL HAVE A BENCH CONFERENCE.

3          OFF THE RECORD.

4                    (BENCH CONFERENCE)

5          THE COURT:  OKAY.  GO AHEAD.

6          MR. BLACK:  YOUR HONOR, AT THIS TIME THE DEFENDANT

7    WOULD LIKE TO INQUIRE OF THIS WITNESS REGARDING THE SPECIFIC

8    CHARACTER AND CHARACTER TRAITS OF MR. PLANT, SPECIFICALLY AS TO

9    HIS DRUG USE AND DRUG ADDICTION.  IT IS THE POSITION OF THE

10   DEFENDANT THAT THE CHARACTER EVIDENCE IS ADMISSIBLE UNDER RULE

11   404(A) AND 405(B).  IT IS ALSO THE POSITION OF THE DEFENDANT

12   THAT THE GOVERNMENT HAS NOW OPENED THE DOOR AS TO THE CHARACTER

13   OF MR. PLANT BY ASKING ABOUT HIS PHYSIQUE, CHARACTER TRAITS,

14   WHETHER HE WAS A VIOLENT INDIVIDUAL.  AND THE GOVERNMENT HAS

15   OPENED THE DOOR REGARDING VIOLENCE OF MR. PLANT.  I WOULD ALSO

16   LIKE TO INQUIRE ABOUT ANYTHING THAT IS RELEVANT ON CROSS IN

17   RESPONSE TO DIRECT.

18          THE COURT:  ALL RIGHT.  ONE SECOND, PLEASE.

19          OKAY.  GO AHEAD.

20          MR. STEVENS:  ARE YOU GOING TO -- IF I MAY ASK

21   SPECIFICALLY, YOU'RE JUST TALKING ABOUT -- YOU'RE TALKING ABOUT

22   DRUG USE.  YOU'RE NOT TALKING ABOUT HIS CONVICTIONS AND YOU'RE

23   NOT TALKING ABOUT WHAT HE'S GOING TO SAY WHAT HE HAS SAID, ARE

24   YOU?

25          MR. BLACK:  I DO NOT INTEND TO ASK ABOUT ANY VERBAL

68

1   STATEMENTS MADE BY MR. PLANT.  I DO NOT INTEND TO ASK ABOUT

2   PRIOR CONVICTIONS OF MR. PLANT IN REGARD TO THIS WITNESS.

3   OTHER WITNESSES I MAY.  AND I WILL APPROACH THE BENCH BECAUSE I

4   THINK THE ISSUE REGARDING VIOLENCE OF MR. PLANT HAS NOT BEEN

5   PUT IN QUESTION WITH MR. MATT THE CURRENT WITNESS ON THE STAND.

6   I ONLY INTEND TO ASK ABOUT MR. PLANT'S DRUG USE AND DRUG

7   ADDICTION WHILE AN INMATE WITHIN THE B.O.P.

8       MR. STEVENS:  THE ONLY OBJECTION WE WOULD HAVE, YOUR

9   HONOR, IS HE HADN'T TIED UP HOW THE DRUG USE EQUALS ANY

10  VIOLENCE THAT OCCURRED ON THIS OCCASION.  THAT'S ALL.

11      THE COURT:  WHAT WOULD BE YOUR 104 PREDICATE?

12      MR. BLACK:  WELL, YOUR HONOR, I'M THINKING A MINUTE.

13      YOUR HONOR, I THINK THAT THE DRUG USE IS RELEVANT

14  BECAUSE IT GOES TO THE STATE OF MIND OF MR. PLANT, THE VICTIM,

15  AT THE TIME OF THE OFFENSE IN QUESTION.  I THINK IT'S EXTREMELY

16  RELEVANT THAT ONLY 15 DAYS PRIOR TO THIS OFFENSE, MR. PLANT

17  TESTED POSITIVE FOR HEROIN.  HE HAS A LONG HISTORY OF DRUG USE

18  WITHIN THE B.O.P., AND, IN FACT, THE B.O.P. HAS CLASSIFIED MR.

19  PLANT AS AN INMATE THAT HAS A, QUOTE, CHRONIC AND SEVERE DRUG

20  ADDICTION PROBLEM, END QUOTE.

21      THE COURT:  DOES THIS HAVE ANYTHING TO DO WITH

22  SELF-DEFENSE?

23      MR. BLACK:  YES, YOUR HONOR, IT DOES.  THIS IS AN

24  ESSENTIAL ELEMENT OF THE DEFENDANT'S OPINION THAT MR. AGOFSKY

25  ACTED IN SELF-DEFENSE IN THIS CASE.  BECAUSE IT GOES NOT ONLY

69

1  TO THE STATE OF MIND TO MR. PLANT, BUT ALSO TO HIS BEHAVIOR AND

2  CHARACTERISTICS ON THE DAY IN QUESTION AND WHY HE ACTED OR DID

3  NOT ACT IN A CERTAIN WAY.

4         MR. STEVENS:  JUST BRIEFLY.  IT'S JUST HARD FOR US TO

5  RESPOND, BECAUSE WE DON'T -- THERE'S A BIG GAP HERE.  IT

6  DOESN'T -- DOESN'T MAKE ANY SENSE THAT DRUG ADDICTION HAD OR

7  DRUG USE HAD ANYTHING TO DO WITH VIOLENT BEHAVIOR.  WE'RE

8  MAKING THIS REACH AND WE HAVEN'T EVEN BEEN PROFFERED HOW THAT'S

9  SUPPOSED TO CONNECT.  IT DOESN'T SHOW HOW ANY DRUG USE RESULTED

10 IN SELF-DEFENSE.  HE HASN'T ARTICULATED HOW THAT CONNECTION

11 OCCURS YET.

12        MR. BLACK:  IT CONNECTS -- IT GOES TO HIS BEHAVIOR,

13 YOUR HONOR.  IT'S JUST LIKE A CASE WHERE AN INDIVIDUAL IS

14 INTOXICATED, IT'S THE SAME AS BEING UNDER THE INFLUENCE OF

15 DRUGS.

16        THE COURT:  READ THAT.  READ THIS ARTICLE AND THAT

17 ONE.  YOU READ IT TOO.

18              (SHORT PAUSE)

19        THE COURT:  DID YOU READ THE SECOND ONE?

20        MR. BLACK:  YES, YOUR HONOR.  I THINK RULE 404(A) IS

21 THE RULE ON POINT HERE.  IT SPECIFICALLY --

22        THE COURT:  404(A)(2).

23        MR. BLACK:  YES, SIR.  IT SPECIFICALLY SAYS THE

24 CHARACTER OF THE VICTIM IS ADMISSIBLE AND THE COMMITTEE

25 ADVISORY NOTES AFTER THAT RULE TALK ABOUT WHEN SELF-DEFENSE IS

1  RAISED THAT IN THOSE CASES WITHOUT A DOUBT, A CHARACTER OR

2  SPECIFIC CHARACTER TRAIT OF THE VICTIM IS ADMISSIBLE.

3          MR. STEVENS:  WELL, AND THIS ONE THAT THE COURT HAS

4  POINTED OUT TALKED ABOUT HIS VIOLENT CHARACTER.  ALL WE ARE

5  DOING IS SMEARING THE CHARACTER AS BEING AS THE STATUS OF A

6  DRUG USER.  IT HAS NOT YET LEAPED TO THE POINT OF CONNECTING

7  HIS CHARACTER OF DRUG USE, NOT VIOLENCE, BUT DRUG USE TO

8  SELF-DEFENSE.  HOW IS THAT RELEVANT TO SELF-DEFENSE?  I MEAN IS

9  HE SAYING "I HAVE A RIGHT TO DEFEND MYSELF FROM DRUG USERS?"

10 HE HASN'T LEAPED TO THAT CONNECTION YET.

11         MR. BLACK:  YOUR HONOR, I THINK THE CASES ARE CLEAR

12 THAT A CHARACTER TRAIT, WHEN THE DEFENDANT IS ASSERTING

13 SELF-DEFENSE, IS ADMISSIBLE.  THIS IS A CHARACTER -- A

14 CHARACTER TRAIT.  I THINK THE FACT THAT MR. PLANT WAS A DRUG

15 ADDICT, WHEN THE B.O.P. TESTED POSITIVE FOR HEROIN 15 DAYS

16 PRIOR TO THIS, GOES NOT ONLY TO MR. PLANT'S STATE OF MIND, BUT

17 ALSO TO HIS PROPENSITY FOR VIOLENCE, TO ACT IN A CERTAIN WAY ON

18 THE TIME IN QUESTION, WHETHER HE WAS UNDER THE INFLUENCE OF

19 DRUGS OR WHETHER HE WAS WITHIN A WITHDRAWAL STATUS, YOUR HONOR.

20         THE COURT:  DOES IT BEGIN AND END THERE, OR DO YOU

21 HAVE CONNECTING POINTS WITH MR. PLANT ABOUT THIS --

22         MR. BLACK:  I --

23         THE COURT:  -- PRIOR HISTORY OF DRUG USE EVENTS,

24 OCCASIONS, VIOLENCE?

25         MR. BLACK:  I HAVE THAT EVIDENCE, YOUR HONOR, AND I

1   MAY OR MAY NOT INTRODUCE IT.

2          THE COURT:  I'M GOING TO ALLOW IT IT UNDER 405,

3   404(A)(2) WITH THE CAVEAT THAT COUNSEL OUGHT NOT TO GO FURTHER

4   THAN THE PARAMETERS SET OUT IN 404(A)(2) AT THIS TIME.

5               (END BENCH CONFERENCE)

6          THE COURT:  GO AHEAD, MR. BLACK.

7          MR. BLACK:  MAY I PROCEED, YOUR HONOR?

8          THE COURT:  YES, SIR, YOU MAY.

9               CROSS-EXAMINTION

10  BY MR. BLACK:

11  Q.    MR. MATT, YOU DID NOT SEE THE FIGHT START ON JANUARY THE

12  5TH, 2001, DID YOU?

13  A.    NO, SIR.

14  Q.    AND YOU DID NOT SEE WHICH INDIVIDUAL THREW THE FIRST

15  PUNCH, DID YOU?

16  A.    NO, SIR.

17  Q.    IN FACT, YOU DID NOT HEAR ANY WORDS, IF ANY, THAT WERE

18  SPOKEN BETWEEN MR. PLANT AND MR. AGOFSKY AT THE TIME OF THE

19  FIGHT, DID YOU?

20  A.    NO, SIR.

21  Q.    IN FACT, IF I UNDERSTAND YOUR TESTIMONY CORRECT, YOU

22  WERE DOWN BY RECREATIONAL CAGE NO. 6 WHEN YOU FIRST BECAME

23  AWARE THAT ANYTHING WAS OCCURRING?

24  A.    YES, SIR.

25  Q.    OKAY.  AND FROM YOUR POSITION THAT YOU HAVE IDENTIFIED

72

1   DOWN BY CAGE NO. 6, YOU COULD NOT SEE CAGE NO. 3 BECAUSE YOUR

2   VIEW WAS OBSTRUCTED BY THE SALLY PORTS; IS THAT CORRECT?

3   A.      YES, SIR.

4   Q.      AND WOULD YOU, PLEASE, EXPLAIN TO THE JURY WHAT A SALLY

5   PORT OR AN ENTRANCE IS?

6   A.      IT'S THE -- IT'S A LITTLE AREA IN WHERE WE PLACE THE

7   INMATES IN BEFORE HE ENTERS THE REC CAGE SO WE CAN UNCUFF THEM

8   SO THAT HE WOULDN'T BE CUFFED UP WHILE HE'S IN THE REC CAGE

9   WITH OTHER INMATES.

10  Q.      BUT EVEN THOUGH THE SALLY PORT OBSTRUCTED YOUR VIEW, THE

11  DIVIDERS BETWEEN THE CAGES IS CONSTRUCTED OF LIKE A HURRICANE

12  OR CHAIN LINK FENCE THAT YOU CAN SEE THROUGH, CORRECT?

13  A.      YES, SIR.

14  Q.      AND IT'S THE SAME TYPE OF MATERIAL, FOR INSTANCE, THAT

15  AN INDIVIDUAL MAY HAVE IN THEIR BACK YARD WITH A CYCLONE FENCE

16  THAT THEY WOULD HAVE, CORRECT?

17  A.      OKAY.

18  Q.      NOW, IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY, YOU COULD

19  NOT HAVE A PLAIN -- OR DID NOT HAVE A PLAIN VIEW OF CAGE NO. 3

20  UNTIL YOU TURNED AROUND AND STARTED WALKING BACK FROM CAGE 6

21  AREA TOWARDS CAGE 3, CORRECT?

22  A.      CORRECT.

23  Q.      AND IT WAS NOT UNTIL YOU GOT TO APPROXIMATELY THE CAGE 4

24  AREA THAT YOU COULD SEE THE INDIVIDUALS IN CAGE 3, CORRECT?

25  A.      CORRECT.

73

1    Q.    NOW, YOU WERE THE ONLY GUARD OUT IN THE RECREATION AREA

2    ON THE DAY IN QUESTION?

3    A.    YES, SIR.

4    Q.    NOW, BACK IN JANUARY OF 2001, THERE WERE NOT ANY

5    WALL-MOUNTED VIDEO CAMERAS IN THE RECREATIONAL AREA, CORRECT?

6    A.    CORRECT.

7    Q.    BUT NOW THERE ARE VIDEO CAMERAS THAT ARE MOUNTED ON THE

8    WALLS, CORRECT?

9    A.    YES, SIR.

10   Q.    AND THE ONLY VIDEO RECORDING THAT WAS MADE ON JANUARY

11   THE 5TH, 2001 IN THE REC AREA, IS THE ONE THAT YOU'VE TESTIFIED

12   ABOUT THIS MORNING THAT YOU YOURSELF MADE, CORRECT?

13   A.    YES, SIR.

14   Q.    OKAY.  NOW, DID YOU EVER GIVE A VERBAL ORDER OR A VERBAL

15   COMMAND TO MR. AGOFSKY TO STOP FIGHTING?

16   A.    I DON'T BELIEVE.  I THINK I WENT STRAIGHT TO THE CAMERA

17   AND SUMMONSED FOR HELP.

18   Q.    OKAY.  AND IT'S YOUR TESTIMONY, IS IT NOT, THAT EVEN

19   THOUGH YOU DID NOT GIVE A VERBAL COMMAND OR AN ORDER TO MR.

20   AGOFSKY, THAT HE VOLUNTARILY STOPPED THE FIGHT; IS THAT

21   CORRECT?

22   A.    CORRECT.

23   Q.    NOW, AFTER THE FIGHT STOPPED BETWEEN MR. PLANT AND MR.

24   AGOFSKY, YOU DID NOT IMMEDIATELY ENTER INTO CAGE NO. 3, DID

25   YOU?

74

1    A.    NO, SIR.

2    Q.    AND THAT WAS PRIMARILY BECAUSE YOU NEEDED PERMISSION

3    FROM A SUPERVISOR TO ENTER CAGE NO. 3?

4    A.    CORRECT.

5    Q.    AND LIEUTENANT MEL LYNN WAS THE SUPERVISOR THAT WAS ON

6    DUTY THAT DAY THAT YOU WOULD HAVE HAD TO OBTAINED PERMISSION

7    FROM, CORRECT?

8    A.    CORRECT.

9    Q.    NOW, HOW MUCH TIME WENT BY FROM THE TIME THAT THE FIGHT

10   ACTUALLY STOPPED BETWEEN THE PARTIES AND THE TIME YOU AND OTHER

11   OFFICERS ENTERED CAGE NO. 3?

12   A.    APPROXIMATELY TWO MINUTES.

13   Q.    NOW, DURING THAT 2-MINUTE TIME PERIOD, IT WAS OBVIOUS TO

14   YOU, WAS IT NOT, THAT MR. PLANT WAS STILL ALIVE?

15   A.    HE WAS STILL TWITCHING AND MOVING.

16   Q.    HE WAS MAKING MOVEMENTS, CORRECT?

17   A.    CORRECT.

18   Q.    AND, IN FACT, THAT WAS THE VIDEOTAPE THAT YOU'VE

19   TESTIFIED ABOUT SHOWING MR. PLANT MOVING AROUND ON THE FLOOR OF

20   RECREATION CAGE NO. 3?

21   A.    CORRECT.

22   Q.    DURING THOSE TWO MINUTES BEFORE YOU AND THE OTHER

23   OFFICERS ENTERED THE RECREATION CAGE, WHAT COULD YOU HAVE DONE

24   IF MR. AGOFSKY HAD NOT VOLUNTARILY STOPPED FIGHTING WITH MR.

25   PLANT?

1    A.    NOTHING, REALLY.  PROBABLY GO GET CHEMICAL AGENTS TO

2    SPRAY INSIDE THE REC YARD.

3    Q.    AND THAT WOULD HAVE TAKEN SOME TIME TO HAVE DONE, WOULD

4    IT NOT, BECAUSE YOU DIDN'T HAVE THOSE AGENTS AVAILABLE?

5    A.    NO, I DIDN'T HAVE THEM AT MY HAND AT THE TIME.

6    Q.    OKAY.  SO, IF I UNDERSTAND YOU CORRECTLY, EVEN THOUGH

7    YOU DID NOT GIVE A VERBAL COMMAND TO MR. AGOFSKY TO STOP THE

8    FIGHT, AND EVEN THOUGH THERE WAS NOTHING THAT YOU COULD HAVE

9    DONE DURING THE TWO MINUTES TO ENTER RECREATION CAGE NO. 3, HE

10   STOPPED FIGHTING WITH MR. PLANT?  I MEAN THAT'S THE FACT, ISN'T

11   IT?

12   A.    CORRECT.

13   Q.    NOW, AFTER YOU AND THE OFFICERS ENTERED RECREATION CAGE

14   NO. 3, MR. AGOFSKY WAS REMOVED, WAS HE NOT?

15   A.    YES, SIR.

16   Q.    AND HE WAS -- THE EXPRESSION I BELIEVE THAT YOU USED

17   PREVIOUSLY WAS HE WAS CUFFED UP, CORRECT?

18   A.    YES, SIR.  HE WAS RESTRAINED.

19   Q.    HANDCUFFS WERE PLACED ON HIM?

20   A.    YES, SIR.

21   Q.    OKAY.  WHEN YOU AND THE OTHER OFFICERS HANDCUFFED MR.

22   AGOFSKY, DID HE STRUGGLE WITH YOU IN ANY WAY?

23   A.    NO, SIR.

24   Q.    DID HE RESIST IN ANY WAY?

25   A.    NO, SIR.

1    Q.      DID HE FIGHT WITH YOU OR ANY OTHER OFFICERS?

2    A.      NO, SIR.

3    Q.      I WOULD ALSO ASSUME THAT DURING THE CUFF UP PROCEDURE

4    WHEN YOU RESTRAINED MR. AGOFSKY, THAT AS A PART OF THAT

5    PROCEDURE HE WAS ALSO SEARCHED; IS THAT CORRECT?

6    A.      YES, SIR.  ONCE YOU GOT BACK TO THE HOLDING AREA.

7    Q.      AND I ASSUME THAT MR. AGOFSKY WAS, IN FACT, SEARCHED

8    AFTER THIS FIGHT OCCURRED?

9    A.      YES, SIR.  I WASN'T IN THAT HOLDING AREA WHEN HE WAS

10   SEARCHED, BUT PROCEDURES ARE HE IS TO BE SEARCHED.

11   Q.      AND IS IT YOUR UNDERSTANDING THAT NO WEAPON OF ANY TIME

12   TYPE WAS FOUND ON MR. AGOFSKY?

13   A.      CORRECT.

14   Q.      NOW, AS A RECREATIONAL OFFICER, IT WAS YOUR PRIMARY DUTY

15   TO ASSIGN THE INMATES ON THIS DAY TO THEIR INDIVIDUAL REC

16   CAGES, CORRECT?

17   A.      YES, SIR.

18   Q.      AND IT'S ALREADY BEEN STATED, YOU TESTIFIED THAT YOU

19   WERE THE ONLY OFFICER THAT WAS IN THE REC AREA ON THIS DATE?

20   A.      YES, SIR.

21   Q.      NOW, PRIOR TO JANUARY THE 5TH OF 2001, YOU KNEW BOTH MR.

22   PLANT AND MR. AGOFSKY?

23   A.      YES, SIR.

24   Q.      OKAY.  IN FACT I BELIEVE YOU TESTIFIED YOU HAD KNOWN MR.

25   PLANT FOR OVER THREE YEARS IN THE SPECIAL HOUSING UNIT,

77

1    CORRECT?

2    A.    NOT EXACTLY IN THE SPECIAL HOUSING UNIT.  OUT ON THE

3    COMPOUND AND GENERAL POPULATION, ALSO.

4    Q.    AND, IN FACT, ISN'T IT TRUE THAT MR. AGOFSKY AND MR.

5    PLANT HAD SHARED THE SAME RECREATIONAL CAGE TOGETHER BEFORE

6    THIS DATE?

7    A.    CORRECT.

8    Q.    IN FACT, THEY HAD SHARED IT ON NUMEROUS OCCASIONS

9    TOGETHER, HAD THEY NOT?

10   A.    YES, SIR.

11   Q.    AND ON NONE OF THOSE PREVIOUS OCCASIONS THERE HAD NEVER

12   BEEN ANY TYPE OF FIGHT OR ALTERCATION BETWEEN MR. PLANT AND MR.

13   AGOFSKY, HAD THERE?

14   A.    NO, SIR.

15   Q.    NOW, IT'S ALSO POSSIBLE, IS IT NOT, AND DOESN'T IT

16   HAPPEN THAT SOMETIMES AN INMATE WILL SPECIFICALLY REQUEST OF

17   YOU, OR WHOEVER THE RECREATION OFFICER MAY BE, THAT THEY BE

18   PLACED IN A CELL WITH ANOTHER INMATE?

19   A.    IT HAPPENS SOMETIMES.

20   Q.    OKAY.  NOW, ON JANUARY THE 5TH, 2001, DID MR. AGOFSKY,

21   DID HE REQUEST OF YOU, AS THE RECREATION OFFICER, THAT HE BE

22   PLACED IN REC CAGE NO. 3 WITH MR. PLANT?

23   A.    NO, SIR.

24   Q.    AND YOU'VE WORKED AT THE BUREAU OF PRISONS FOR

25   APPROXIMATELY SIX YEARS?

1   A.      SIX AND A HALF YEARS, YES, SIR.

2   Q.      AND I BELIEVE MR. STEVENS ASKED YOU THIS, BUT DURING

3   THAT TIME PERIOD, THOSE SIX YEARS, YOU'VE SEEN A LOT OF

4   VIOLENCE BETWEEN INMATES, HAVE YOU NOT?

5   A.      YES, SIR.

6   Q.      NOW, INMATES ARE NORMALLY SEARCHED BEFORE THEY GO INTO

7   THE RECREATIONAL CAGE OR THE RECREATION AREA, ARE THEY NOT?

8   A.      YES, SIR.

9   Q.      EXPLAIN THAT PROCEDURE TO THE JURY?

10  A.      WELL, BEFORE WE -- NOW WE HAVE STRIP CAGES THAT EVERY

11  INMATE THAT GOES OUT TO THE REC YARD HAS TO BE STRIPPED OUT.

12  BUT AT THAT TIME WE DIDN'T HAVE STRIP CAGES.  SO AS SOON AS THE

13  INMATES COME OUT OF THEIR CELLS, THEY WOULD BE PATTED DOWN, PUT

14  OUR HANDS ON THE INMATES, PAT THEM DOWN TO MAKE SURE THEY HAVE

15  NOTHING AROUND THEIR WAIST, IN THEIR FEET, THEIR SOCKS.  THEN

16  ONCE OUT ON THE REC YARD I HAD A METAL DETECTOR, HAND-HELD

17  METAL DETECTOR THAT I WOULD GO OVER THEIR LEGS AND THEIR BODIES

18  AND UNDER THEIR SHOES BEFORE PLACING THEM INSIDE THE RECREATION

19  AREA.

20  Q.      AND I ASSUME THAT YOU YOURSELF UTILIZE THAT SAME

21  PROCEDURE, THE PAT DOWN AND EVERYTHING ELSE TO SEARCH NOT JUST

22  MR. AGOFSKY AND MR. PLANT, BUT ALL OF THE OTHER INMATES THAT

23  WERE IN THE RECREATION AREA IN JANUARY OF 2001?

24  A.      YES, SIR.

25  Q.      OKAY.  AND THERE WERE APPROXIMATELY 30 INMATES IN THE

1    REC CAGES AT THIS TIME; IS THAT RIGHT?

2    A.    APPROXIMATELY.

3    Q.    OKAY.  NOW, EVEN THOUGH BACK IN JANUARY OF 2001 BEFORE

4    AN INMATE WENT TO THE REC CAGE AREA AND YOU PERFORMED THE

5    PROCEDURE THAT YOU HAVE TALKED ABOUT, ABOUT PATTING DOWN,

6    SEARCHING, THINGS OF THAT NATURE, THERE HAVE BEEN OCCASIONS

7    WHERE WEAPONS HAVE STILL GOTTEN INSIDE THE REC CAGE, HAVE THERE

8    NOT?

9    A.    CORRECT.

10   Q.    IN FACT, YOU YOURSELF HAVE SEEN INMATE STABBINGS IN THE

11   RECREATIONAL AREA WHERE THIS FIGHT OCCURRED?

12   A.    I'VE SEEN ONE.

13   Q.    AND THAT WAS SHORTLY BEFORE THIS, I BELIEVE TOWARD THE

14   END OF 2000 INVOLVING AN INMATE BY THE NAME OF GREEN?

15   A.    YES, SIR.

16   Q.    EXPLAIN TO THE JURY WHAT A SHANK IS.

17   A.    IT'S A HOMEMADE WEAPON FASHIONED TO A -- COULD BE MADE

18   OUT OF PRETTY MUCH ANYTHING, ANY KIND OF STEEL THEY FIND OUT

19   THERE, PLASTIC, THEY SHARPEN IT TO A POINT TO WHERE IT LOOKS

20   LIKE A KNIFE.

21   Q.    OKAY.  SO BOTTOM LINE, ESSENTIALLY A SHANK IS A WEAPON,

22   CORRECT?

23   A.    YES, SIR.

24   Q.    AND NORMALLY IT'S A KNIFE-TYPE WEAPON?

25   A.    YES, SIR.

80

1    Q.    OKAY.  AND, IN FACT, ISN'T IT TRUE, MR. MATT, THAT ON

2    JANUARY THE 5TH OF 2001, A SHANK WAS FOUND IN THE REC CAGE AREA

3    AFTER THIS FIGHT OCCURRED?

4    A.    I'VE HEARD THAT THERE WAS ONE IN THERE.  I DIDN'T SEE A

5    SHANK THAT DAY, OR HAVEN'T SEEN ONE.  BUT I'VE BEEN TOLD THAT

6    THERE WAS A SHANK, THERE WAS A WEAPON IN THE RECREATION AREA.

7    Q.    AND DID YOU HEAR OR WERE YOU TOLD THAT IT WAS FOUND IN

8    RECREATIONAL CAGE NO. 4, DIRECTLY ADJACENT TO NO. 3?

9    A.    I WASN'T TOLD WHERE IT WAS FOUND, WHICH CAGE IT WAS IN.

10   Q.    ALL RIGHT.  BASED ON YOUR SIX YEARS EXPERIENCE IN THE

11   BUREAU OF PRISONS, AND ALSO BASED UPON THE TYPE OF VIOLENCE

12   THAT YOU HAVE SEEN BETWEEN INMATES, WOULDN'T YOU AGREE THAT

13   WHEN ONE INMATE ATTACKS ANOTHER INMATE THAT IT IS COMMON THAT

14   THE AGGRESSOR INMATE, HE HAS A WEAPON?

15   A.    CORRECT.

16   Q.    HAVE YOU EVER HEARD THE RECREATIONAL CAGE OR CELL AREA

17   REFERRED TO BY INMATES AND BY PRISON GUARDS AS THUNDER DOME?

18   A.    NOT REALLY AT THE PENITENTIARY IN BEAUMONT THAT I'M AT.

19   I'VE HEARD THAT TERM BEFORE, BUT I HAVEN'T HEARD IT BEING

20   SPECIFIED AT OUR INSTITUTION.

21   Q.    BUT YOU ARE FAMILIAR WITH THAT TERM?

22   A.    YES, SIR.

23   Q.    OKAY.  HAVE YOU HEARD THE TERM "GLADIATOR SCHOOL" USED

24   BY YOU, OTHER INMATES, OR OTHER GUARDS IN REGARD TO THE

25   RECREATIONAL CAGE AREA HERE AT THE BEAUMONT PRISON?

81

1    A.      YEAH, I'VE HEARD THAT TERM BEFORE.

2    Q.      OKAY.  EXPLAIN TO THE JURY WHAT YOU TOOK THAT TERM TO

3    MEAN WHEN YOU HEARD IT OR HOW IT'S USED WITHIN THE BUREAU OF

4    PRISONS.

5    A.      WELL, THAT'S WHERE INMATES WHO HAVE PROBLEMS WITH

6    ANOTHER INMATE OR GANG-RELATED INMATES WHO ARE OPPOSING EACH

7    OTHER, GET INTO THE SAME RECREATION CAGE WITH EACH OTHER AND

8    END UP FIGHTING.

9    Q.      AND, IN FACT, THESE RECREATIONAL CAGES THAT YOU HAVE

10   TESTIFIED ABOUT THIS MORNING, THEY ARE SOMETIMES REFERRED TO BY

11   THE GUARDS AND INMATES AS GLADIATOR SCHOOL AND MAYBE THUNDER

12   DOME, ISN'T THAT CORRECT?

13   A.      I'VE NEVER HEARD IT MENTIONED PERTAINING -- I'VE HEARD

14   IT PERTAINING FOR OTHER INSTITUTIONS, YES.

15   Q.      NOW, LET'S TALK ABOUT THE VERBAL STATEMENTS THAT YOU

16   HAVE TESTIFIED ABOUT THIS MORNING CONCERNING MR. AGOFSKY.

17           IF I UNDERSTAND YOU CORRECTLY, THE VERBAL STATEMENTS OR

18   THE CONVERSATION THAT OCCURRED BETWEEN YOU AND MR. AGOFSKY

19   OCCURRED ON TWO SEPARATE OCCASIONS; IS THAT RIGHT?

20   A.      YES, SIR.

21   Q.      OKAY.  THE FIRST CONVERSATION THAT YOU HAD OCCURRED THE

22   DAY AFTER THE FIGHT OCCURRED, AND THAT RELATED TO WHAT I

23   BELIEVE YOU TESTIFIED TO AS THE BERNIE CONSPIRACY; IS THAT

24   CORRECT?

25   A.      CORRECT.

82

1    Q.    NOW, WOULDN'T YOU AGREE WITH ME, MR. MATT, THAT PRISON

2    HUMOR IS SUBSTANTIALLY DIFFERENT THAN HUMOR IN WHAT WE MAYBE

3    REFER TO AS THE OUTSIDE WORLD?

4    A.    YES, SIR.

5    Q.    AND, IN FACT, ISN'T YOUR EXPERIENCE THAT ON SOMETIMES

6    THAT TYPE OF HUMOR, PRISON HUMOR CAN BE SOMEWHAT TWISTED OR

7    LOOKED AT IN A DIFFERENT LIGHT THAN WHAT PEOPLE NOT IN PRISON

8    WOULD LOOK AT IT?

9    A.    YES, SIR.

10   Q.    IN FACT A LOT OF TIMES THE GUARDS, SUCH AS YOURSELF, AND

11   THE INMATES JOKE AROUND WITH EACH OTHER PRETTY REGULARLY ON A

12   DAY-TO-DAY BASIS?

13   A.    EVERY ONCE IN A WHILE.

14   Q.    IN FACT, YOU ON PRIOR OCCASIONS, PRIOR TO THE FIGHT, YOU

15   HAVE JOKED AROUND WITH MR. AGOFSKY BEFORE, HAVE YOU NOT?

16   A.    ON A COUPLE OF OCCASIONS.

17   Q.    OKAY.  AND, IN FACT, AT THE TIME HE MADE THE REMARK TO

18   YOU ABOUT THE BERNIE CONSPIRACY, DO YOU REMEMBER THAT YOU

19   LAUGHED A LITTLE BIT WHEN HE MADE THAT?

20   A.    YEAH, I FOUND IT A LITTLE HUMOROUS.

21   Q.    AND DO YOU REMEMBER THAT HE TOO SORT OF LAUGHED AT THE

22   REMARK THAT HE HAD MADE?

23   A.    YES, SIR.

24   Q.    I MEAN IT'S OBVIOUS, IS IT NOT, THAT YOU DIDN'T TAKE

25   THAT REMARK SERIOUSLY?

83

1    A.      I FOUND IT HUMOROUS; I LAUGHED AT IT.

2    Q.      NOW, IN REGARD TO THE SECOND STATEMENT THAT YOU HAVE

3    TESTIFIED ABOUT, WHEN DID THAT STATEMENT ACTUALLY OCCUR?

4    A.      I BELIEVE IT WAS THAT SECOND WEEK AFTER IT HAPPENED.

5    BECAUSE USUALLY WHEN AN INMATE WILL GET INTO AN ALTERCATION IN

6    THE REC YARD, THEY WILL BE ON RESTRICTION FOR A WEEK.   AND I --

7    SO -- AND I KNEW HE WAS ON REC RESTRICTION, SO HE WOULDN'T HAVE

8    GONE TO REC THAT WEEK.   SO IT WOULD HAVE BEEN THE SECOND WEEK.

9    Q.      DID YOU FILE ANY TYPE OF WRITTEN INCIDENT REPORT

10   REGARDING THE VERBAL CONVERSATION THAT YOU HAD WITH MR.

11   AGOFSKY?

12   A.      NO, SIR.

13   Q.      DID YOU MAKE ANY TYPE OF VERBAL REPORT REGARDING THAT

14   CONVERSATION TO ANYONE?

15   A.      NO, I DIDN'T, NOT UNTIL THE FBI TALKED TO ME.

16   Q.      BUT YOU NEVER REPORTED THAT CONVERSATION TO ANY B.O.P.

17   SUPERVISOR, DID YOU?

18   A.      NO, I DIDN'T.

19   Q.      AND YOU NEVER REPORTED THAT REMARK TO EVEN A CO-WORKER

20   AT THE B.O.P., DID YOU?

21   A.      NOT THAT I'M AWARE OF, NO.

22   Q.      OKAY.   IT WAS NOT UNTIL NINE MONTHS LATER IN SEPTEMBER

23   OF 2001, THAT YOU TOLD ANYONE ABOUT THE STATEMENT, SPECIFICALLY

24   THE CONVERSATION YOU HAD WITH MR. AGOFSKY; IS THAT CORRECT?

25   A.      YES, SIR.   THAT WAS THE FIRST TIME SOMEBODY QUESTIONED

1  ME ABOUT THE INCIDENT.

2  Q.    NOW, THE CONVERSATION THAT YOU HAD WITH MR. AGOFSKY AND

3  WHAT YOU HAVE TESTIFIED ABOUT AS TO WHAT HE SAID, YOU ARE NOT

4  TELLING THIS JURY -- YOU'RE NOT QUOTING MR. AGOFSKY

5  SPECIFICALLY WORD-FOR-WORD WHAT HE SAID ON THAT DATE, ARE YOU?

6  A.    YEAH.   I DON'T REMEMBER THE WORD-FOR-WORD.   I CAN'T

7  QUOTE HIM.

8  Q.    IN EFFECT, WHAT YOU'RE DOING IS PARAPHRASING OR GIVING A

9  SUMMARY; WOULD THAT BE A FAIR ASSESSMENT?

10  A.    I PRETTY MUCH TOLD WHAT HE TOLD ME.   I MEAN I CAN'T SAY

11  WHAT HE SAID WORD-FOR-WORD.

12  Q.    AND DO YOU RECALL TESTIFYING PREVIOUSLY AT A HEARING

13  UNDER OATH ABOUT THE CONVERSATION YOU'VE TALKED ABOUT HERE

14  TODAY?

15  A.    YES, SIR.

16  Q.    NOW, IS IT POSSIBLE THAT MR. AGOFSKY MAY HAVE SAID TO

17  YOU, "I WAITED FOR YOU TO GET DOWN THERE," G-E-T?

18  A.    I WAITED FOR YOU TO GET DOWN THERE, THAT'S WHAT HE SAID.

19  Q.    OKAY.   AND THERE WAS NO AUDIO RECORDING ON TAPE, OR

20  ANYTHING OF THAT NATURE, MADE OF THE CONVERSATION THAT YOU HAD

21  WITH MR. AGOFSKY, WAS THERE?

22  A.    NO, SIR.

23  Q.    YOU AND MR. PLANT, DURING THE THREE YEARS THAT YOU HAD

24  KNOWN HIM, YOU AND HE HAD HAD CONVERSATIONS BEFORE, HAD YOU

25  NOT?

85

1   A.      YEAH, WE HAD CONVERSATIONS BEFORE.

2   Q.      AND YOU FELT LIKE YOU WERE SOMEWHAT FAMILIAR WITH HIM,

3   CORRECT?

4   A.      PRETTY MUCH.  HE HAD BEEN THERE FOR A LONG TIME.

5   INMATES THAT'S BEEN THERE FOR A LONG TIME I'M PRETTY FAMILIAR

6   WITH.

7   Q.      OKAY.  WERE YOU AWARE, OFFICER MATT, THAT 15 DAYS PRIOR

8   TO THIS FIGHT OCCURRING THAT YOU TESTIFIED ABOUT HERE TODAY

9   THAT MR. LUTHER PLANT TESTED POSITIVE FOR HEROIN WHILE AN

10  INMATE AT THE BUREAU OF PRISONS?

11  A.      I WASN'T AWARE OF THAT.  NO, I WASN'T.

12  Q.      WERE YOU AWARE THAT IN AUGUST OF 2000, HE HAD TESTED

13  POSITIVE FOR HEROIN WITHIN THE BUREAU OF PRISONS?

14  A.      NO, SIR.

15  Q.      WERE YOU AWARE THAT IN SEPTEMBER OF 2000, HE HAD TESTED

16  POSITIVE FOR HEROIN WHILE AN INMATE IN THE BUREAU OF PRISONS?

17  A.      I KNEW HE HAD TESTED POSITIVE ON CERTAIN TIMES.  BUT I

18  DON'T KNOW SPECIFIC DATES.  BUT I REMEMBER HIM GETTING LOCKED

19  UP IN SPECIAL HOUSING FOR THE USE OF DRUGS.

20  Q.      FROM YOUR KNOWLEDGE, HOW MANY TIMES HAD HE TESTED

21  POSITIVE FOR HEROIN WHILE AN INMATE AT THE FEDERAL BUREAU OF

22  PRISONS?

23  A.      I COULDN'T GIVE YOU AN ACCURATE -- TWO OR THREE TIMES AT

24  LEAST.

25  Q.      DURING THE TIME PERIOD AT LEAST THAT YOU KNEW HIM?

86

1   A.      YES, SIR.

2   Q.      WERE YOU AWARE THAT THE BUREAU OF PRISONS HAD CLASSIFIED

3   MR. PLANT AS A CHRONIC AND SEVERE DRUG ADDICT WITHIN THE

4   B.O.P.?

5   A.      NO, I HADN'T.

6   Q.      A LOT OF THE INMATES THAT ARE IN FEDERAL CUSTODY WORK

7   OUT ON A REGULAR BASIS, DO THEY NOT?

8   A.      YES, SIR.

9   Q.      I MEAN THAT'S NOT AN UNUSUAL THING FOR FEDERAL INMATES

10  TO BE WORKING OUT, CORRECT?

11  A.      NO, SIR.

12  Q.      AND I ASSUME THAT YOU'VE SEEN THAT ON NUMEROUS OCCASIONS

13  BY VARIOUS INMATES IN THE SIX YEARS THAT YOU'VE BEEN A

14  CORRECTIONAL OFFICER?

15  A.      YES, SIR.

16  Q.      BUT ON JANUARY THE 5TH, 2001, YOU DID NOT SEE THE FIGHT

17  START, CORRECT?

18  A.      CORRECT.

19  Q.      AND YOU DID NOT SEE WHO THREW THE FIRST PUNCH?

20  A.      CORRECT.

21  Q.      AND YOU DIDN'T HEAR WHAT WORDS, IF ANY, WERE SPOKEN

22  BETWEEN MR. PLANT AND MR. AGOFSKY?

23  A.      NO, SIR.

24          MR. BLACK:  PASS THE WITNESS, YOUR HONOR.

25                      REDIRECT EXAMINATION

 1   BY MR. STEVENS:

 2   Q.    BUT YOU DO KNOW THAT THE DEFENDANT STATED I WAITED FOR

 3   YOU TO GET DOWN THERE BEFORE THIS BEGAN?

 4   A.    YES, SIR.

 5   Q.    AND YOU DO KNOW THAT HE SAID THERE WAS NOTHING YOU COULD

 6   HAVE DONE, IT WAS GOING TO HAPPEN ANYWAY?

 7   A.    YES, SIR.

 8   Q.    AND THE STATEMENTS CONCERNING THIS BERNIE CONSPIRACY, I

 9   WANT TO GET THAT STRAIGHT SO THAT WE ARE CLEAR ABOUT THAT.

10         ARE YOU TELLING US THAT THE DAY AFTER HE KILLS A HUMAN

11   BEING HE'S JOKING ABOUT IT, IS THAT WHAT YOU'RE SAYING?

12   A.    YES, SIR.

13   Q.    BUT HE NEVER SAID THIS WAS SELF-DEFENSE?

14   A.    NO, SIR.

15   Q.    EVER?

16   A.    NO, SIR.

17   Q.    EVER.  AND THE -- ARE YOU AWARE OF ANY, ANY REASON THAT

18   LUTHER PLANT'S DRUG USAGE WOULD HAVE BEEN THE CAUSE OF THE

19   INITIATION OF THIS FIGHT?

20   A.    NO, SIR.

21   Q.    IN FACT WHAT YOU KNOW IS HE NEVER PUT UP ANY FIGHT AT

22   ALL?

23   A.    I'VE NEVER SEEN HIM FIGHT, SIR.

24   Q.    WELL, ON THIS OCCASION HE NEVER EVEN DEFENDED HIMSELF

25   THAT YOU SAW IN THIS CASE, DID YOU?

1  A.    NO, SIR.

2  Q.    AND THE WAY THE FIGHT BEGAN, WHAT YOU KNOW ABOUT THE WAY

3  IT BEGAN WAS THE DEFENDANT'S STATEMENT WAS "I WAITED BEFORE

4  THIS STARTED FOR YOU TO GET DOWN THERE"?

5  A.    YES, SIR.

6  Q.    COULD THAT MEAN THAT LUTHER PLANT STARTED THE FIGHT OR

7  DOES IT MEAN THAT THE DEFENDANT BEGAN THE FIRST BLOWS?

8         MR. BLACK:  OBJECTION, YOUR HONOR.  THIS CALLS FOR

9  SPECULATION AND CONCLUSION.

10        THE COURT:  SUSTAINED.

11        MR. BLACK:  THANK YOU.

12        THE COURT:  GO AHEAD.

13  Q.    (BY MR. STEVENS)  AND ON THIS OCCASION, DID IT APPEAR TO

14  YOU IN ANYWAY THAT LUTHER PLANT WAS ACTING IN A STRANGE OR

15  BIZARRE OR AN AGGRESSIVE MANNER IN ANY WAY?

16  A.    NO, SIR.

17  Q.    DO YOU REMEMBER ANY REASON TO BELIEVE, FROM WHAT YOU

18  KNOW ABOUT WHAT HAPPENED HERE, THAT LUTHER PLANT BEGAN THIS

19  FIGHT?

20  A.    NO, SIR.

21  Q.    AND WHEN THE DEFENDANT STOPPED STRIKING THE DEFENDANT --

22  WHEN THE DEFENDANT STOPPED STRIKING LUTHER PLANT, THAT WAS

23  AFTER WHAT YOU HAD SEEN TO BE SEVERAL BLOWS BY THE DEFENDANT ON

24  LUTHER PLANT?

25  A.    YES, SIR.

1  Q.    AND AFTER SEVERAL SECONDS OF WHAT YOU HEARD WAS GRUNTING

2  AND OTHER SOUNDS?

3  A.    YES, SIR.

4  Q.    YOU THINK THE TOTAL AMOUNT OF TIME WAS ABOUT HOW LONG

5  FROM THE BEGINNING, FROM THE TIME YOU SAID YOU BEGAN HEARING

6  THE GRUNTING WHEN YOU WERE DOWN NEAR CAGE 6 UNTIL THE DEFENDANT

7  STOPPED STRIKING -- YOU SAW THE DEFENDANT STOP STRIKING LUTHER

8  PLANT, TOTAL AMOUNT OF TIME WOULD HAVE BEEN HOW LONG?

9  A.    TEN TO 11 SECONDS.

10  Q.    TEN TO 11 SECONDS.  AND YOU SAW HIM JUST A PORTION OF

11  THAT PERIOD OF TIME?

12  A.    YES, SIR.

13  Q.    AND WHAT YOU SAW WAS A ONE-SIDED SITUATION, THE

14  DEFENDANT HITTING LUTHER PLANT WITH HIS FEET?

15  A.    YES, SIR.

16  Q.    STRIKING HIM IN THE NECK AND THE FACE?

17  A.    YES, SIR.

18  Q.    CAUSING INJURIES TO THE POINT WHERE YOU COULDN'T EVEN

19  RECOGNIZE WHO THAT WAS, WHO WAS LAYING IN THAT CAGE INJURED?

20  A.    CORRECT.

21        MR. STEVENS:  PASS.  THANK YOU.

22        MR. BLACK:  NO FURTHER QUESTIONS OF THIS WITNESS,

23  YOUR HONOR, AT THIS TIME.

24        THE COURT:  DOES ANYBODY HAVE ANY FURTHER QUESTIONS,

25  OR MAY HE BE EXCUSE?

90

1          MR. BLACK:  NO OBJECTION TO HIM BEING EXCUSED,

2    SUBJECT TO RECALL, YOUR HONOR, IN THE EVENT THE DEFENSE RECALLS

3    HIM AS A WITNESS.

4          THE COURT:  ALL RIGHT.  YOU ARE EXCUSED SUBJECT TO

5    RECALL.

6          WE WILL TAKE THIS TIME FOR A LUNCH BREAK AND WILL ASK

7    YOU TO BE BACK AT 1:10, PLEASE.

8          IS THAT ENOUGH TIME?

9          LET ME SEE SOME EXPRESSIONS FROM THE JURY.  IF IT'S

10   NOT -- NORMALLY I TAKE AN HOUR AND 15 MINUTES.  BUT MY CLOCK

11   SAYS 5 MINUTES UNTIL 12, SO THAT WILL BE ABOUT AN HOUR AND

12   15 MINUTES.

13         WE WILL SEE YOU BACK AT 1:10.

14         (RECESS AT 12:00 P.M. UNTIL 1:14 P.M.)

15                    AFTERNOON SESSION

16         THE COURT:  ALL RIGHT, BRING THE JURY IN.

17         BE SEATED.

18              (JURY IN THE BOX)

19         THE COURT:  OKAY.  BE SEATED, PLEASE.

20         MR. STEVENS.

21         MR. STEVENS:  RUSSELL HAAS.

22         THE COURT:  RUSSELL HAAS.

23         RUSSELL HAAS, GOVERNMENT'S WITNESS, SWORN

24                 DIRECT EXAMINATION

25   BY MR. STEVENS:

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

1     Q.     TELL US YOUR FULL NAME, SIR.

2     A.     RUSSELL JOHN HAAS.

3     Q.     HOW ARE YOU EMPLOYED?

4     A.     FEDERAL BUREAU OF PRISONS.

5     Q.     AND HOW LONG HAVE YOU BEEN WITH THE B.O.P.?

6     A.     ELEVEN YEARS AND 11 MONTHS.

7     Q.     WHAT DO YOU DO FOR THE BUREAU OF PRISONS?

8     A.     I AM A CORRECTIONAL SUPERVISOR.

9     Q.     AND WHAT DOES THAT MEAN?

10     A.     I AM A LIEUTENANT.

11     Q.     AND WHAT DO YOU DO AS A LIEUTENANT?

12     A.     MY INITIAL RESPONSIBILITIES ARE THE CARE AND CONFINEMENT

13 OF INMATES AND THE SAFETY OF STAFF ON A DAILY BASIS.

14     Q.     HOW MUCH EXPERIENCE AND TRAINING HAVE YOU HAD IN DOING

15 YOUR JOB, SIR?

16     A.     WITHIN THE LAST 11 YEARS IT'S BEEN A CONSTANT TRAINING,

17 TRAINING ENVIRONMENT EVERYDAY.

18     Q.     DO YOU KNOW THE DEFENDANT IN THIS CASE, SHANNON AGOFSKY?

19     A.     YES, I DO.

20     Q.     HOW DID YOU COME TO KNOW HIM?

21     A.     HE WAS AN INMATE AT THE U.S.P. BEAUMONT.

22     Q.     AND DID YOU KNOW LUTHER PLANT?

23     A.     YES, I DID.

24     Q.     AS FAR AS PHYSICAL CHARACTERISTICS OF THE DEFENDANT

25 VERSUS LUTHER PLANT, HOW WOULD YOU DESCRIBE EACH OF THEM?

1    A.    LUTHER PLANT WAS A SMALLER FRAME IN NATURE, NOT

2    ATHLETICALLY BUILT, AS OPPOSED TO MR. AGOFSKY WHO WAS IN ABOVE

3    AVERAGE SHAPE AT THE TIME.

4    Q.    DID YOU EVER SEE THE DEFENDANT WORKOUT?

5    A.    YES, I DID.

6    Q.    DID YOU EVER SEE HIM WORKOUT IN FIGHTING ACTIVITIES?

7    A.    HE WOULD WORKOUT IN AN AGGRESSIVE MANNER.

8    Q.    AND DID YOU EVER -- CAN YOU DESCRIBE ANY OF THE WORKOUTS

9    YOU WITNESSED?

10   A.    JUST VERY, VERY, PHYSICAL, VERY DEMANDING ON THE

11   PHYSICAL BODY, AND WOULD CONTINUE THAT FOR HIS RECREATION

12   PERIOD, WHICH USUALLY LASTED UP TO AN HOUR.

13   Q.    DID YOU EVER SEE HIM USE A PUNCHING BAG?

14   A.    NO, I DID NOT SEE HIM USE A PUNCHING BAG.

15   Q.    YOU ALL DON'T HAVE PUNCHING BAGS THERE?

16   A.    NO, SIR.

17   Q.    ON JANUARY THE 5TH, 2001, WHAT WERE YOU DOING?

18   A.    I WAS IN THE SPECIAL HOUSING UNIT AT U.S.P. BEAUMONT,

19   CONDUCTING AN INTERVIEW WITH AN INMATE.

20   Q.    AND ARE YOU FAMILIAR WITH THE INCIDENT WHERE THE

21   DEFENDANT ASSAULTED LUTHER PLANT?

22   A.    YES, I AM.

23   Q.    WHAT WERE YOU DOING AT THAT TIME?

24   A.    AT THE TIME OF THE ASSAULT I WAS -- AS I SAID EARLIER,

25   CONDUCTING AN INTERVIEW WITH AN INMATE WHEN I HEARD THE

93

1    RESPONDING STAFF ENTER THE UNIT.

2    Q.    AND WHAT DID YOU DO THEN?

3    A.    I RESPONDED OUT TO THE REC CAGE AND OBSERVED THE SUBJECT

4    AND THE VICTIM.

5    Q.    AND DID YOU HAVE AN OCCASION TO BE WITH THE DEFENDANT

6    SUBSEQUENT TO THIS ASSAULT WHEN THE DEFENDANT WAS BEING VIDEOED

7    OR PHOTOGRAPHED?

8    A.    COULD YOU REPEAT THAT, PLEASE.

9    Q.    WERE YOU A WITNESS TO THE DEFENDANT BEING VIDEOED OR

10   PHOTOGRAPHED BY B.O.P. AUTHORITIES?

11   A.    YES.

12   Q.    OKAY.  I AM GOING TO SHOW YOU WHAT'S BEEN MARKED AS

13   GOVERNMENT'S EXHIBIT NO. 13, A VIDEOTAPE.

14         ARE YOU FAMILIAR WITH THIS TAPE?

15   A.    YES.

16   Q.    YOU SAW IT BEFORE, WE VIEWED IT TOGETHER BEFORE TODAY?

17   A.    YES, SIR.

18   Q.    IS IT A TRUE AND ACCURATE REPRESENTATION OF WHAT IT IS

19   SHOWING?

20   A.    YES, SIR.

21   Q.    ON THE FIRST PART OF IT, DOES IT SHOW THE RECREATIONAL

22   CAGES, GENERALLY SPEAKING, IMMEDIATELY AFTER THIS ASSAULT?

23   A.    YES.

24   Q.    AND DOES IT SHOW THE DEFENDANT, THE VIDEO OF THE

25   DEFENDANT AND HIS APPEARANCE?

94

1    Q.    AND BOTH OF THOSE LAST ABOUT A MINUTE EACH?

2    A.    YES.

3          MR. STEVENS:  YOUR HONOR, FOR THE PURPOSE OF THIS

4    RECORD, WE ARE GOING TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT

5    NO. 13, THIS VIDEO OF THE REC CAGE AND THE DEFENDANT.

6          MR. BLACK:  NO OBJECTION TO GOVERNMENT'S 13, YOUR

7    HONOR, AS I BELIEVE THIS IS THE VIDEOTAPE THAT'S PREVIOUSLY

8    BEEN SUPPLIED BY THE GOVERNMENT TO US.

9          THE COURT:  ALL RIGHT, GOVERNMENT'S EXHIBIT 13 IS

10   ADMITTED.

11         MR. STEVENS:  THANK YOU.

12         AT THIS TIME WE ARE GOING TO PLAY THIS VIDEO.  AND IT

13   ONLY LAST ABOUT TWO MINUTES.

14                       (VIDEO BEING PLAYED)

15   Q.    (BY MR. STEVENS)  NOW, THERE IS NO AUDIO, SO WOULD YOU,

16   PLEASE, DESCRIBE WHAT WE ARE SEEING RIGHT NOW?

17   A.    THAT IS RECREATION CAGE NO. 3 IN THE SPECIAL HOUSING

18   UNIT AT U.S.P. IN BEAUMONT.  IT APPEARS TO BE EVIDENCE AS IT

19   WAS LEFT IN ITS PRISTINE STATE, WITH SOME BLOOD AND BLOOD

20   STAINED SHOES, BLOODY -- SHOES THAT ARE ISSUED TO THE INMATES

21   IN SPECIAL HOUSING.

22   Q.    ALL OF THE SPECIAL HOUSING INMATES ARE ISSUED THOSE

23   SHOES?

24   A.    YES, SIR.

25   Q.    LET ME ASK: THE BOTTOM OF THOSE SHOES, WHAT DO THEY LOOK

95

1    LIKE?

2    A.    THEY'RE A WHITE SOLE WITH A -- THEY'RE DESIGNED, HAS A

3    DESIGN LIKE THAT ON IT (INDICATING).

4    Q.    NOW, RIGHT HERE WHAT ARE WE SEEING?

5    A.    THAT IS MYSELF CONDUCTING A VISUAL CHECK OF INMATE

6    AGOFSKY.

7    Q.    DOES HE HAVE ANY INJURIES THAT YOU WERE ABLE TO SEE AT

8    ALL, OTHER THAN SOMETHING ON HIS ARM?

9    A.    NONE.

10   Q.    AND THAT IS IT RIGHT THERE?

11   A.    YES, SIR.

12   Q.    A LITTLE HOLE IN HIS FOREARM?

13   A.    YES, SIR.

14   Q.    AND IT LOOKS LIKE IT'S BLEEDING?

15   A.    YES, THERE IS BLOOD COMING OUT OF IT.

16   Q.    WHAT ARE WE SEEING NOW?

17   A.    BLOOD STAINED BOTTOM OF THE LEFT PANT LEG AND ON THE

18   RIGHT THIGH AREA AS WELL.

19   Q.    OKAY.  AND THE DEFENDANT, THIS IS IMMEDIATELY AFTER THIS

20   ASSAULT, HOW DID HE APPEAR TO YOU?

21   A.    VERY CALM.  VERY CALM.

22   Q.    AND THE DEFENDANT'S SHOES, WHERE WERE THEY?

23   A.    I HAD THOSE SHOES REMOVED AND PLACED IN A SPECIAL PAPER

24   BAG MARKED AS EVIDENCE.

25   Q.    OKAY.  BUT HE WAS WEARING SHOES?

96

1    A.      YES, SIR.

2    Q.      OKAY.  AND THE SHOES THAT LOOK LIKE THOSE ORANGE SHOES

3    THAT WE SAW IN CAGE 3?

4    A.      YES, SIR.

5          MR. STEVENS:  ALL RIGHT.  WE PASS THIS WITNESS.

6                          CROSS-EXAMINATION

7    BY MR. BLACK:

8    Q.      MR. HAAS, IF I UNDERSTAND YOUR TESTIMONY CORRECTLY, YOU

9    DID NOT WITNESS THE FIGHT?

10   A.      NO, I DID NOT.

11   Q.      OKAY.  BECAUSE YOU WERE IN ANOTHER AREA WITHIN THE

12   B.O.P. FACILITY WHEN YOU FIRST LEARNED OF THE FIGHT.

13   A.      I WAS IN THAT HOUSING UNIT, YES, I WAS.

14   Q.      OKAY.  DID YOU GO TO THE RECREATIONAL AREA BEFORE

15   OFFICER MATT AND THE OTHER OFFICERS ENTERED RECREATIONAL CAGE

16   NO. 3?

17   A.      DID I GO INTO THE REC CAGE BEFORE THE ASSAULT HAD TAKEN

18   PLACE?

19   Q.      INTO THE REC CAGE AREA.

20   A.      I WAS OUT IN THE REC CAGE AREA, BUT NOT IN THAT SPECIFIC

21   CAGE.

22   Q.      OKAY.  WHEN YOU WENT TO THE REC CAGE AREA, WAS MR.

23   AGOFSKY STILL IN REC CAGE NO. 3?

24   A.      NO.

25   Q.      HE HAD ALREADY BEEN REMOVED?

1    A.    YES.

2    Q.    OKAY.  DURING THE TIME PERIOD THAT YOU YOURSELF WERE

3    WITH MR. AGOFSKY, DID HE STRUGGLE, PHYSICALLY STRUGGLE WITH YOU

4    IN ANY WAY?

5    A.    NO.

6    Q.    WAS HE VIOLENT TOWARD YOU IN ANY MANNER?

7    A.    NO.

8    Q.    MR. MATT'S IMMEDIATE SUPERVISOR WAS LIEUTENANT MEL LYNN

9    IN JANUARY OF 2001; IS THAT CORRECT?

10   A.    YES.

11   Q.    OKAY.  SO YOU WERE NOT THE LIEUTENANT THAT WAS HIS

12   IMMEDIATE SUPERVISOR?

13   A.    WE'RE ALL -- WE SUPERVISE ALL OF THE OFFICERS.

14   Q.    OKAY.  BUT ON THE DATE THAT THIS HAPPENED WAS MR. MATT,

15   AS THE RECREATIONAL OFFICE, WAS HIS IMMEDIATE SUPERVISOR

16   LIEUTENANT LYNN?

17   A.    YES.

18   Q.    OKAY.  NOW, IT'S NOT UNUSUAL FOR THE INMATES AT THE

19   BEAUMONT U.S.P. TO WORKOUT ON A REGULAR BASIS, IS IT?

20   A.    NO.  THAT'S PART OF THEIR DAILY ROUTINE.

21   Q.    IN FACT, I MEAN THEY DO IT ON A REGULAR AND REOCCURRING

22   DAILY BASIS, WOULDN'T YOU SAY?

23   A.    YES.

24   Q.    AND ONE OF THE REASONS THEY DO IT IS OUT OF BOREDOM; IS

25   THAT CORRECT?

1   A.      I MEAN THEY'RE OUT THERE IN THE REC CAGE AT THEIR

2   REQUEST.

3   Q.      OKAY.  AND THAT'S FOR ONE HOUR EACH AND EVERY DAY, OR IS

4   IT ONE HOUR FIVE DAYS A WEEK?

5   A.      IT'S ONE HOUR AND IT HAS TO BE A MINIMUM OF FIVE HOURS A

6   WEEK.

7           MR. BLACK:  OKAY.  THANK YOU VERY MUCH.

8           NO FURTHER QUESTIONS, YOUR HONOR.

9           MR. STEVENS:  PASS THIS WITNESS.  THANK YOU.

10          THE COURT:  ALL RIGHT, SIR, YOU'RE EXCUSED.  THANK

11  YOU.

12          MR. BLACK, DO YOU HAVE ANY INTENTION OF RECALL OF

13  THIS WITNESS?

14          MR. BLACK:  NOT AT THIS TIME, YOUR HONOR.

15          THE COURT:  MR. STEVENS?

16          MR. STEVENS:  NO, SIR.

17          THE COURT:  ALL RIGHT, SIR, YOU'RE FULLY EXCUSED.

18  NEXT WITNESS.

19          MR. STEVENS:  WALTER MOSS.

20          WALTER MOSS, GOVERNMENT'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22  BY MR. STEVENS:

23  Q.      PLEASE TELL US YOUR FULL NAME AND HOW YOU ARE EMPLOYED.

24  A.      I'M WALTER MOSS, I'M A PHYSICIAN'S ASSISTANT; AND I WORK

25  FOR UTMB THAT IS CONTRACTED TO THE B.O.P. HERE IN BEAUMONT.

99

1    Q.    TELL US A LITTLE BIT ABOUT WHAT A PHYSICIAN'S ASSISTANT

2    IS AND WHAT KIND OF TRAINING AND EXPERIENCE YOU PERSONALLY HAVE

3    HAD.

4    A.    A PHYSICIAN'S ASSISTANT IS ONE WHO IS DELEGATED

5    RESPONSIBILITIES IN THE PRACTICE OF MEDICINE AND IS SUPERVISED

6    BY THE PERSON WHO IS DELEGATING THE RESPONSIBILITIES, WHICH

7    WOULD BE A PHYSICIAN.

8          I WAS EDUCATED AT THE UNIVERSITY OF TEXAS IN DALLAS.  IT

9    WAS THE HEALTH SCIENCE CENTER AT THE TIME I WAS THERE.  IT'S

10   UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL SCHOOL NOW, WHICH WAS

11   A TWO-YEAR PROGRAM CULMINATING IN A BS DEGREE.

12   Q.    AND HOW LONG HAVE YOU BEEN A PHYSICIAN'S ASSISTANT?

13   A.    IT WILL BE -- NEXT YEAR WILL BE 40 YEARS.

14         NO.  I'M SORRY.  THIRTY YEARS.

15   Q.    TIME GOES BY.

16   A.    YES, IT DOES.

17   Q.    ON JANUARY 5TH, 2001, WHAT WERE YOU DOING, SIR?

18   A.    I WAS SEEING CLINIC PATIENTS IN THE MEDICAL DEPARTMENT

19   OF THE U.S. PENITENTIARY, BEAUMONT.

20   Q.    AND IS THAT WHERE YOU WORKED REGULARLY AT THAT TIME?

21   A.    I WAS BEING -- I WAS SOMETIMES AT THE -- SOME OF THE

22   OTHER INSTITUTIONS.  I WOULD WORK AT THE LOW SECURITY, THE

23   CAMP, AND THE MEDIUM AT TIMES.

24   Q.    OKAY.  WAS AN INMATE BROUGHT IN LATE IN THE MORNING WITH

25   SERIOUS INJURIES?

1    A.    YES, SIR.

2    Q.    AND WHAT DID YOU AND YOUR STAFF DO TO ATTEND TO THIS

3    INMATE?

4    A.    WE ASSESSED THE PATIENT TO DETERMINE WHAT WAS NECESSARY

5    TO MAINTAIN LIFE AT THAT TIME.

6    Q.    CAN YOU DESCRIBE FOR THE JURY WHAT YOU WERE ABLE TO

7    DETERMINE THE EXTENT OF HIS INJURIES WERE AT THE TIME YOU WERE

8    ADMINISTERING TO HIM?

9    A.    AT THE TIME THAT I SAW THE PATIENT HE WAS ON HIS BACK IN

10   WHAT WE CALL THE TREATMENT OR EMERGENCY ROOM.  HE WAS NOT

11   RESPONSIVE TO VOICE AT THE TIME NOR WAS HE RESPONSIVE TO ANY OF

12   THE NEUROLOGICAL TESTING, AS IN CORONIA REFLEX.  HOWEVER, THE

13   OBLIGATION AT THE TIME WAS TO MAINTAIN AN AIRWAY.  AND WE

14   ACCOMPLISHED FROM -- AT LEAST FROM ABOVE THE VOCAL CORDS THAT

15   THE AIRWAY WAS CLEAR AT THAT TIME.  AND I USED A BAG VALVE MASK

16   TO ADMINISTER OXYGEN TO ASSIST HIS VENTILATION.

17   Q.    DID THE PATIENT HAVE A PULSE AT ALL TIMES YOU WERE

18   ATTENDING TO HIM?

19   A.    THERE WAS A PULSE WHEN WE FIRST STARTED TO RESUSCITATE

20   THE PATIENT, BUT IT WAS SOMETIME AFTERWARDS THAT WE HAD LOST

21   THAT TOO.  BUT WE DID NOT STOP ANY -- AND WE HAD ALSO BEGUN AT

22   THAT TIME EXTERNAL CARDIAC PRESSURE AS WELL AS RESUSCITATIVE

23   EFFORT.

24   Q.    SO DID THE VICTIM QUIT BREATHING AT ANY TIME WHILE YOU

25   WERE ATTENDING TO HIM?

1    A.    HE HAD VERY LITTLE RESPIRATION WHEN WE WERE ATTENDING TO

2    HIM, IF ANY AT ALL.  WE WERE HAVING TO ASSIST HIS RESPIRATIONS

3    THE FULL TIME THAT I WAS THERE.

4    Q.    DID HIS HEART STOP AT ANY TIME?

5    A.    YES, HIS HEART DID STOP.

6    Q.    AND FOR HOW LONG WOULD YOU SAY HE HAD NO PULSE?

7    A.    I WOULD SAY FOR AT LEAST FIVE OR SIX MINUTES.

8    Q.    AND FROM YOUR EXPERIENCE AND TRAINING, IS THAT REALLY A

9    TERMINAL CONDITION?

10   A.    YES.

11   Q.    THE INJURIES THAT YOU SAW ON THE VICTIM, CAN YOU

12   GENERALLY DESCRIBE THEM?

13   A.    THE INJURIES THAT I ASSESSED WERE MORE FROM THE NECK UP

14   AND WERE SUPERFICIAL.  THE MAN -- THE PATIENT APPEARED TO HAVE

15   NO SPONTANEOUS REACTION AT ALL.  HIS --

16   Q.    LET ME JUST STOP YOU RIGHT THERE.  WHAT DOES THAT MEAN?

17   CAN YOU DESCRIBE IN LAYMAN'S TERMS?

18   A.    IF YOU WOULD YELL INTO HIS EAR, HE WOULD NOT RESPOND.

19   IF YOU WOULD TOUCH HIS EYELASH, HE WOULD NOT BLINK.

20   Q.    AND WHAT DOES THAT MEAN TO YOU AT THE TIME?

21   A.    THERE IS NO NEUROLOGICAL RESPONSE.  AND THAT MEANS HE,

22   FROM A CLINICAL STANDPOINT, AS I STOOD THERE, HE WAS CLINICALLY

23   DEAD.  ALTHOUGH, I'M NOT, IN MY POSITION, LICENSED TO MAKE THAT

24   DECISION.

25   Q.    IS THAT WHY HE IS TRANSPORTED ULTIMATELY TO --

1    A.    YES.

2    Q.    -- MID-JEFFERSON HOSPITAL?

3    A.    WE CONTINUE -- WE CONTINUE THE ARTIFICIAL RESPIRATIONS

4    WITH A BAG VALVE MASK AND EXTERNAL CARDIAC MASSAGE UNTIL THE

5    PARAMEDICS GET THERE.  THEY TAKE OVER, THEY TAKE THE PATIENT TO

6    THE HOSPITAL AND HE IS PRONOUNCED THERE.

7    Q.    BUT, ESSENTIALLY, ARE YOU GOING THROUGH THE MOTIONS IN

8    THIS CASE?

9    A.    YES, SIR.

10   Q.    BUT FROM WHAT YOU KNOW FROM YOUR EXPERIENCE, THEY'RE NOT

11   HAVING A POSITIVE EFFECT ON THIS PERSON?

12   A.    THAT'S TRUE.

13   Q.    I'M GOING TO SHOW YOU WHAT'S BEEN INTRODUCED AS

14   GOVERNMENT'S EXHIBIT NO. 2.  AND WE'RE GOING TO START WELL INTO

15   THIS VIDEO.  AND IT WILL SHOW YOU AND OTHER MEMBERS OF YOUR

16   STAFF ATTENDING TO THIS PARTICULAR PATIENT.

17        BY THE WAY, WHO IS THE SENIOR OFFICIAL HERE IN THIS ROOM

18   AT THIS TIME?

19   A.    MEDICAL?

20   Q.    YES, SIR.

21   A.    I THINK IT WAS I.

22   Q.    IT WAS YOU?

23   A.    YES, SIR.

24   Q.    I MEAN YOU HAVE A ROSS, MS. ROSS THERE.  AND IS SHE

25   SENIOR TO YOU OR?

1   A.    WE ARE PROBABLY PARALLEL.  SHE WAS THE HEAD NURSE ON THE

2   UNIT.

3   Q.    ALL RIGHT.  IF WE CAN GET THE VIDEO TO BEGIN, THEN I

4   WANT TO PICK UP SOMETHING ON THIS.

5         UP TO YOUR RIGHT IT WILL BE THE SCREEN WHEN THIS IS

6   DISPLAYED.

7         MR. STEVENS:  2004 IN CUTTING EDGE ELECTRONICS.

8   Q.    (BY MR. STEVENS)  DID YOU MAKE -- WHILE WE'RE WORKING

9   ON THIS, DID YOU COMPLETE A MEDICAL REPORT OF HIS INJURIES?

10  A.    YES, I DID.

11  Q.    I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS GOVERNMENT'S

12  EXHIBIT NO. 14, AND I'M GOING TO ASK YOU IF YOU CAN RECOGNIZE

13  THIS?

14        MR. STEVENS:  IF I MAY APPROACH?

15  Q.    (BY MR. STEVENS)  DO YOU RECOGNIZE GOVERNMENT'S

16  EXHIBIT 14?

17  A.    YES, SIR.

18  Q.    AND WHAT IS THAT, SIR?

19  A.    THIS IS AN ACCIDENT REPORT, AN INJURY REPORT.  THAT'S

20  THE USUAL FORM USED BY THE BUREAU OF PRISONS.  THE FIRST PART

21  OF IT WAS FILLED OUT BY MS. ROSS, THE HEAD NURSE.  AND SHE

22  DESCRIBED THE PATIENT'S CURRENT ILLNESSES AND WHAT WAS REPORTED

23  TO HER, AND HER PHYSICAL ASSESSMENT OF THE PATIENT WHEN HE

24  ARRIVED.

25  Q.    OKAY.  AND THE PORTION YOU FILLED OUT, WHAT DID THAT

1   INVOLVE?

2   A.    THE FACT -- THE ACTION THAT WAS TAKEN TO TAKE CARE OF

3   THE PATIENT.  SHOULD I READ IT OR?

4   Q.    WELL, YOU CAN SUMMARIZE.

5   A.    WELL, IT'S WHAT I INDICATED BEFORE.  WE ESTABLISHED AN

6   AIRWAY AND DESCRIBED WHAT WAS FOUND AS WE LOOKED INTO THE ORAL

7   PHARYNX, AND -- WHICH WAS BLOOD AND ALSO WAS, INCIDENTALLY,

8   FOUND SOME DENTURES OR TEETH THAT WERE THERE -- I'M NOT SURE

9   WHETHER THEY WERE FALSE TEETH OR HIS TEETH -- TO CLEAR THE

10  AIRWAY.  AND IT DOCUMENTED THE FACT THAT THE MAN HAD

11  VENTRICULAR FIBRILLATION.

12  Q.    WHICH MEANS?

13  A.    WHICH MEANS THAT IT WAS A INEFFECTUAL BEATING OF THE

14  HEART.  AND THAT WAS CORRECTED TO A FASTER NORMAL RHYTHM AS WE

15  CLEARED THE AIRWAY.  AND THEN THE BAG VALVE MASK AND SUCTION

16  WERE APPLIED.  AND DURING THE TIME WAITING BY -- FOR THE

17  PARAMEDICS TO COME, HIS -- WE LOST THE RHYTHM OF THE HEART ON

18  THE EKG MACHINE OR THE MONITOR THAT WE HAD ON HIM.

19       THE MEDICS AT THAT TIME APPEARED TO BE ABLE TO

20  SUCCESSFULLY INTUBATE THE PATIENT; THAT IS, PUT A TUBE INTO THE

21  BRONCHUS IN ORDER TO ASSIST HIS BREATHING.

22  Q.    OKAY.

23  A.    THAT WAS WHAT WAS DESCRIBED HERE.

24  Q.    AND THAT'S WHAT YOU WROTE?

25  A.    YES.

105

1    Q.    OKAY.  IN SUMMARY, THOUGH, DID YOU LOSE THE PATIENT

2    THERE --

3    A.    YES, SIR.

4    Q.    -- IN THAT FACILITY?

5    A.    ESSENTIALLY HE WAS LOST.

6    Q.    HE DIED THERE?

7    A.    YES, SIR.

8    Q.    BUT HE WAS, NONETHELESS, TRANSPORTED TO A FACILITY WHERE

9    A FORMAL DETERMINATION OF RENDERING OF DEATH IS MADE BY A

10   LICENSED PHYSICIAN RATHER THAN A PHYSICIAN'S ASSISTANT?

11   A.    YES.

12        MR. STEVENS:  OKAY.  WE PASS THIS WITNESS.  THANK

13   YOU.

14                   CROSS-EXAMINATION

15   BY MR. BLACK:

16   Q.    MR. MOSS, FROM LOOKING AT YOUR RESUME IT APPEARS THAT

17   DURING YOUR 30 YEARS OF MEDICAL EXPERIENCE YOU HAVE WORKED AT A

18   LOT OF DIFFERENT HOSPITALS, A LOT OF DIFFERENT CLINICS AND

19   YOU'VE GOT A PRETTY DIVERSE BACKGROUND AND EXPERIENCE; IS THAT

20   CORRECT?

21   A.    YES, SIR.

22   Q.    OKAY.  DURING THE 30 YEARS THAT YOU HAVE BEEN INVOLVED

23   IN THE MEDICAL FIELD, HAVE YOU EVER HAD THE OPPORTUNITY TO

24   TREAT OR TO SEE PATIENTS THAT WERE HEROIN ADDICTS?

25   A.    NO, SIR.

106

1    Q.    ARE YOU FAMILIAR --

2    A.    MAY I -- MAY I BACK THAT UP?

3    Q.    YES, SIR.

4    A.    ON TWO OCCASIONS I HAVE HAD CONTACT WITH HEROIN ADDICTS

5    ON RECEIVING THEM INTO THE FEDERAL SYSTEM, IN MY LATEST --

6    Q.    IN OTHER WORDS, DURING THE IN PROCESSING IS WHAT YOU ARE

7    REFERRING TO?

8    A.    YES, SIR.  BUT I HAVE NOT HAD ANY COUNSELING EXPERIENCE

9    WITH AN ADDICT.

10    Q.    HAVE YOU, DURING YOUR EXPERIENCE, WORKED WITH ANY

11    INMATES AFTER THEY WERE IN PROCESSED INTO THE FEDERAL BUREAU OF

12    PRISONS THAT WERE HEROIN ADDICTS?

13    A.    FOR THE HEROIN ADDICTION?

14    Q.    YES, SIR.

15    A.    NO, SIR.

16    Q.    OKAY.

17          MR. BLACK:  PASS THE WITNESS, YOUR HONOR.

18          MR. STEVENS:  NOTHING FURTHER FROM THIS WITNESS.

19          THANK YOU VERY MUCH.

20          THE COURT:  YOU HAVE GOT YOUR -- ALL RIGHT.  YOU'RE

21    EXCUSED AND I THANK YOU, SIR.

22          NEXT WITNESS.

23          MR. STEVENS:  NINA HOLLAND.

24          NINA HOLLAND, GOVERNMENT'S WITNESS, SWORN

25                  DIRECT EXAMINATION

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

1   BY MR. STEVENS:

2   Q.      TELL US YOUR FULL NAME, PLEASE, AND HOW YOU ARE

3   EMPLOYED.

4   A.      NINA ANN HOLLAND.  I'M A NURSE WITH UTMB.

5   Q.      AND ON JANUARY 5TH, 2001, WHERE WERE YOU EMPLOYED?

6   WHERE WERE YOU LOCATED?

7   A.      UTMB.  I WORK AT THE FEDERAL COMPLEX AS A CONTRACT

8   NURSE.

9   Q.      WHEN YOU SAY THE FEDERAL COMPLEX, IS THAT THE FEDERAL

10  CORRECTIONAL INSTITUTION, INCLUDING THE UNITED STATES

11  PENITENTIARY HERE IN BEAUMONT?

12  A.      YES.

13  Q.      CAN YOU TELL US WHAT YOUR OCCUPATION IS?

14  A.      I'M A NURSE.

15  Q.      AND WHAT KIND OF EXPERIENCE AND TRAINING HAVE YOU HAD IN

16  NURSING?

17  A.      NURSING, I WAS A NURSE AT THE COUNTY JAIL.  THEN I WAS A

18  NURSE AT THE STATE PRISON AT STILES IN BEAUMONT.  AND THEN WHEN

19  THE FEDERAL OPENED, I TRANSFERRED OVER THERE.

20  Q.      HOW MANY YEARS OF EXPERIENCE HAVE YOU IN NURSING?

21  A.      IN NURSING ALL TOGETHER?

22  Q.      YES, MA'AM.

23  A.      SINCE 1991.

24  Q.      AND NOW WHAT IS YOUR CAPACITY AS A NURSE?  ARE YOU AN

25  L.V.N., A LICENSED VOCATIONAL NURSE?

108

1    A.    YES, SIR.  LICENSED VOCATIONAL NURSE.

2    Q.    YOU ARE.  WHAT DOES THAT MEAN?

3    A.    I WENT TO COLLEGE TO BE A LICENSED VOCATIONAL NURSE.

4    Q.    OKAY.  DO YOU HAVE A DEGREE IN THAT?

5    A.    YES, SIR.

6    Q.    OKAY.

7          ON JANUARY 5TH, 2001, WERE YOU CALLED TO THE SPECIAL

8    HOUSING UNITS RECREATIONAL CAGES TO ATTEND TO A VICTIM?

9    A.    YES, SIR.

10   Q.    AND TELL US WHAT YOU DID.

11   A.    WELL, WE WENT IN -- I HAD ANOTHER NURSE WITH ME, AND WE

12   WENT IN AND WENT TO THE REC YARD.  AND WE JUST SCOOPED THE

13   INMATE UP AND RAN BACK WITH HIM TO THE E.R.

14   Q.    DID YOU KNOW WHO IT WAS?

15   A.    NO, I DID NOT.

16   Q.    DID YOU LATER FIND OUT THE VICTIM WAS LUTHER PLANT?

17   A.    YES.

18   Q.    DID YOU KNOW LUTHER PLANT?

19   A.    NOT REALLY KNOW HIM.  HE WAS IN SPECIAL HOUSING, SO I

20   MADE ROUNDS EVERYDAY IN THE SPECIAL HOUSING UNIT.

21   Q.    WOULD YOU HAVE RECOGNIZED HIM HAD YOU KNOWN?

22   A.    YES, I BELIEVE SO.

23   Q.    ON THAT DAY YOU DIDN'T KNOW WHO THAT WAS, WHO WAS

24   INJURED?

25   A.    NO, SIR.

109

1    Q.    WHY NOT?

2    A.    BECAUSE HIS FACE WAS SWOLLEN AND HE WAS BLEEDING, AND I

3    JUST COULDN'T RECOGNIZE HIM.

4    Q.    NOW, IN THE VIDEO WE SEE A BLOND LADY WHO IS WORKING --

5    WHO GOES INTO THE CAGE AND RUNS OFF WITH THE GROUP OF PEOPLE

6    CARRYING LUTHER PLANT TO THE HEALTH FACILITY.  NOW, DO YOU KNOW

7    WHO THAT BLOND LADY IS?

8    A.    ME.

9    Q.    THAT'S YOU, OKAY.  SO WE KNOW WHO YOU ARE AND WHERE YOU

10   ARE IN THERE.

11         AND THEN YOU ARE -- WHEN LUTHER PLANT IS BROUGHT TO THE

12   HEALTH FACILITY, ARE YOU ASSISTING WALTER MOSS, MELINDA ROSS

13   AND OTHERS IN TRYING TO ATTEND TO LUTHER PLANT AND HIS

14   INJURIES?

15   A.    YES, SIR.

16   Q.    DID YOU HAVE AN OCCASION TO CHECK THE DEFENDANT'S

17   INJURIES THAT DAY?

18   A.    YES, SIR.

19   Q.    OKAY.  AND DO YOU SEE SHANNON AGOFSKY IN THE COURTROOM

20   TODAY?

21   A.    YES, SIR.

22   Q.    AND DID YOU HAVE AN OCCASION TO REVIEW WITH HIM, CHECK

23   HIM PHYSICALLY AND ATTEND TO ANY FIRST AID THAT HE MIGHT NEED?

24   A.    YES, SIR.

25   Q.    IS THAT NORMAL AND CUSTOMARY FOR YOU TO DO?

110

1    A.    YES.

2    Q.    DO YOU RECALL, WITHOUT LOOKING AT YOUR NOTES ON THIS,

3    THE INJURIES THAT YOU ATTENDED TO ON SHANNON AGOFSKY ON JANUARY

4    5TH, 2001?

5          WOULD YOU LIKE TO REVIEW YOUR NOTES?

6    A.    YES, SIR.

7    Q.    OKAY.  I'M GOING TO SHOW YOU WHAT'S MARKED AS

8    GOVERNMENT'S EXHIBIT NO. 15, FOR YOUR MEMORY RECOLLECTION

9    THERE.

10         IS THAT AN INJURY REPORT THAT YOU MADE CONCERNING THE

11   DEFENDANT AND HIS INJURIES CONCERNING THIS ASSAULT ON JANUARY

12   5TH, 2001?

13   A.    YES, SIR.

14   Q.    AND WHAT DOES IT REFLECT, OR WHAT DO YOU REMEMBER AS YOU

15   TREATED THE DEFENDANT?

16   A.    HE JUST HAD A SMALL SUPERFICIAL HOLE AND A FEW

17   SCRATCHES.

18   Q.    ANYTHING ELSE?

19   A.    NO, SIR.

20   Q.    AND THE INJURIES TO LUTHER PLANT, WHEN YOU SAW HIM AND

21   WHEN YOU WERE ATTENDING TO HIM, DID THOSE INJURIES APPEAR TO BE

22   MINOR OR SEVERE?

23   A.    SEVERE.

24   Q.    AND AS FAR AS TREATMENT FOR THE DEFENDANT, WHAT WAS

25   DONE?  WAS ANY MEDICATION GIVEN, WAS STITCHES GIVEN OR MADE OR

1   WHAT?

2   A.      DEFENDANT IS AGOFSKY?

3   Q.      DEFENDANT, YES, MA'AM.

4   A.      OKAY.  WE JUST CLEANED THE AREA WITH PEROXIDE AND PUT

5   SOME ANTIBIOTIC OINTMENT ON IT.

6   Q.      AND THAT WAS ALL?

7   A.      AND A BAND-AID.

8   Q.      THAT WAS IT, A BAND-AID?

9   A.      YES.

10  Q.      OKAY.  NOW, THE PERSON YOU ATTENDED, DO YOU SEE HIM IN

11  THE COURTROOM TODAY?

12  A.      AGOFSKY, YES.

13  Q.      AND COULD YOU PLEASE POINT HIM OUT, FOR THE PURPOSES OF

14  THIS RECORD?

15  A.      HE'S SITTING RIGHT THERE (INDICATING).

16  Q.      TELL US WHERE HE'S LOCATED.

17  A.      ON THIS TABLE IN THE MIDDLE BETWEEN THESE TWO GENTLEMEN.

18          MR. STEVENS:  YOUR HONOR, FOR THE PURPOSES OF THIS

19  TRANSCRIPTION, WE WOULD ASK THAT THE RECORD REFLECT THAT THE

20  WITNESS HAS IDENTIFIED THE DEFENDANT SHANNON AGOFSKY.

21          THE COURT:  THE RECORD WILL SO REFLECT THAT THE

22  WITNESS HAS IDENTIFIED THE DEFENDANT SHANNON WAYNE AGOFSKY.

23          MR. STEVENS:  AND WE PASS THIS WITNESS.  THANK YOU.

24                      CROSS-EXAMINATION

25  BY MR. BLACK:

112

1    Q.    MS. HOLLAND, YOU WERE NOT PRESENT WHEN THE FIGHT

2    OCCURRED IN RECREATIONAL CAGE NO. 3, WERE YOU?

3    A.    NO, SIR.

4    Q.    OKAY.  BUT PRIOR TO THE FIGHT OCCURRING, YOU WERE AT

5    LEAST SOMEWHAT FAMILIAR WITH MR. LUTHER PLANT, CORRECT?

6    A.    SOMEWHAT.

7    Q.    OKAY.  YOU KNEW WHO HE WAS?

8    A.    YES.

9    Q.    OKAY.  DO YOUR RECORDS INDICATE OR DOES YOUR MEMORY

10   RECALL THAT AT THE TIME OF THE FIGHT MR. PLANT WAS A

11   37-YEAR-OLD WHITE MALE?

12   A.    I KNOW HE WAS A WHITE MALE.  I WOULDN'T KNOW HOW OLD HE

13   WAS.

14   Q.    WOULD YOU DISAGREE IF THE RECORDS SHOW HE WAS 37 YEARS

15   OF AGE?

16   A.    NO, SIR.

17        MR. BLACK:  PASS THE WITNESS, YOUR HONOR.

18        MR. STEVENS:  NOTHING FURTHER.  THANK YOU.

19        THE COURT:  THANK YOU.  YOU'RE EXCUSED.

20        NEXT WITNESS.

21        MR. STEVENS:  WE HAVE A WITNESS THAT WE MUST HAVE

22   JUST A SMALL HEARING ON.  AND WE ASK FOR INDULGENCE ON THAT.

23   THANK YOU.

24        THE COURT:  YOU WANT TO EXCUSE THE JURY?

25        MR. STEVENS:  YES, SIR.

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

```
 1          THE COURT:  AS I MENTIONED AT ONE OF OUR PRIOR VOIR
 2   DIRES AND DISCUSSIONS, WE WILL HAVE SOME HEARINGS OUTSIDE OF
 3   THE PRESENCE OF THE JURY BEFORE WE CONTINUE WITH THE CASE.
 4          AND I WILL, AGAIN, ASK YOUR INDULGENCE AND YOUR
 5   PATIENCE AND YOU ARE EXCUSED UNTIL WE FINISH THE HEARING, WHICH
 6   SHOULD BE VERY BRIEF.  THANK YOU.
 7              (JURY OUT AT 1:53 P.M.)
 8          THE COURT:  ALL RIGHT.
 9          MR. STEVENS:  YOUR HONOR, WE HAVE A WITNESS, DENNIS
10   HILL; AND DENNIS HILL IS A BUREAU OF PRISONS CORRECTIONAL
11   OFFICER.  HE ESCORTED THE DEFENDANT FROM THE EXERCISE CAGE TO
12   THE AREA WHERE THE VIDEO EXHIBIT THAT WAS RECENTLY INTRODUCED
13   WHERE THE DEFENDANT WAS VIDEOED FROM HEAD TO TOE WHERE THAT
14   TOOK PLACE.  AND THE WITNESS' -- WE'RE PROFFERING THE WITNESS
15   FOR TWO THINGS.  NO. 1, FOR HIS RECOGNITION OF THE DEFENDANT'S
16   ATTITUDE AND HIS APPEARANCE; AND, ALSO, FOR A STATEMENT THAT
17   THE DEFENDANT MAKES TO THIS WITNESS.  THE STATEMENT IS A VERY
18   SHORT STATEMENT.  IT IS NOT THE PRODUCT OF INTERROGATION.  IT'S
19   A VOLUNTEERED STATEMENT INITIATED BY THE DEFENDANT.  AND IT IS,
20   ESSENTIALLY, "IS THIS GOING TO MEAN THAT I AM GOING TO MISS
21   LUNCH?"
22          HE IS OUTSIDE.  IF THE COURT WISHES, WE MAY CALL HIM
23   JUST FOR THE PURPOSES OF PRESENTING THIS EVIDENCE FOR THE COURT
24   TO RULE UPON.
25          MR. BLACK:  YOUR HONOR, SINCE WE'RE OUTSIDE THE
```

114

1   PRESENCE OF THE JURY, I WOULD SUGGEST THAT WE DO BRING IN MR.

2   HILL IN ORDER FOR THE COURT TO MAKE A DETERMINATION AS TO THE

3   VOLUNTARINESS OF THE ALLEGED STATEMENT, AND WHETHER OR NOT HE

4   WAS IN CUSTODY, AND CONDUCT AN INQUIRY INTO THAT, EVEN THOUGH

5   IT WILL BE VERY BRIEF.

6          MR. STEVENS:  DENNIS HILL.

7            DENNIS ARTHUR HILL, GOVERNMENT'S WITNESS, SWORN

8          THE COURT:  GO AHEAD.

9       DIRECT EXAMINATION (OUTSIDE THE PRESENCE OF THE JURY)

10  BY MR. STEVENS:

11  Q.    TELL US YOUR FULL NAME, SIR.

12  A.    DENNIS ARTHUR HILL.

13  Q.    HOW ARE YOU EMPLOYED?

14  A.    I WORK FOR THE FEDERAL BUREAU OF PRISONS IN BEAUMONT.

15  Q.    DOING WHAT?

16  A.    SENIOR OFFICER SPECIALIST.

17  Q.    AND WHAT DOES THAT MEAN?

18  A.    I'M A SENIOR CORRECTION OFFICER.

19  Q.    HOW LONG HAVE YOU BEEN A CORRECTION OFFICER, SIR?

20  A.    SEVEN YEARS THREE MONTHS.

21  Q.    ON JANUARY 5TH, 2001, WHAT WERE YOU DOING?

22  A.    I WAS WORKING THE S.H.U. FLOOR OFFICER.

23  Q.    WHAT DOES THAT MEAN?

24  A.    ESCORTING INMATES TO AND FROM REC, MEDICAL, FEEDING,

25  MAKING ROUNDS.

115

1   Q.      WERE YOU CLOSE BY WHEN THE ASSAULT OF LUTHER PLANT

2   OCCURRED?

3   A.      YES, I WAS.

4   Q.      AND WHAT DID YOU DO IN REGARDS TO RESPONDING TO THAT?

5   A.      I RESPONDED, AND BY THE TIME I GOT THERE OFF THE RANGE

6   -- I WAS DOWN ONE OF THE RANGES.  BY THE TIME I GOT THERE THEY

7   WERE PULLING INMATE AGOFSKY OFF OF THE REC YARD.  I TOOK

8   CONTROL OF HIM AND ESCORTED HIM TO THE HOLDING CELL.

9   Q.      AND HOW LONG DID THAT TIME TAKE FROM THE ESCORTING OF

10  HIM FROM THE REC CAGES TO THE HOLDING CELL?

11  A.      FIFTEEN, 20 SECONDS.

12  Q.      OKAY.  NOW, DURING THAT TIME DID THE DEFENDANT SAY

13  ANYTHING TO YOU?

14  A.      WHEN I PLACED HIM IN THE HOLDING CELL HE ASKED ME WHEN

15  WE WOULD FEED HIM AND IF HE WAS GOING TO BE FOUR POINTED.

16  Q.      OKAY.  AND WAS THAT A RESPONSE TO ANYTHING YOU ASKED OF

17  HIM?

18  A.      NO.

19  Q.      WAS THAT A STATEMENT THAT HE INITIATED?

20  A.      YES.

21  Q.      AND WAS IT SOMETHING THAT WAS VOLUNTEERED IN ANY WAY --

22  I'M SORRY.  WAS IT -- DID IT APPEAR TO BE A VOLUNTARY STATEMENT

23  OR WAS IT FORCED IN ANY WAY?

24  A.      IT WAS VOLUNTARY.

25  Q.      OKAY.  NOW, HOW DID HE, GENERALLY, DURING THIS TIME YOU

116

1   ESCORTED HIM, HOW DID HE APPEAR TO YOU?

2   A.      CALM, RELAXED.

3   Q.      AND WHEN HE WAS IN THE CELL HE ASKED IF WHEN HE WAS

4   GOING TO BE FED?

5   A.      YES.

6   Q.      AND IF HE WAS GOING TO BE FOUR POINTED?

7   A.      YES, SIR.

8   Q.      WHAT DOES THAT MEAN?

9   A.      STRAPPED DOWN TO THE BED.

10   Q.      AND IS THAT DONE?

11   A.      SOMETIMES IN JUST FOR THE -- IF HE -- FOR THE SAFETY OF

12   STAFF OR THE SAFETY OF HIS OWNSELF, YES; BUT HE WASN'T.

13   Q.      THAT WAS NOT DONE IN THIS CASE?

14   A.      NO, SIR.

15   Q.      BUT NONE OF THIS WAS A PRODUCT OF YOUR INTERROGATION OF

16   HIM?

17   A.      NO.

18   Q.      DID YOU SAY ANYTHING TO HIM AT ALL FROM THE TIME HE WAS

19   MOVED AS YOU WERE ESCORTING HIM FROM THE REC CAGE WHERE THIS

20   OCCURRED WITH LUTHER PLANT TO THE HOLDING CELL?

21   A.      NO.

22           MR. STEVENS:   THANK YOU.

23           CROSS-EXAMINATION (OUTSIDE THE PRESENCE OF THE JURY)

24   BY MR. BLACK:

25   Q.      OFFICER HILL, WHAT TIME IS LUNCH NORMALLY SERVED IN THE

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

117

1    SPECIAL HOUSING UNIT ALSO KNOWN AS THE S.H.U.?

2    A.    ANYWHERE FROM 10:30 TO NOON.

3    Q.    AND WHAT TIME WAS IT WHEN MR. AGOFSKY ASKED YOU ABOUT

4    THE LUNCH SCHEDULE?

5    A.    I DON'T RECALL.

6    Q.    COULD IT HAVE BEEN AFTER 12:00 O'CLOCK?

7    A.    POSSIBLY.

8    Q.    OKAY.  YOU'RE THE OFFICER THAT NORMALLY HANDS OUT THE

9    FOOD TRAYS; IS THAT CORRECT?

10    A.    ONE OF THEM.

11    Q.    OKAY.  IN FACT YOU HAD HANDED OUT FOOD TRAYS BEFORE TO

12    MR. AGOFSKY, CORRECT?

13    A.    YES.

14    Q.    AND IF I UNDERSTOOD YOU CORRECTLY, THE PHRASE THAT YOU

15    USED WAS "FOUR POINT," DID I HEAR THAT CORRECTLY?

16    A.    YES.

17    Q.    AND THAT REFERS TO FORCIBLY PLACING A PERSON OR HOLDING

18    THEM DOWN IN A RESTRICTED MOVEMENT SITUATION?

19    A.    YES.

20    Q.    AND THAT WAS NOT DONE TO MR. AGOFSKY IN THIS CASE?

21    A.    NO.

22    Q.    OKAY.

23        MR. BLACK:  PASS THE WITNESS, YOUR HONOR.

24        MR. STEVENS:  NOTHING FURTHER.  THANK YOU.

25        THE COURT:  YOU CAN STEP OUTSIDE PLEASE, SIR.

118

```
 1          ALL RIGHT, MR. STEVENS, YOU WANT TO MAKE YOUR POINT
 2   AND THEN MR. BLACK CAN RESPOND.
 3          MR. STEVENS:  YOUR HONOR, THIS EVIDENCE IS IMPORTANT
 4   IN THE GOVERNMENT'S CASE.  IT SHOWS THE DEFENDANT'S REACTION
 5   IMMEDIATELY AFTER THIS EVENT AND HIS APPEARANCE AS WELL, WHICH
 6   ARE ALL RELEVANT IN SOME OF THE ELEMENTS WHICH INCLUDE MALICE
 7   AFORETHOUGHT AND PREMEDITATION IN THIS CASE.
 8          THE COURT:  DO YOU FOLLOW IT UNDER ANY PARTICULAR
 9   EXCEPTION?
10          MR. STEVENS:  AND, I'M SORRY.  AND FURTHERMORE, IT IS
11   THE STATEMENTS THAT THE DEFENDANT MAKES ARE VOLUNTARY, ARE NOT
12   A PRODUCT OF INTERROGATION, ARE ADMISSIONS BY THE DEFENDANT
13   VOLUNTARILY MADE; AND UNDER 801 ARE ADMISSIBLE UNDER THE RULES
14   OF EVIDENCE.
15          THE COURT:  MR. BLACK.
16          MR. STEVENS, ARE YOU CONCLUDED?
17          MR. STEVENS:  I JUST WANT TO GIVE YOU AN UPDATE TOO,
18   YOUR HONOR.  THIS MACHINE IS COLLAPSED.  SO WE'RE GOING TO HAVE
19   TO EXTRACT IT AND GET ANOTHER ONE.
20          THE COURT:  WHATEVER YOU NEED TO DO IS FINE.  YOU CAN
21   DO IT WHILE THE TRIAL IS GOING ON IF YOU NEED TO.
22          MR. STEVENS:  YES, SIR.  WE WILL ASK A LITTLE
23   INDULGENCE WITH THE COURT.  WE NEED TO GET THAT FIXED AND I
24   BELIEVE OUR COMPUTER PERSON IS GOING TO NEED TO TAKE IT WITH
25   HIM FOR A SHORT PERIOD OF TIME.
```

119

```
 1            THE COURT:  YOU WANT TO WAIT UNTIL HE GETS BACK
 2   BEFORE WE BRING THE JURY BACK?  IS THAT YOUR QUESTION?
 3            MR. STEVENS:  YES, SIR, IT IS NECESSARY.
 4            WE HAVE PART OF THAT VIDEO WE NEED TO SHOW, BRIEFLY;
 5   AND IT IS IMPORTANT.  BUT WE WOULD ASK IF HE WOULD BE ALLOWED
 6   TO LEAVE WITH THE MACHINE AND GET TO WORKING ON THAT AS SOON AS
 7   POSSIBLE.
 8            THE COURT:  I SAY PRESS ON.
 9            OKAY.  LET'S ADDRESS THE ISSUE.  ANYTHING ELSE, MR.
10   BLACK?
11            MR. BLACK:  NO, YOUR HONOR.
12            THE COURT:  YOU'VE MADE YOUR POSITION ON THIS
13   STATEMENT?
14            MR. BLACK:  NO OBJECTION TO THE ADMISSIBILITY OF THE
15   STATEMENT, YOUR HONOR.
16            THE COURT:  OF MR. AGOFSKY'S STATEMENT?
17            MR. BLACK:  NO LEGAL OBJECTION, YOUR HONOR.
18            THE COURT:  WELL, WHAT OTHER KIND OF OBJECTION WOULD
19   YOU HAVE?
20            MR. BLACK:  A RELEVANCY OBJECTION, SIR.
21            THE COURT:  ALL RIGHT.
22            MR. BLACK:  I WOULD OBJECT UNDER 402 AND 403.  I DO
23   NOT HAVE AN OBJECTION AS TO THE VOLUNTARINESS OF THE ISSUE FROM
24   THAT STANDPOINT.  SO IT WOULD BE AN EVIDENTIARY OBJECTION, BUT
25   NOT AN ADMISSION THAT WOULD GO TO A SUPPRESSION ISSUE, YOUR
```

120

 1   HONOR.

 2          THE COURT:  I FULLY BELIEVE THAT IT DOES HAVE A -- IS

 3   RELEVANT, PARTICULARLY RELEVANT IN THIS CASE.  AND THAT IS YOUR

 4   OBJECTION IS TO THE RELEVANCY; IS THAT IT?

 5          MR. BLACK:  THAT'S CORRECT, YOUR HONOR.

 6          THE COURT:  OKAY.  AND FOR THE RECORD, ALL RELEVANT

 7   EVIDENCE IS ADMISSIBLE EXCEPT AS OTHERWISE PROVIDED BY THE

 8   CONSTITUTION.  THERE ARE NO CONSTITUTIONAL ISSUES HERE SUCH AS

 9   3501 ARE SUBJECTS OF INTERROGATION.  IT IS ADMISSIBLE UNDER

10   801.  AND AS FAR AS IT IS EVIDENCE, THE ADMISSION IS RELEVANT

11   EVIDENCE AND IT'S SUCH THAT IT HAS A TENDENCY TO MAKE THE

12   EXISTENCE OF A FACT THAT IS OF THE CONSEQUENCE TO THE

13   DETERMINATION OF THE ACTS ARE MORE PROBABLE THAN NOT -- AND

14   THAT IS, THE DEMEANOR, THE ATTITUDE, THE OVERALL PICTURE OF THE

15   DEFENDANT IMMEDIATELY FOLLOWING THE ALTERCATION -- AND ANY

16   STATEMENT REFLECTING HIS MENTAL STATE IS CERTAINLY RELEVANT TO

17   THE ISSUES RAISED AS ELEMENTS IN COUNTS 1 AND 2; AND IT WILL BE

18   ADMITTED.

19          ALL RIGHT.  MAY I VISIT WITH COUNSEL ABOUT ANOTHER

20   THING?

21          ARE THERE ANY OTHER OUT OF THE JURY MATTERS THAT WE

22   NEED TO TAKE UP OR ARE YOU PREPARED TO GO INTO, FOR INSTANCE,

23   ANY OF THE 404(B) OR THE LETTER ISSUES OR AUTHENTICITY?

24          MR. STEVENS:  THAT IS SCHEDULED FOR TOMORROW, SIR.

25   AS FAR AS TODAY, I DON'T PREDICT ANOTHER ISSUE LIKE THIS, NO,

121

1   SIR.

2            THE COURT:  OKAY.  MR. BLACK, ANYTHING ON YOUR PART?

3            MR. BLACK:  NO, YOUR HONOR.  IF WE ARE NOT GOING TO

4   REACH THE LETTER ISSUE TODAY, THEN THAT'S THE ONLY UPCOMING

5   PENDING ISSUE THAT I CAN SEE.

6            MR. STEVENS:  YOUR HONOR, IF THE COURT WOULD ALLOW,

7   LET ME -- IF I MIGHT BE ALLOWED TO GO CHECK.  I DON'T WANT TO

8   HOLD THIS -- I WANT TO MOVE THROUGH EXPEDIENTLY.  BUT I CAN

9   CHECK AND SEE WHO IS OUT THERE AND WE CAN TAKE ANOTHER WITNESS

10  IN LIEU OF MR. HILL UNTIL THIS VIDEO COMES BACK.

11           THE COURT:  YOU CAN DO THAT.  AND WE CAN ALLOW THE

12  COMPUTER ASSISTANT TO WORK ON IT WHILE THE OTHER PERSON IS

13  TESTIFYING.

14           DO YOU HAVE ANY OBJECTION TO TAKING THE WITNESS OUT

15  OF ORDER?

16           MR. BLACK:  NO OBJECTION, YOUR HONOR.

17           MR. STEVENS:  JUDGE, I WANT TO GIVE THE COURT AN IDEA

18  OF WHERE WE ARE HEADED THE REST OF THE DAY.

19           MELINDA ROSS WE ARE NOT GOING TO CALL HER NOW BECAUSE

20  SHE ESSENTIALLY IS WALTER MOSS' COUNTERPART ON THIS AND, I

21  THINK, THE POINTS THAT I WOULD MAKE.

22           DR. KOLCUM SHOULD BE HERE ANY MOMENT.  HE WAS THE

23  ATTENDING PHYSICIAN AT MID-JEFFERSON HOSPITAL THAT PRONOUNCED

24  HIM DEAD.

25           DEANNA STEVENS IS AN FBI AGENT WHO TOOK SOME

1    PHOTOGRAPHS AND PICKED UP SOME EVIDENCE, AND SHE SHOULD BE HERE

2    ANY MOMENT.

3              DR. TOMMY BROWN, THE MEDICAL EXAMINER --

4              THE COURT:  MR. STEVENS, IS THAT THE MOTHER?  IS THAT

5    WHAT THIS IS?

6              MR. STEVENS:  SHE IS AN FBI AGENT.

7              THE COURT:  ANY OBJECTIONS TO THESE PHOTOGRAPHS?

8              MR. BLACK:  NONE THAT SHE TOOK, YOUR HONOR.  BUT I

9    UNDERSTAND THOSE ARE JUST PHOTOGRAPHS OF THE RECREATION CAGE

10   AREA.

11             MR. STEVENS:  AND THEN TOMMY BROWN WHO IS THE MEDICAL

12   EXAMINER WITH THE AUTOPSY.  AND THEN RICKI MILLER WHO IS A

13   B.O.P. OFFICIAL WHO IS THEIR ENGINEERING PERSON WHO IS GOING TO

14   TALK ABOUT THE BOUNDARIES OF THE FEDERAL PENITENTIARY.

15             AND THEN THAT IS ALL WE HAVE FOR TODAY.  THESE OTHER

16   PEOPLE ARE COMING IN THIS EVENING.

17             SO THAT WILL -- SO ACTUALLY WE'RE STUCK RIGHT NOW.

18   DENNIS HILL WE'RE WAITING ON THAT VIDEO TO COME BACK AND THAT

19   WILL CONCLUDE TODAY'S PRESENTATION.

20             THE COURT:  NOBODY EVER HAS TO APOLOGIZE FOR THE

21   COMPUTER EQUIPMENT.

22             OFF THE RECORD.

23                 (OFF THE RECORD DISCUSSION)

24             THE COURT:  OKAY.  SHORT RECESS.

25                 (RECESS AT 2:15 P.M. UNTIL 2:25 P.M.)

123

1           THE COURT:  COUNSEL, ARE YOU READY TO START?

2           MR. STEVENS:  THE WITNESS WHO WAS JUST HERE HAS LEFT

3    THE BUILDING.  HE THOUGHT THAT THIS -- I GUESS HE PRESUMED THIS

4    HEARING WAS HIS TESTIMONY AND HE WALKED OFF AND HE -- WE'RE

5    TRYING TO CATCH HIM.

6           THE COURT:  IT'S JUST ONE OF THOSE DAYS.

7           ALL RIGHT, WE'LL FIND HIM.  WHO DO YOU WANT TO PUT ON

8    NEXT?

9           MR. STEVENS:  HE WAS THE ONE UP NEXT.  THE PHYSICIANS

10   ARE NOT HERE YET.  WE ASKED THEM TO BE HERE AT 2:30, WHICH

11   WOULD HAVE WORKED OUT IN ORDER.

12          THE COURT:  OKAY.  WHY DON'T WE JUST TELL THE JURY

13   THAT WE ARE GOING TO EXTEND THE BREAK UNTIL 2:30.

14          IS EVERYBODY IN AGREEMENT WITH THAT?  MR. BLACK?

15          MR. BLACK:  YES, YOUR HONOR.

16          THE COURT:  THAT'S WHAT WE'LL DO.  OKAY.

17              (RECESS AT 2:20 P.M. UNTIL 2:35 P.M.)

18          THE COURT:  ARE WE READY FOR THE JURY, COUNSEL?

19          MR. STEVENS:  YES, YOUR HONOR.

20          THE COURT:  ALL RIGHT.  BRING THE JURY IN.

21              (JURY IN AT 2:36 P.M.)

22          THE COURT:  WHAT'S THIS GENTLEMAN'S NAME, MR.

23   STEVENS?

24          MR. STEVENS:  HILL, DENNIS HILL.

25          THE COURT:  OKAY.

124

1          THE COURT:  LET'S BRING THE WITNESS IN MR. HILL.

2          ALL RIGHT, WE'RE GOING TO SWEAR YOU IN, MR. HILL.  I

3   KNOW THAT WE HAVE, BUT FOR THE PRESENCE OF THE JURY.

4          DENNIS ARTHUR HILL, GOVERNMENT'S WITNESS, SWORN

5              THE COURT:  ALL RIGHT, SIR.

6                   DIRECT EXAMINATION

7   BY MR. STEVENS:

8   Q.     TELL US YOUR FULL NAME.

9   A.     DENNIS ARTHUR HILL.

10  Q.     HOW ARE YOU EMPLOYED, SIR?

11  A.     I WORK FOR THE FEDERAL BUREAU OF PRISONS, CORRECTION

12  OFFICER.

13  Q.     AND HOW LONG HAVE YOU BEEN A CORRECTIONS OFFICER?

14  A.     SEVEN YEARS THREE MONTHS.

15  Q.     SIR, ON JANUARY 5TH, 2001, WERE YOU A CORRECTIONS

16  OFFICER THEN?

17  A.     YES.

18  Q.     AND WHERE WERE YOU ON THAT DAY?

19  A.     SPECIAL HOUSING UNIT, U.S.P. BEAUMONT, FLOOR OFFICER.

20  Q.     AND ON THAT DAY WERE YOU SUMMONED TO THE RECREATIONAL

21  CAGES IN THE SPECIAL HOUSING UNIT FOR AN ASSAULT THAT HAD TAKEN

22  PLACE?

23  A.     YES.

24  Q.     WHAT DID YOU DO, SIR?

25  A.     BY THE TIME I ARRIVED TO THE REC AREA THEY HAD PULLED

1   INMATE AGOFSKY OUT.  I ESCORTED HIM FROM THE REC AREA TO THE

2   HOLDING CELL.

3   Q.      OKAY.  THAT WAS REALLY FAST.  WE'LL TAKE IT JUST SLOWLY.

4           THE FIRST RESPONSE YOU MAKE, YOU GO TO WHERE?

5   A.      I COME OFF THE RANGE, I GO TO THE REC DOOR RIGHT AT THE

6   ENTRY TO THE REC CAGES.

7   Q.      AND HOW LONG DID THAT TAKE?

8   A.      PROBABLY 30, 35 SECONDS.

9   Q.      YOU WERE SHORTLY -- YOU ARRIVED SHORTLY AFTER THE

10  INCIDENT?

11  A.      YES.

12  Q.      AND THEN YOU ESCORTED THE DEFENDANT?

13  A.      YES.

14  Q.      AND WAS THIS ALL DONE SHORTLY AFTER YOU ARRIVED TO THE

15  LOCATION AT THE RECREATIONAL CAGES?

16  A.      YES.

17  Q.      OKAY.  AND YOU TOOK THE DEFENDANT WHERE?

18  A.      INSIDE TO THE COMMON AREA DOWN THE HALLWAY TO THE

19  HOLDING CELL.

20  Q.      HOW LONG WOULD THAT HAVE TAKEN?

21  A.      FIFTEEN, 20 SECONDS.

22  Q.      OKAY.  DURING THE TIME THAT YOU WERE ESCORTING THE

23  DEFENDANT FROM THE RECREATIONAL CAGE TO THIS HOLDING CELL, DID

24  HE SAY ANYTHING TO YOU?

25  A.      WHEN I PLACED HIM IN THE HOLDING CELL HE ASKED ME WHEN

1   WE WERE GOING TO FEED HIM AND IF WE WERE GOING TO FOUR POINT

2   HIM.

3   Q.    ALL RIGHT.  WAS THIS A PRODUCT OR A RESPONSE OF

4   QUESTIONING BY YOU IN ANY WAY?

5   A.    NO.

6   Q.    DID THE DEFENDANT INITIATE THIS STATEMENT TO YOU?

7   A.    YES.

8   Q.    WHEN YOU SAY "FOUR POINT" WHAT DOES THAT MEAN?

9   A.    STRAPPED DOWN TO THE BUNK.

10  Q.    WAS THAT DONE IN THIS CASE?

11  A.    NO.

12  Q.    IS IT DONE IN SOME CASES?

13  A.    YES.

14  Q.    WHEN?

15  A.    WHEN THE INMATE IS A DANGER TO HIMSELF OR TO STAFF

16  MEMBERS, TO KEEP THEM UNDER CONTROL.

17          THE COURT:  KIND OF LEAN FORWARD INTO THE MICROPHONE

18  FOR ME, PLEASE.

19          THE WITNESS:  OKAY.  ASK IT AGAIN.

20          THE COURT:  JUST PULL THAT CHAIR UP.

21          MR. STEVENS:  IT'S KIND OF AWKWARD, BUT YOU'RE GOING

22  TO HAVE TO LEAN FORWARD.

23          THE COURT:  THE WITNESS BOX WAS BUILT IN 1930 AND

24  THEY DIDN'T HAVE AIR CONDITION OR EVEN CHAIRS THAT MOVED.

25          THE WITNESS:  IT'S DONE IN SOME CASES WHEN THE INMATE

127

1  IS A DANGER TO HIMSELF OR TO STAFF MEMBERS.

2  Q.    (BY MR. STEVENS)  ALL RIGHT.  YOU ESCORTED THE DEFENDANT

3  ALMOST IMMEDIATELY AFTER THIS EVENT, HOW DID HE APPEAR TO YOU?

4  A.    CALM AND RELAXED.

5  Q.    HAVE YOU HAD OCCASIONS WHERE YOU WENT TO THE SCENE OF

6  ASSAULTS OR FIGHTS AT THE PENITENTIARY?

7  A.    YES.

8  Q.    AND HOW DO THE PEOPLE WHO ARE PARTICIPATING IN THAT, HOW

9  DO THEY APPEAR NORMALLY?

10      MR. BLACK:  YOUR HONOR, I WILL OBJECT UNDER RULE 402

11  AND 403 AS TO THE RELEVANCY AS TO WHAT OTHER INMATES DO OR MAY

12  NOT DO IN OTHER SITUATIONS THAT ARE TOTALLY UNRELATED TO THE

13  FACTS BEFORE THIS COURT.

14      MR. STEVENS:  HE IS TESTIFYING TO HIS PERSONAL

15  OBSERVATIONS AND HIS APPEARANCE, APPLYING THE APPEARANCES OF

16  INMATES THAT HE HAS PERSONAL KNOWLEDGE OF.  AND IN THIS

17  PARTICULAR CASE, HE HAS A VERY SPECIAL KNOWLEDGE OF THE

18  PERCEPTION, IN THIS PARTICULAR CASE, OF THIS PARTICULAR

19  DEFENDANT, IMMEDIATELY AT THE TIME OR AFTER THE EVENT.

20      THE COURT:  I BELIEVE HE CAN TESTIFY TO THE FACT THAT

21  HE HAS AN EXPERIENCE AND AN ABILITY TO PERCEIVE WHAT HE DOES

22  SEE.  BUT AS TO THE OTHER EVENTS, I WOULD SUGGEST THAT WE KEEP

23  THOSE OUT.  I SUSTAIN IT.

24      MR. STEVENS:  OKAY.

25  Q.    (BY MR. STEVENS)  OKAY.  BUT AGAIN -- LET ME ASK THIS

1   AGAIN: HOW DID THE DEFENDANT APPEAR TO YOU FROM THE TIME YOU

2   BEGAN ESCORTING HIM UNTIL THE TIME HE WAS PLACED IN THE HOLDING

3   CELL?

4   A.    CALM, RELAXED, LIKE NOTHING HAD HAPPENED.

5   Q.    OKAY.  AND THE VERY FIRST THING OUT OF HIS MOUTH WHEN HE

6   WAS PLACED IN THE HOLDING CELL WAS?

7   A.    WHETHER OR NOT WE WERE GOING TO FEED HIM.

8   Q.    OKAY.

9        MR. STEVENS:  PASS THIS WITNESS.  THANK YOU.

10                      CROSS-EXAMINATION

11  BY MR. BLACK:

12  Q.    MR. AGOFSKY WAS NOT VIOLENT TOWARD YOU IN ANY WAY WAS

13  HE, MR. HILL?

14  A.    NO.

15  Q.    HE DIDN'T SHOW ANY KIND OF DISRUPTIVE BEHAVIOR OR ANY

16  VIOLENCE OF ANY FORM OR FASHION DIRECTED TOWARD YOU, CORRECT?

17  A.    NO.

18  Q.    NOW, THE BEAUMONT PRISON OPERATES OFF OF A FAIRLY

19  REGIMENTED SCHEDULE, DOES IT NOT?

20  A.    YES.

21  Q.    OKAY.  FOR INSTANCE THE INDIVIDUALS, THE INMATES THAT

22  ARE HOUSED IN THE S.H.U., THE SPECIAL HOUSING AREA, THEY ARE

23  NORMALLY FED BETWEEN 10:30 A.M. AND 12:00 NOON; IS THAT

24  CORRECT?

25  A.    THE LUNCH MEAL, YES.

129

1   Q.    AND IN FACT YOU WERE ONE OF THE OFFICERS THAT ON

2   OCCASION HAS HANDED OUT THE FOOD TRAYS TO THE INMATES; IS THAT

3   CORRECT?

4   A.    YES.

5   Q.    IN FACT YOU YOURSELF HAVE PREVIOUSLY HANDED OUT FOOD

6   TRAYS TO MR. AGOFSKY FOR THE LUNCH MEAL?

7   A.    YES.

8   Q.    OKAY.  WHEN MR. AGOFSKY INQUIRED OF YOU AS TO WHETHER OR

9   NOT HE WAS GOING TO BE FED, DID HE ASK THAT OF YOU AFTER 12:00

10  NOON?

11  A.    I CAN'T RECALL.  I DON'T REMEMBER WHAT TIME IT WAS.

12  Q.    OKAY.  IS IT POSSIBLE THAT IT WAS AFTER THE NORMAL

13  FEEDING TIME?

14  A.    YES.

15  Q.    THE FACT THAT YOU'RE ONE OF THE OFFICERS THAT HAS

16  NORMALLY SERVED MR. AGOFSKY BEFORE THAT DID NOT SEEM THAT

17  UNUSUAL, DID IT, THAT HE WOULD ASK YOU THAT QUESTION?

18  A.    AT THE TIME IT DID.

19  Q.    OKAY.  DID -- HE WAS BEING PLACED IN A HOLDING CELL FOR

20  OBSERVATION, CORRECT?

21  A.    YES.

22  Q.    AND AT THAT TIME IT WAS UNDETERMINED HOW LONG HE WAS

23  GOING TO BE IN THAT CELL; ISN'T THAT CORRECT?

24  A.    YES.

25  Q.    OKAY.  IT COULD HAVE BEEN SEVERAL HOURS, THERE WAS NO

130

1   WAY TO HAVE KNOWN AT THE TIME YOU PLACED HIM IN THERE, IS THAT

2   A FAIR STATEMENT?

3   A.      YES.

4   Q.      NOW, YOU MADE THE REFERENCE TO WHAT'S CALLED THE FOUR

5   POINT OR SOMEONE BEING FOUR POINTED.  ARE YOU TESTIFYING THAT

6   WHEN YOU USE THAT PHRASE YOU'RE REFERRING TO SECURING AN

7   INDIVIDUAL TO A BUNK OR A BED BY FORCE?

8   A.      YES.

9   Q.      AND THAT'S A SITUATION THAT IS DONE WHEN A DETERMINATION

10  HAS BEEN MADE THAT THAT INMATE MAY BE A DANGER TO OTHER GUARDS

11  SUCH AS YOURSELF FOR INSTANCE?

12  A.      YES OR HIMSELF.

13  Q.      OKAY.  BUT IN THIS CASE, MR. AGOFSKY WAS NOT FOUR

14  POINTED WHEN HE WAS PLACED IN THE CELL; IS THAT CORRECT?

15  A.      THAT'S CORRECT.

16  Q.      DID YOU PREPARE ANY TYPE OF WRITTEN INCIDENT REPORT IN

17  REGARD TO WHAT YOU'VE TESTIFIED TO ABOUT HERE TODAY?

18  A.      NO.

19  Q.      OKAY.

20          MR. BLACK:  PASS THE WITNESS, YOUR HONOR.

21          MR. STEVENS:  JUST ONE.

22          GOVERNMENT'S EXHIBIT NO. 2.  YES, THAT VIDEO.

23                      REDIRECT EXAMINATION

24  BY MR. STEVENS:

25  Q.      WE ARE NOW SHOWING GOVERNMENT'S EXHIBIT NO. 2, WHICH HAS

131

1  BEEN PREVIOUSLY ADMITTED INTO EVIDENCE.  DO YOU SEE THE

2  DEFENDANT LEAVING THE CAGE AT THIS TIME?

3  A.    YES.

4  Q.    IS IT AT OR ABOUT THAT TIME THAT YOU ESCORT HIM TO THE

5  HOLDING CELL?

6  A.    YES.

7  Q.    WHAT TIME DOES IT SAY THERE?

8  A.    10:30 A.M.

9  Q.    STILL AN HOUR AND A HALF HERE BEFORE THE END OF FEEDING;

10  IN FACT, IT'S -- IT MAY NOT HAVE EVEN BEGUN.

11  A.    THAT'S CORRECT.

12          MR. STEVENS:  OKAY.  THAT'S ALL.  THANK YOU.

13                  RECROSS-EXAMINATION

14  MR. BLACK:

15  Q.    MR. HILL, WHEN YOU ARRIVED AT REC CAGE NO. 3, IN REGARD

16  TO THE VIDEO THAT YOU JUST SAW, WAS MR. AGOFSKY STILL INSIDE OF

17  REC CAGE NO. 3?

18  A.    I TOOK HIM FROM AN OFFICER ON THE WALKWAY OF THE REC

19  CAGES.

20  Q.    SO MR. AGOFSKY HAD ALREADY BEEN REMOVED FROM

21  RECREATIONAL CAGE NO. 3 WHEN YOU ARRIVED?

22  A.    YES.

23  Q.    OKAY.

24          MR. BLACK:  NO FURTHER QUESTIONS, YOUR HONOR.

25          MR. STEVENS:  THAT IS ALL.  THANK YOU.

1          THE COURT:  ALL RIGHT, SIR, YOU'RE RELEASED.

2          NEXT WITNESS.

3          MR. STEVENS:  DEANNA STEVENS.

4          DEANNA STEVENS, GOVERNMENT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6   MR. STEVENS:

7   Q.    TELL US YOUR FULL NAME.

8   A.    DEANNA STEVENS.

9   Q.    HOW ARE YOU EMPLOYED, MA'AM?

10  A.    I'M A SPECIAL AGENT WITH THE FEDERAL BUREAU OF

11  INVESTIGATION.

12  Q.    AND WHAT DO YOU DO WITH THE FBI?

13  A.    I'M A SPECIAL AGENT AND I INVESTIGATE CASES.

14  Q.    HOW LONG HAVE YOU BEEN WITH THE FBI?

15  A.    IT WILL BE FIVE YEARS THIS SEPTEMBER.

16  Q.    DO YOU HAVE A SPECIAL TRAINING AND SKILLS FOR PARTICULAR

17  JOBS IN THE FBI IN RELATION TO EVIDENCE RECOVERY AND

18  INVESTIGATIONS AT THE SCENES OF INSTANCES?

19  A.    I DO NOW.  I AM ON THE HOUSTON'S EVIDENCE RESPONSE TEAM

20  SO THAT -- BECAUSE I AM -- I HAVE GONE INTO SPECIALIZED

21  TRAINING.

22  Q.    AND DO YOU HAVE SPECIAL EXPERIENCE IN THE RECOVERY OF

23  EVIDENCE, INCLUDING EXPERIENCE WORKING AT THE WORLD TRADE

24  CENTER RECOVERY OF THE 9/11 DISASTER?

25  A.    I DO.  I'VE BEEN ON SEVERAL DEPLOYMENTS.  ONE OF THEM IS

133

1    THE NEW YORK WORLD TRADE CENTER.  WE DID THE SPACE SHUTTLE

2    COLUMBIA.  AND IN ADDITION TO THOSE, WE'VE RESPONDED TO SEVERAL

3    MURDERS IN OUR AREA WHERE WE HAVE RECOVERED BODIES WITHIN THE

4    COUNTIES THAT WE COVER.

5    Q.    I WANT YOU TO RECALL BACK TO JANUARY 5TH, 2001.  WERE

6    YOU INVOLVED IN THE INVESTIGATION OF THE KILLING OF LUTHER

7    PLANT AT THE UNITED STATES PENITENTIARY HERE IN BEAUMONT,

8    TEXAS?

9    A.    YES, I WAS.

10   Q.    WHAT WERE YOUR DUTIES IN THAT REGARD?

11   A.    WE RESPONDED TO THAT INCIDENT AND WHAT I SPECIFICALLY

12   DID WAS TO TAKE PHOTOGRAPHS AND SURVEY THE CRIME SCENE AS SOON

13   AS WE ARRIVED.

14   Q.    SO YOU PHOTOGRAPHED ITEMS?

15   A.    YES, ITEMS AND THE ENTIRE CRIME DESIGN.

16   Q.    YOU WERE, THEN, AT THE UNITED STATES PENITENTIARY, I

17   GUESS, IN THE RECREATION CAGES WHERE THIS OCCURRED?

18   A.    YES, I WAS.

19   Q.    AND DID YOU SEE ITEMS OF EVIDENCE AND WERE YOU PART OF

20   THE TEAM THAT RETAINED OR PICKED UP ITEMS OF EVIDENCE?

21   A.    YES, I DID SEE CERTAIN ITEMS OF EVIDENCE; AND YES, I WAS

22   PART OF THE TEAM THAT COLLECTED THOSE ITEMS OF EVIDENCE.

23   Q.    I'M GOING TO SHOW YOU FOUR PHOTOGRAPHS MARKED

24   GOVERNMENT'S EXHIBITS 9, 10, 11 AND 12.  I'M GOING TO ASK YOU

25   TO LOOK AT THESE.  I'M GOING TO ASK YOU IF YOU CAN RECOGNIZE

134

1  THEM AND IF THEY ARE TRUE AND ACCURATE REPRESENTATIONS OF WHAT

2  THEY ARE SHOWING.

3           THE COURT:  YES, SIR.

4           MR. STEVENS:  YOUR HONOR, I HAVE TENDERED TO THE

5  WITNESS GOVERNMENT'S EXHIBITS 9, 10, 11 AND 12.

6           THE COURT:  MR. BLACK.

7           MR. BLACK:  IF I MAY SEE THOSE, YOUR HONOR, AFTER THE

8  WITNESS HAS HAD THE OPPORTUNITY TO LOOK AT THEM?

9                     (SHORT PAUSE)

10          MR. BLACK:  I HAVE REVIEWED THEM, YOUR HONOR.

11          THE COURT:  YOU TENDER THEM, MR. STEVENS?

12          MR. STEVENS:  YES, YOUR HONOR.  WE MOVE INTO EVIDENCE

13 GOVERNMENT'S EXHIBITS 9, 10, 11 AND 12.

14          MR. BLACK:  NO OBJECTION, YOUR HONOR.

15          THE COURT:  GOVERNMENT'S EXHIBITS 9, 10, 11, AND 12

16 ARE ADMITTED.

17 Q.    (BY MR. STEVENS)  AND FOR THE JURY'S CONVENIENCE I AM

18 GOING TO ASK THAT GOVERNMENT'S EXHIBITS 9, 10, 11 AND 12 BE

19 DISPLAYED ON THE BIG SCREEN.

20      OKAY.  THIS IS GOVERNMENT'S EXHIBIT NO. 9.  WHAT IS THAT

21 SHOWING, MA'AM?

22 A.    WE ARE TAKING PHOTOGRAPHS OF SOME BLOOD SPLATTER ABOVE

23 THE RULER.  AND WE PUT THE RULER IN THE PHOTOGRAPH TO SHOW THE

24 SIZE OF THE BLOOD SPLATTER.

25 Q.    SO THERE ARE TRACES OF BLOOD ON THE SIDE OF THE CAGE?

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

135

1   A.      YES.

2   Q.      ALL RIGHT, GOVERNMENT'S EXHIBIT NO. 10.  AND WHAT IS

3   THAT SHOWING?

4   A.      THE SAME THING, THE BLOOD SPLATTER ALONG THE WALL AND

5   ALONG THE FLOOR OF THE CAGE.

6   Q.      OKAY.  GOVERNMENT'S EXHIBIT NO. 11.  THIS IS -- WHAT IS

7   THIS SHOWING?

8   A.      THIS SHOWS THE WALL THAT IS ON THE RIGHT-HAND SIDE, AND

9   THE FLOOR IS ON THE LEFT-HAND SIDE OF THE PHOTOGRAPH.  AND ON

10  THE LEFT THERE'S A POOL OF BLOOD AND ON THE RIGHT, ALONG THE

11  WALL, THERE'S A LITTLE WHITE THING ABOVE THE CRACK IN THE

12  CONCRETE, OR THE JOINT IN THE CONCRETE, AND THAT'S A TOOTH OR

13  WHAT APPEARED TO BE A TOOTH AT THE TIME.

14  Q.      RIGHT IN THAT CIRCLE?

15  A.      YES.

16  Q.      AND GOVERNMENT'S EXHIBIT NO. 12?

17  A.      AND THIS IS A CLOSE UP OF THE TOOTH.

18  Q.      OKAY.

19          AND YOUR OBSERVATIONS OF THIS CAGE CAN YOU TELL WHAT THE

20  FLOOR WAS MADE OF, IS IT A HARD FLOOR OR A SOFT FLOOR, OR?

21  A.      CONCRETE, HARD.

22          MR. STEVENS:  WE PASS THE WITNESS.  THANK YOU.

23          MR. BLACK:  NO QUESTIONS OF MS. STEVENS, YOUR HONOR.

24          THE COURT:  ALL RIGHT.  THANK YOU.  MS. STEVENS, YOU

25  ARE RELEASED.

136

1          THE WITNESS:  THANK YOU.

2          THE COURT:  NEXT WITNESS.

3          MR. STEVENS:  WE CALL RICKEY MILLER.

4          RICKEY MILLER, GOVERNMENT'S WITNESS, SWORN

5                   DIRECT EXAMINATION

6     MR. STEVENS:

7     Q.    TELL US YOUR FULL NAME, SIR.

8     A.    RICKEY MILLER.

9     Q.    AND HOW ARE YOU EMPLOYED, MR. MILLER?

10    A.    I'M THE ENGINEERING TECHNICIAN WITH THE FEDERAL

11    CORRECTIONS COMPLEX BEAUMONT.

12    Q.    ALL RIGHT.

13          I'M GOING TO ASK YOU TO DO TWO THINGS: YOU'RE GOING TO

14    HAVE TO SPEAK CLOSER TO THE MICROPHONE AND JUST A LITTLE MORE

15    SLOWLY?

16    A.    OKAY.

17    Q.    THANK YOU HAVE MUCH.

18          OKAY, TELL US AGAIN, YOU ARE WITH THE B.O.P. HERE IN

19    BEAUMONT?

20    A.    YES, SIR.

21    Q.    AND YOUR DUTIES THERE INCLUDE WHAT?

22    A.    TAKE CARE OF ALL THE RECORDS, MAPS OF THE PLANT.

23    Q.    IS THAT LIKE AN ENGINEERING DIVISION OR SOMETHING LIKE

24    THAT?

25    A.    YES, IN THE MAINTENANCE DEPARTMENT.

1    Q.    AND WHAT IS YOUR JOB TITLE THERE?

2    A.    ENGINEERING TECHNICIAN.

3    Q.    OKAY.  AND ARE YOU A CUSTODIAN OF THOSE RECORDS?

4    A.    YES, SIR.

5    Q.    AND ARE THOSE RECORDS KEPT IN THE NORMAL COURSE OF

6    BUSINESS OF THE BUREAU OF PRISONS?

7    A.    YES, SIR.

8    Q.    AND I'M TALKING ABOUT RECORDS, THE JURISDICTIONAL AND

9    BOUNDARY LOCATIONS OF THE FEDERAL CORRECTIONAL INSTITUTION,

10   INCLUDING THE UNITED STATES PENITENTIARY IN BEAUMONT?

11   A.    YES, SIR.

12   Q.    AND ARE ALL OF THOSE RECORDS MADE AT OR NEAR THE TIME OF

13   THE EVENT BY PEOPLE WHO HAVE SPECIAL KNOWLEDGE OF THE DATA IN

14   THOSE RECORDS?

15   A.    YES, SIR.

16   Q.    NOW, WE HAVE ASKED YOU TO COLLECT CERTAIN RECORDS

17   CONCERNING THE BUREAU OF PRISONS FACILITY HERE IN BEAUMONT.

18   CAN YOU TELL US A LITTLE BIT ABOUT IF YOU WERE FLYING IN A

19   PLANE OVER -- AND MANY PEOPLE DO THAT AS THEY ARE ABOUT TO LAND

20   AT THE JEFFERSON COUNTY AIRPORT.  WHEN YOU LOOK DOWN WHAT DO

21   YOU SEE IN THE COMPLEX, HOW DOES IT APPEAR?

22   A.    YOU SEE THREE INSTITUTIONS AND A CAMP AND A CENTRAL

23   ADMINISTRATION BUILDING, A COUPLE OF OTHER WAREHOUSE BUILDINGS,

24   THINGS LIKE THAT.

25           THE COURT:  KIND OF SPEAK INTO THAT MICROPHONE IF YOU

138

1    WOULD.

2    Q.      (BY MR. STEVENS)  IF I WAS A BIRD FLYING OVER LOOKING

3    DOWN WHAT IS -- IS THERE A MIDDLE BUILDING LIKE THE HUB OF A

4    WHEEL?

5    A.      CENTRAL ADMINISTRATION BUILDING.

6    Q.      AND ARE THERE OTHER BUILDINGS THAT CONNECT ON THE

7    BOUNDARIES OF THE ADMINISTRATION BUILDING OR FLOW OUT LIKE THE

8    SPOKES OF A WHEEL?

9    A.      THERE ARE -- THE OTHER INSTITUTIONS, THE LOW AND THE

10   MEDIUM, THE CAMP AND THE WAREHOUSE BUILDINGS AND THE GARAGE.

11   Q.      AND IS THE UNITED STATES PENITENTIARY A SEPARATE

12   BUILDING?

13   A.      YES, SIR.

14   Q.      SO YOU HAVE THE CAMP THEN THERE'S A LOW?

15   A.      LOW SECURITY.

16   Q.      LOW SECURITY?

17   A.      MEDIUM.

18   Q.      MEDIUM SECURITY?

19   A.      YES, SIR.

20   Q.      AND THE UNITED STATES PENITENTIARY, WHICH IS THE HIGH

21   SECURITY --

22   A.      YES.

23   Q.      -- FACILITY.  AND THEN YOU HAVE THE ADMINISTRATION

24   BUILDING RIGHT IN THE MIDDLE.

25   A.      YES, SIR.

1    Q.     WHERE DO YOU WORK?

2    A.     OUT BY THE GARAGE IN THE LITTLE TRAILER.

3    Q.     IN THE TRAILER.

4         NOW, THERE ARE SOME DOCUMENTS THAT I ASKED YOU TO

5    PRESENT AND THERE ARE SEVERAL DOCUMENTS IN SOMETHING THAT IS

6    CALLED GOVERNMENT'S EXHIBIT NO. 20.  AND I'M GOING TO ASK YOU

7    IF YOU ARE FAMILIAR WITH THESE AND IF YOU CAN RECOGNIZE THESE

8    AND IF THEY ARE TRUE AND ACCURATE REPRESENTATIONS OF WHAT THEY

9    ARE SHOWING AS PART OF THE RECORDS THAT YOU KEEP IN THE NORMAL

10   CUSTOMARY BUSINESS.

11        MR. STEVENS:  I'VE TENDERED, YOUR HONOR, GOVERNMENT'S

12   EXHIBIT NO. 20, WHICH IS A MULTI-PAGE PACKAGE OF DOCUMENTS AND

13   I'M GOING TO ASK THE WITNESS TO REVIEW THOSE AND MAKE SURE HE

14   RECOGNIZES THEM.

15   A.     YES, SIR.  THE DEED ASSESSMENT IS WHERE THE LAND WAS

16   BOUGHT.

17   Q.     (BY MR. STEVENS)  WHAT I'M GOING TO DO IS, WE'RE GOING

18   TO TALK ABOUT THEM HERE IN A MINUTE --

19   A.     ALL RIGHT.

20   Q.     -- IN MORE DETAIL.  BUT IF YOU CAN TELL US IF THOSE

21   GENERALLY ARE THE ITEMS OUT OF YOUR RECORDS THAT YOU'RE

22   FAMILIAR WITH?

23   A.     YES, SIR, THEY ARE.

24   Q.     OKAY.  AND IN ADDITION, I THINK THERE ARE SOME TAX

25   DOCUMENTS AS WELL THAT ARE SEPARATE THAT ARE PART OF THAT

140

1    EXHIBIT AS WELL?

2    A.    OKAY.  YES, SIR.

3    Q.    AND THEN THERE IS A DEED FROM THE COUNTY WHICH IS ALSO

4    PART OF THE FIRST PACKAGE OF RECORDS THAT YOU HAVE LOOKED AT?

5    A.    YES, SIR.

6         MR. STEVENS:  YOUR HONOR, COLLECTION OF RECORDS

7    CALLED GOVERNMENT'S EXHIBIT NO. 20, WE MOVE FOR ITS ADMISSION

8    INTO EVIDENCE AT THIS TIME.

9         MR. BLACK:  NO OBJECTION, YOUR HONOR.

10        THE COURT:  ALL RIGHT, GOVERNMENT'S EXHIBIT 20, WHICH

11   IS A COLLECTION OF DOCUMENTS, IS ADMITTED INTO EVIDENCE.

12   Q.    (BY MR. STEVENS)  FIRST OF ALL, SIR, ARE YOU FAMILIAR

13   WITH DEED RECORDS AND HOW THEY APPEAR IN INSTRUMENTS THAT ARE

14   RELATED TO LAND?

15   A.    YES, SIR.

16   Q.    AND MOST SPECIFICALLY ARE YOU INTIMATELY FAMILIAR WITH

17   THE RECORDS CONCERNING THE UNITED STATES BUREAU OF PRISONS

18   FACILITY HERE IN BEAUMONT, WHICH INCLUDES THE UNITED STATES

19   PENITENTIARY BEAUMONT?

20   A.    YES, SIR.

21   Q.    YOU'RE FAMILIAR WITH THE METES AND BOUNDS DESCRIPTIONS

22   THAT ARE IN THE DEED RECORDS AS WELL AS THAT DEED OF SESSIONS

23   THAT ALSO INCLUDES THE RECORDS OF THE BOUNDARIES CONCERNING

24   THAT PLOT OF LAND?

25   A.    YES, SIR.

141

1    Q.     OKAY.  HAVE YOU EVEN WALKED OFF THE BOUNDARIES THAT ARE

2    PUBLISHED IN THAT -- IN THOSE DOCUMENTS WITH THE METES AND

3    BOUNDS DESCRIPTIONS?  ARE YOU FAMILIAR WITH THE VERY BOUNDARIES

4    AND HOW THEY ARE WORDED AND HOW THEY APPLY TO THE DIRECTIONS OF

5    THE BOUNDARIES OF THE FEDERAL CORRECTIONAL INSTITUTION IN

6    BEAUMONT?

7    A.     VERY FAMILIAR, SIR.

8    Q.     OKAY.  NOW, FIRST OF ALL, I'M GOING TO ASK YOU: THE

9    UNITED STATES PENITENTIARY, BEAUMONT THAT BUILDING, THAT

10   BUILDING THERE (INDICATING) IS THAT PART OF THE BUREAU OF

11   PRISONS COMPLEX THAT IS OWNED BY THE DEPARTMENT OF JUSTICE, THE

12   UNITED STATES OF AMERICA?

13   A.     YES, SIR.

14   Q.     AND IT INCLUDES THE UNITED STATES PENITENTIARY.  THE

15   UNITED STATES PENITENTIARY SITS ON LAND OWNED BY THE FEDERAL

16   GOVERNMENT?

17   A.     YES, SIR.

18   Q.     AND THAT'S WHERE YOU GO TO WORK EVERYDAY?

19   A.     YES, SIR.

20   Q.     IS THERE ANOTHER UNITED STATES PENITENTIARY IN THIS AREA

21   CALLED "UNITED STATES PENITENTIARY BEAUMONT"?

22   A.     NO, SIR.

23   Q.     AND IS THIS THE FEDERAL FACILITY FOR MILES AROUND?

24   A.     YES, SIR.

25   Q.     THIS IS THE ONE?

142

1    A.      ONLY ONE HERE.

2    Q.      AND DOES THIS SIT IN THE EASTERN DISTRICT OF TEXAS?

3    A.      YES, SIR.

4    Q.      AND THE DIFFERENT DOCUMENTS THAT YOU HAVE IN

5    GOVERNMENT'S EXHIBIT NO. 20 CAN YOU DESCRIBE THEM FOR US?  AND

6    LET'S SEE WHAT THEY LOOK LIKE HERE ON THE OVERHEAD.

7            OKAY.  FIRST OF ALL, THERE'S A DECLARATION OF MARY ANN

8    DETORO.  THAT'S A DOCUMENT THAT'S ATTACHED TO THESE PAGES THAT

9    INVOLVES A LADY FROM THE JUSTICE DEPARTMENT, THE UNITED STATES

10   BUREAU OF PRISONS IN WASHINGTON, CORRECT?

11   A.      YES, SIR.

12   Q.      AND DOES THAT, IN ESSENCE, STATE THAT THESE ARE TRUE AND

13   ACCURATE COPIES ON FILE WITH THE JUSTICE DEPARTMENT?

14   A.      YES, SIR.

15   Q.      OKAY, THE NEXT PAGE.

16           AND THIS IS A DOCUMENT TO OUR THEN GOVERNOR GEORGE BUSH

17   WHERE THE DEED OF SESSION WAS GRANTED?

18   A.      YES, SIR.

19   Q.      AND TELL US WHAT A DEED OF SESSION IS.

20   A.      A DEED OF SESSION IS BASICALLY A LEGAL -- A DOCUMENT

21   WITH A LEGAL DESCRIPTION DESCRIBING THE PROPERTY THAT IT WAS

22   GOING TO BE BOUGHT BY THE GOVERNMENT.

23   Q.      OKAY.  AND DOES IT SHOW THAT THE JURISDICTION AND

24   AUTHORITY OVER THIS LAND IS HELD BY THE UNITED STATES OF

25   AMERICA AND, I THINK IN THE LINE FOUR OR FIVE, CONCURRENTLY

143

1   WITH THE STATE OF TEXAS?

2   A.      YES, SIR, IT SAYS THAT.

3   Q.      OKAY, THE NEXT DOCUMENT.

4           AND THAT IS A DOCUMENT ACKNOWLEDGING THE DEED OF SESSION

5   SIGNED BY THEN ATTORNEY GENERAL JANET RENO AND THEN GOVERNOR

6   GEORGE BUSH?

7   A.      YES, SIR.

8   Q.      OKAY, NEXT DOCUMENT.

9           AND THIS IS THE ACTUAL DEED OF SESSION WHICH BEGINS WITH

10  THE UNITED STATES OF AMERICA EXPLAINING THAT IT IS ACQUIRED

11  FROM JEFFERSON COUNTY A TRACT OF LAND.  AND IS THAT TRACT OF

12  LAND THAT THIS IS DESCRIBING FOR THE SITE OF THE FEDERAL

13  CORRECTIONAL COMPLEX, IS THAT WHERE THE BUREAU OF PRISONS PUT

14  ITS FEDERAL PENITENTIARY BEAUMONT?

15  A.      YES, SIR.  YES, SIR.

16  Q.      OKAY, NEXT.  AND THE NEXT DOCUMENT, PLEASE.

17          AND IT GOES ON WITH LEGAL DESCRIPTION OF THE TERMS BUT,

18  NONETHELESS, IT IS THE STATE OF TEXAS AND THE UNITED STATES

19  HAVE DUAL JURISDICTION OVER THIS LAND?

20  A.      YES, SIR.

21  Q.      OKAY, NEXT.  AND.

22          THIS IS A SIGNATURE LINE BY THE GOVERNOR AGREEING TO

23  THAT SESSION WHERE IT'S THE STATE OF TEXAS JURISDICTION PART OF

24  IT IS SEATED OVER TO THE UNITED STATES OF AMERICA FOR JOINT

25  JURISDICTION?

144

1   A.      YES, SIR.

2   Q.      NEXT.

3           AND THERE IS A WARRANTY DEED.  IS THIS THE DOCUMENT

4   WHICH REFLECTS THE TRANSFER OF TITLE FOR THAT LAND WHERE THE

5   UNITED STATES PENITENTIARY BEAUMONT SITS FROM JEFFERSON COUNTY

6   TO THE UNITED STATES OF AMERICA, THE BUREAU PRISONS, THE

7   JUSTICE DEPARTMENT?

8   A.      YES, SIR.

9   Q.      IT WOULD BE LIKE A DEED WHEN YOU BUY A HOUSE WHEN IT IS

10  DEEDED FROM THE SELLER TO THE BUYER.  AND THE BUYER IN THIS

11  CASE IS THE UNITED STATES AND THE SELLER WAS -- OR THE ONE

12  DONATING THE LAND TO THE UNITED STATES IS JEFFERSON COUNTY?

13  A.      YES, SIR.

14  Q.      NEXT.

15          THE NEXT DOCUMENT THAT WAS THE DEED THAT WAS SIGNED BY

16  THEN COUNTY JUDGE RICHARD LEBLANC WHO WAS THE COUNTY JUDGE AT

17  THE TIME THE DEED WAS TRANSFERRED.

18          NEXT.

19          AND THEN ATTACHED TO THE WARRANTY DEED IS AN EXHIBIT

20  WHICH IS THE METES AND BOUNDS DESCRIPTION OF THE BOUNDARIES OF

21  THE LAND OUT THERE; ISN'T THAT RIGHT?

22  A.      THAT'S RIGHT.

23  Q.      AND YOU'RE INTIMATELY FAMILIAR WITH THAT?

24  A.      VERY, YES, SIR.

25  Q.      AND IT BEGINS WITH BEING A CERTAIN 961.60 ACRE TRACT OF

1    LAND?

2    A.    YES, SIR.

3    Q.    THAT'S HOW MUCH LAND THE UNITED STATES OWNS OUT THERE,

4    WHICH INCLUDES THE UNITED STATES PENITENTIARY BEAUMONT?

5    A.    YES, SIR.

6    Q.    AND DOES ALL OF THIS, THESE METES AND BOUNDS FROM YOUR

7    FAMILIARITY WITH YOUR JOB, YOU'RE FAMILIARITY WITH THE

8    BOUNDARIES, DOES THAT INCLUDE WHAT WE'RE TALKING ABOUT HERE

9    WITH THE FEDERAL COMPLEX AND THE UNITED STATES PENITENTIARY?

10   A.    YES, SIR, INCLUDES IT ALL.

11   Q.    NEXT DOCUMENT.

12         AND THIS IS -- LET ME HIGHLIGHT THIS -- ATTACHED WITH

13   GOVERNMENT'S EXHIBIT IS A DOCUMENT FROM THE TAX OFFICE WHICH

14   SHOWS A PARCEL OF LAND WHICH INCLUDES 961.60 ACRES IS OWNED BY

15   THE JUSTICE DEPARTMENT FEDERAL BUREAU OF PRISONS.  AND WE'RE

16   TALKING ABOUT THE LAND WHERE UNITED STATES PENITENTIARY

17   BEAUMONT IS?

18   A.    YES, SIR.

19   Q.    OKAY, NEXT.

20         AND THESE ARE OTHER TAX DOCUMENTS; BUT, AGAIN, FROM THE

21   JEFFERSON COUNTY TAX OFFICE SHOWING OWNERSHIP OF THAT TRACT OF

22   LAND BY THE UNITED STATES OF AMERICA?

23   A.    YES, SIR.

24   Q.    NEXT.

25         AND THIS IS THE SAME WARRANTY DEED FROM SEPTEMBER 27TH,

146

1    '93 THAT IS PART OF THE DEED OF SESSION?

2    A.    YES, SIR.

3    Q.    IT'S THE SEPARATE WARRANTY DEED, THOUGH, THAT -- AS A

4    CERTIFIED COPY WAS MADE THAT'S A FREE-STANDING ATTACHMENT TO

5    THIS EXHIBIT?

6    A.    YES, SIR.

7    Q.    OKAY.  AND I THINK THAT IS SUBSTANCE OF ALL OF THESE

8    DOCUMENTS.  BUT IS THERE ANY DOUBT THAT IF A CRIME TAKES PLACE

9    AT THE UNITED STATES PENITENTIARY IN BEAUMONT, LIKE ALLEGED IN

10   THIS CASE, THAT IT OCCURRED ON LAND OWNED BY THE UNITED STATES

11   OF AMERICA AND IS UNDER THE JURISDICTION OF THE UNITED STATES

12   OF AMERICA AS A LEGAL ENTITY?

13   A.    YES, SIR, THERE IS NO DOUBT.

14        MR. STEVENS:  THANK YOU.  PASS THIS WITNESS.

15        MR. BLACK:  NO QUESTIONS, YOUR HONOR.

16        THE COURT:  ALL RIGHT, SIR, YOU'RE RELEASED.

17        YOU MAY CALL YOU NEXT WITNESS.

18        MR. STEVENS:  CALL DR. KOLCUM.

19        DR. KOLCUM IS IN TRANSIT FROM HOUSTON AND FROM WHAT I

20   CAN HEAR FROM IN HERE, THERE MAY BE SOME WEATHER.  BUT WE ARE

21   PREPARED TO GO FURTHER ON.  WE WILL CALL DR. TOMMY BROWN.

22        THE COURT:  ALL RIGHT.

23        TOMMY BROWN, M.D., GOVERNMENT'S WITNESS, SWORN

24                      DIRECT EXAMINATION

25   MR. STEVENS:

147

1    Q.      TELL US YOUR FULL NAME, SIR.

2    A.      DR. TOMMY J. BROWN.

3    Q.      DR. BROWN, HOW ARE YOU EMPLOYED?

4    A.      I'M A CONTRACT FORENSIC PATHOLOGIST FOR JEFFERSON COUNTY

5    AND FOR THIS AREA.

6    Q.      HOW LONG HAVE YOU BEEN SERVICING JEFFERSON COUNTY AND

7    THIS AREA AS A PATHOLOGIST?

8    A.      SINCE AUGUST OF 1998, ALSO, BEFORE THAT, I WAS WITH --

9    PART-TIME WOULD COME OVER AND DO AUTOPSIES.

10   Q.      HOW LONG HAVE YOU BEEN A PATHOLOGIST, SIR?

11   A.      SINCE 1972.

12   Q.      THIRTY-TWO YEARS.

13   A.      YES, SIR.

14   Q.      AND HAVE YOU SPECIAL TRAINING AND EXPERIENCE IN

15   PATHOLOGY?

16   A.      YES, SIR.

17   Q.      IF YOU COULD SUMMARIZE YOUR MEDICAL TRAINING, SIR?

18   A.      I HAVE A BACHELOR OF SCIENCE DEGREE IN PHARMACY.  D.O.

19   DEGREE FROM KANSAS CITY COLLEGE OF OSTEOPATHIC MEDICINE.  U.S.

20   ARMY MEDICIAL INTERNSHIP.  ANATOMIC AND CLINICAL PATHOLOGY

21   RESIDENT WITH THE U.S. ARMY.  NUCLEAR MEDICINE FELLOWSHIP WITH

22   THE ARMY.  FORENSIC PATHOLOGY FELLOWSHIP AT THE BEXAR COUNTY

23   MEDICAL EXAMINER'S OFFICE IN SAN ANTONIO.  I'M BOARD CERTIFIED

24   IN ANATOMICAL AND CLINICAL PATHOLOGY NUCLEAR MEDICINE AND

25   FORENSIC PATHOLOGY, AND I ALSO HAVE A TEXAS STATE MEDICAL

1    LICENSE.

2    Q.    HAVE YOU PERFORMED AUTOPSIES, SIR, ON MANY OR FEW

3    OCCASIONS?

4    A.    MANY.

5    Q.    CAN YOU EVEN SPECULATE ON HOW MANY YOU HAVE PERFORMED IN

6    YOUR CAREER?

7    A.    A BALLPARK FIGURE WOULD BE AROUND 9- TO 10,000 AT THIS

8    TIME.

9    Q.    NINE TO 10,000?

10    A.    YES, SIR.

11    Q.    AND HAVE YOU TESTIFIED IN FEDERAL AS WELL AS STATE

12    COURTS ON NUMEROUS OCCASIONS CONCERNING YOUR FINDINGS AND AS AN

13    EXPERT IN PATHOLOGY?

14    A.    YES, SIR.

15    Q.    SIR, DID YOU HAVE AN OCCASION TO PERFORM THE AUTOPSY ON

16    THE BODY OF LUTHER PLANT?

17    A.    I DID.

18    Q.    WHEN DID THAT OCCUR, SIR?

19    A.    THAT WAS JANUARY THE 6TH, 2001.  I PERFORMED THE AUTOPSY

20    AT 7:00 O'CLOCK IN THE MORNING.

21    Q.    AND WHERE WAS THE -- FROM WHAT LOCATION DID LUTHER PLANT

22    COME FROM?

23    A.    HE CAME FROM THE FEDERAL PENITENTIARY HERE IN JEFFERSON

24    COUNTY.

25    Q.    AND CAN YOU TELL US WHAT, GENERALLY, THE PROCEDURES ARE

149

1   EMPLOYED IN PERFORMING AN AUTOPSY?

2   A.    IF I MAY GO BACK.  HE WAS HOUSED AT THE FEDERAL

3   PENITENTIARY BUT HE WAS TAKEN TO MID-JEFFERSON HOSPITAL IN

4   NEDERLAND AND THEN TRANSPORTED TO THE MORGUE.

5   Q.    OKAY.  SO HE WAS SENT TO YOU THEN DIRECTLY FROM

6   MID-JEFFERSON HOSPITAL?

7   A.    YES, SIR.

8   Q.    OKAY.  AND I GUESS I SHOULD ASK: FROM YOUR RECORDS DOES

9   IT REFLECT WHEN HE WAS PRONOUNCED DEAD?

10  A.    YES, SIR.

11  Q.    WHEN WAS THAT, SIR?

12  A.    HE WAS PRONOUNCED AT 12:28 P.M. ON JANUARY THE 5TH, 2001

13  AT MID-JEFFERSON HOSPITAL.

14  Q.    AND THE AUTOPSY THAT WAS PERFORMED BY YOU WAS IT UPON

15  ANY PARTICULAR WRITTEN AUTHORIZATION BY ANY OFFICIAL?

16  A.    IT WAS.

17  Q.    AND WHO WAS THAT?

18  A.    JUSTICE OF THE PEACE CHESSON.

19  Q.    IN PERFORMING AN AUTOPSY CAN YOU DESCRIBE THE PROCEDURE,

20  GENERALLY, THAT YOU PERFORM?

21  A.    YES, SIR.  WE HAVE -- AS THE BODY IS BROUGHT OUT OF THE

22  COOLER THEN WE WEIGH AND MEASURE THE BODY, AND WE TAKE

23  PHOTOGRAPHS AND OBSERVE THE BODY WITH THE CLOTHING ON, IF IT

24  HAS CLOTHING.

25        THE CLOTHING IS THEN REMOVED AND WE DO AN EXTERNAL

150

1   EXAMINATION WITH THE CLOTHING OFF.  WE ALSO TAKE PHOTOGRAPHS

2   WITH THE CLOTHING ON AND THE CLOTHING OFF.

3        WE GO THROUGH THE -- OR OVER THE ENTIRE EXTERNAL BODY,

4   DESCRIBING ANY PATHOLOGY OR ANY TYPE OF TRAUMA TO THE BODY OR

5   ANY TATTOOS OR OTHER AFFECTS TO THE BODY.  AFTER THAT WE DO AN

6   INTERNAL EXAMINATION IN WHICH WE OPEN THE BODY WITH A Y-SHAPED

7   INCISION FROM THE SHOULDER DOWN TO THE CHEST, CHEST TO THE

8   PUBIC AREA.  REFLECT THAT BACK.  REMOVE THE BREAST PLATE.

9   OBSERVE THE ORGANS AS THEY ARE WITHIN THE BODY.  AT THAT TIME

10  WE ALSO TAKE BLOOD AND URINE, IF URINE IS AVAILABLE, FOR

11  TOXICOLOGY ANALYSIS.

12       AFTER THAT, I REMOVED THE ORGANS AND WEIGHED EACH ONE

13  AND THEN DISSECT EACH ORGAN TO SEE IF THERE'S ANY TRAUMA OR

14  PATHOLOGY TO THE ORGANS.

15  Q.    DO YOU REMEMBER THIS PARTICULAR AUTOPSY?

16  A.    YES, SIR, I DO.

17  Q.    YOU'VE PERFORMED 9- OR 10,000 OF THEM, BUT YOU REMEMBER

18  THIS ONE IN PARTICULAR?

19  A.    YES, SIR, I DO.

20  Q.    CAN YOU PLEASE DESCRIBE TO US THE INJURIES THAT YOU SAW

21  EXTERNALLY?

22  A.    EXTERNALLY MR. PLANT HAD A LARGE ABRASION OR A SCRAPE ON

23  THE BACK OF HIS HEAD MEASURED 3-BY-2 INCHES.

24       HE ALSO HAD PERIORBITAL HEMORRHAGE, WHICH IS BLACK EYES,

25  AROUND BOTH EYES FROM HEMORRHAGE BLEEDING, THE SOFT TISSUE

1  AROUND THE EYE.

2       HE HAD FRACTURE OF HIS NASAL BONES AND HE ALSO HAD A

3  LARGE BRUISE ACROSS THE ENTIRE TOP OF HIS NOSE DOWN TO THE TIP

4  OF HIS NOSE.

5       HE HAD A LARGE BRUISE, ABRASIONS AND LACERATIONS OF HIS

6  UPPER LIP.  HE ALSO HAD A BRUISE OF HIS LOWER LIP.  HE HAD A

7  LARGE LACERATION OF HIS LEFT SIDE OF HIS CHIN.

8       HE HAD -- THAT WAS ESSENTIALLY ALL THAT I CAN REMEMBER

9  AT THIS TIME.

10 Q.    LET'S FIRST TALK ABOUT WHAT YOU WERE ABLE TO DETERMINE

11 HIS INJURIES WERE ON FURTHER EXAMINATIONS.

12       FIRST OF ALL IN HIS FACIAL REGION CAN YOU TELL US WHAT

13 YOU WERE ABLE TO DETERMINE WHAT TYPE OF INJURIES HE ACTUALLY

14 SUSTAINED?

15 A.    HE HAD FRACTURED HIS NASAL BONES, AND ON THE INSIDE OF

16 HIS MOUTH THERE WAS A TRANSVERSE FRACTURE THROUGH THE ANTERIOR

17 MANDIBLE.  ONE OF THE INTERIOR LOWER TEETH HAD BEEN LOST OR

18 KNOCKED OUT.  THREE OTHER OF THE CENTRAL INCISOR TEETH, OR

19 UPFRONT TEETH, HAD BEEN FRACTURED AND WERE LOOSE AND WERE

20 ATTACHED TO THE GUM; SO THEY WERE STILL PRESENT WITHIN THE

21 MOUTH.

22 Q.    LET ME ASK JUST TO -- INTERRUPT YOU.  THERE IS A MISSING

23 TOOTH HERE?

24 A.    YES.

25 Q.    AND IT'S IN THE LOWER PART OF THE TEETH?

152

1    A.    YES.    LOWER ANTERIOR TEETH.

2    Q.    OKAY.

3    A.    AND THERE WAS A TRANSVERSE FRACTURE THROUGH THAT AREA;

4    IN OTHER WORDS, THE FRACTURE GOES HORIZONTAL.

5    Q.    OKAY.  AND I'M SORRY.  YOU CAN GO FURTHER, PLEASE.

6    A.    ESSENTIALLY, THAT'S ON THE INSIDE OF THE UPPER LIP; AND

7    THE LOWER LIP, OF COURSE, WAS THE ABRASIONS AND LACERATIONS AND

8    CONTUSIONS, OR BRUISES, WITHIN THE MOUTH.

9         THEN THE -- INSIDE THE NECK, THE ONES THAT I REFLECTED

10   THE SKIN FROM THE NECK AND TOOK OUT THE NECK ORGANS AND

11   OBSERVED THE NECK ORGANS AS THEY WERE WITHIN THE BODY, HE HAD

12   LARGE BRUISES ALONG THE LOWER NECK AROUND THE THYROID CARTILAGE

13   AND ALSO AROUND THE LARYNX AND THE ESOPHAGUS.

14        THERE IS ALSO BRUISES OF THE ANTERIOR STRAP MUSCLES,

15   WHICH ARE THE SMALL MUSCLES OF THE STRAP THAT RUN UP AND DOWN

16   THE ANTERIOR NECK.  ONCE THAT THIS WAS DESCRIBED THEN THERE WAS

17   A FRACTURE THROUGH THE CENTER PART OF THE HYOID BONE, WHICH IS

18   A SMALL HORSESHOE-SHAPED BONE IN THE UPON UPPER PART OF THE

19   NECK.  HE ALSO HAD A TRANSVERSE FRACTURE OR HORIZONTAL FRACTURE

20   THROUGH HIS THYROID CARTILAGE.  THERE WAS ALSO A FRACTURE OF

21   THE LEFT THYROID CORNU OR HORN ON THE LEFT SIDE.

22        BESIDES ALL THE BRUISES AND THE MULTIPLE FRACTURES OF

23   THE SMALL BONES OF THE NECK, HE HAD ALSO HAD A TRACHEOSTOMY

24   OPENING IN THE LOWER PART OF THE TRACHEA IN WHICH A AIRWAY HAD

25   BEEN INSERTED.

153

1   Q.     WERE YOU ABLE TO DETERMINE FROM YOUR EXAMINATION THE

2   CAUSE OF DEATH?

3   A.     YES, SIR.

4   Q.     AND WHAT WAS YOUR DETERMINATION?

5   A.     MR. PLANT DIED FROM A CRUSHED NECK WITH ASPIRATED BLOOD

6   DUE TO BLUNT FORCE TRAUMA.

7   Q.     ALL RIGHT.  LET'S TALK ABOUT SOME OF THESE THINGS A

8   LITTLE MORE DETAIL.  ASPIRATED BLOOD DUE TO BLUNT FORCE TRAUMA,

9   WHAT WOULD THAT MEAN?

10  A.     THAT WOULD MEAN THAT THE BLOOD, HE SWALLOWED THE BLOOD

11  AND IT WENT INTO HIS TRACHEA, WHICH IS THE MAIN OPENING THAT'S

12  GOING DOWN TO THE LUNGS, AND ALSO IT WENT INTO HIS ESOPHAGUS

13  AND IT WAS MIXED WITH FOOD WITHIN HIS STOMACH.

14         SO HE HAD BLOOD WITHIN HIS TRACHEA, HIS UPPER AIRWAY AND

15  ALSO WITHIN HIS STOMACH.  THAT'S WHERE HE SWALLOWED THE BLOOD.

16  Q.     AND CRUSHED NECK.  IT'S PLAIN FROM WHAT YOU HAVE

17  TESTIFIED TO, THE NUMEROUS FRACTURES OF THE NECK, WHEN SOMEBODY

18  HAS THOSE TYPE OF INJURIES ARE THOSE FATAL INJURIES?

19  A.     USUALLY, YES.  UNLESS THEY CAN BE BROUGHT TO THE

20  EMERGENCY ROOM VERY RAPIDLY AND PERHAPS CAN -- A TRACHEOSTOMY

21  WAS PERFORMED IN THIS CASE, BUT IT OCCURRED TOO LATE.  PERHAPS

22  WITH VENTILATION AND TRACHEOSTOMY, HE'D BE ALIVE, COULD HAVE

23  BEEN SAVED.

24  Q.     NOW, THERE WERE NUMEROUS BONES BROKEN IN THE NECK AREA.

25  A.     YES, SIR.

154

1   Q.    AND SEVERE CONTUSIONS OF THE MUSCLES OF THE NECK AND A

2   CRUSHED NECK.  THE DAMAGES TO MR. PLANT'S FACE WOULD THOSE

3   NECESSARILY HAVE BEEN FATAL?

4   A.    NO, NOT NECESSARILY FATAL, NO, SIR.

5   Q.    THE INJURY TO THE BACK OF HIS HEAD, IS THAT -- WOULD

6   THAT BE CONSISTENT TO THE HEAD STRIKING CONCRETE?

7   A.    YES, SIR.

8   Q.    THE NECK INJURIES AND THE FACE INJURIES, ARE THOSE

9   CONSISTENT WITH A DRIVING FORCE AGAINST THE NECK AND FACE LIKE

10  SOMEBODY SMASHING WITH THEIR FEET AND THEIR LEG ON MR. PLANT'S

11  FACE AND NECK?

12  A.    YES, SIR.  ALONG THE CHEEK AREA WERE PARALLEL MARKS OR

13  RIB MARKS THAT WOULD BE CONSISTENT WITH THE SOLE OF A SHOE.

14  Q.    AND FROM THE EXTENT OF THE INJURIES, CAN YOU -- ARE YOU

15  ABLE TO DETERMINE IF THESE WOULD HAVE BEEN THE RESULTS OF

16  REPEATED BLOWS TO THE FACE AND NECK?

17  A.    YES, SIR.

18  Q.    AND WHAT CAN YOU DETERMINE?

19  A.    THEY WOULD BE REPEATED BLOWS.  THE FRACTURE OF THE NASAL

20  BONES ARE SEPARATE FROM THE MOUTH, AND THOSE INJURIES WOULD BE

21  SEPARATE FROM THE NECK.  SO YOU'VE GOT AT LEAST THREE OR FOUR

22  DIFFERENT AREAS THAT ARE INVOLVED WITH BLUNT FORCE TRAUMA.  SO

23  THOSE WOULD BE SEPARATE BLOWS.

24  Q.    NOW, SIR, THESE INJURIES TO THE FACE AND THE NECK, ARE

25  THOSE -- ARE THERE NERVE ENDINGS IN THIS AREA?  ARE THEY THE

155

1    TYPE OF INJURIES THAT ARE PAINFUL INJURIES?

2    A.    YES, THEY COULD BE, DEFINITELY.

3    Q.    AS PART OF YOUR EXAMINATION DID YOU HAVE THE OCCASION TO

4    MAKE PHOTOGRAPHS OF THE INJURIES THAT YOU WERE EXAMINING OF

5    LUTHER PLANT?

6    A.    I DID.

7    Q.    AND YOU AND I HAD AN OCCASION TO REVIEW THESE PHOTOS

8    EARLIER?

9    A.    YES.

10   Q.    AND ARE THESE PHOTOS PICTURES OF THE INJURIES, THE

11   EXTERNAL INJURIES OF LUTHER PLANT, NOT INTERNAL ORGANS OF

12   LUTHER PLANT?

13   A.    YES.

14   Q.    OKAY.  AND ARE THEY REFLECTIVE OF THE INJURIES,

15   INCLUDING SOME OF THE PORTIONS OF THE INJURIES THAT HAVE

16   RESULTED IN THE FATAL INJURIES OF LUTHER PLANT?

17   A.    I BELIEVE SO, YES.

18         MR. STEVENS:  YOUR HONOR, WE HAVE GOVERNMENT'S

19   EXHIBITS 17, 18, 19-A, 19-B, AND 19-C AND WE WILL MOVE THESE

20   INTO EVIDENCE AT THIS TIME.

21         MR. BLACK:  YOUR HONOR, THE DEFENDANT WOULD OBJECT TO

22   THE TENDERED PHOTOGRAPHS FOR THE REASON THAT THE DEFENDANT IS

23   WILLING TO STIPULATE AS TO THE CAUSE OF DEATH AS TESTIFIED TO

24   BY THIS WITNESS.  THERE IS NO ISSUE IN FACT OR CONTROVERSY AND

25   BECAUSE OF THAT THE PHOTOS SERVE NO PURPOSE AS TO ANY ISSUE

156

1    THIS JURY WILL BE CALLED UPON TO DECIDE.

2          THE COURT:  I WILL TAKE A BRIEF BENCH CONFERENCE.

3    COUNSEL.

4          (BENCH CONFERENCE)

5          THE COURT:  GO AHEAD.  YOUR RESPONSE.  HE ALREADY

6    MADE HIS OBJECTION.

7          MR. STEVENS:  MY RESPONSE IS THAT THESE PHOTOGRAPHS

8    WILL ASSIST THE JURY IN UNDERSTANDING MUCH OF THE TESTIMONY

9    THAT IS PRESENTED IN MEDICALESE BY THIS WITNESS.  THESE ARE NOT

10   PHOTOGRAPHS OF -- THAT ARE NORMALLY THE OBJECTIONABLE TYPE OF

11   PHOTOGRAPHS.  WE HAVE NO INTERNAL ORGANS DISSECTED THAT WOULD

12   JUST INFLAME THE JURY.  THESE ARE PHOTOGRAPHS THAT ARE ALSO

13   SIMILAR TO THOSE FEATURED IN GOVERNMENT'S EXHIBIT NO. 2, THE

14   VIDEO, WHICH ARE THE INJURIES, EXTERNAL INJURIES OF LUTHER

15   PLANT'S FACE AND NECK AND THEN AREAS WHICH WILL ASSIST THE

16   WITNESS IN EXPLAINING THE SEVERITY AND FORCE THAT WAS APPLIED

17   TO THESE INJURIES WHICH ASSIST THE JURY IN MAKING A FACTUAL

18   DETERMINATION OF, AMONG OTHER FACTORS, HOW MANY TIMES THE

19   DEFENDANT MAY HAVE STRUCK LUTHER PLANT.

20         THE COURT:  ANYTHING ELSE?

21         MR. BLACK:  YOUR HONOR, AS STATED PREVIOUSLY, WE WILL

22   STIPULATE AS TO THE CAUSE OF DEATH.  WE DO NOT TAKE ISSUE WITH

23   ANY TESTIMONY THAT THIS WITNESS HAS TESTIFIED TO REGARDING THE

24   MANNER OF THE DEATH, THE CAUSE OF THE DEATH; WE DO NOT CONTEST

25   ANY OF THE TYPES OF INJURIES THAT HE SUSTAINED; WE DO NOT

157

1  CONTEST THE NUMBER OF BLOWS THAT MR. PLANT SUSTAINED.

2  FURTHERMORE, THESE PARTICULAR PHOTOGRAPHS WILL SERVE NO PURPOSE

3  AS TO ANY CONTESTED ISSUE OF FACT.  THEY ARE MERELY REPETITIVE

4  OF TESTIMONY THAT HAS ALREADY BEEN ADDUCED FROM THIS WITNESS

5  REGARDING HIS AUTOPSY, THEREFORE THEY ARE NOT RELEVANT.  AND

6  UNDER 403 THEY ARE ONLY BEING OFFERED, YOUR HONOR, TO INFLAME

7  THE MINDS OF THE JURY BASED UPON WHAT THEY ACTUALLY DEPICT.

8       THE COURT:  ANYTHING ELSE?

9       MR. STEVENS:  NO, SIR.

10      THE COURT:  THE COURT, FIRST, LOOKING TO THE

11 RELEVANCY ASPECT OF THE PHOTOGRAPHS, FINDS THAT THEY ARE

12 RELEVANT AND FINDS THAT UNDER RULE 403 THAT THE PROBATIVE VALUE

13 IS NOT SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR

14 PREJUDICE OR MISLEADING THE JURY OR UNDER ANY OTHER

15 CONSIDERATIONS, IT CERTAINLY WON'T CAUSE DELAY OR WASTE OF TIME

16 OR NEEDLESS PRESENTATION, CUMULATIVE EVIDENCE NOR WILL IT HAVE

17 AN ASPECT OF POSSIBLY INFLAMING THE JURY, WHICH IS THE BASIS OF

18 YOUR OBJECTION.

19      AND YOUR STIPULATION -- AND YOUR STIPULATION IS, MR.

20 BLACK, IS TO KEEP THE EVIDENCE OUT BECAUSE YOU AGREE TO ALL

21 THAT, STIPULATED TO ALL THAT YOU SAY THE PHOTOGRAPHS WOULD

22 SHOW.

23      THE COURT ANTICIPATED THIS EVIDENCE AND I REFER TO

24 THE CASES ON THE SUBJECT CASES CITED IN U.S. VERSUS HALL AND

25 U.S. VERSUS MCVEIGH, BUT I WILL JUST USE SOME OF THE REASONING

1 | THAT HAVE COME FROM SOME OF THOSE CASES.

2 | THE REASON -- QUOTE, THE REASON THAT A CRIMINAL

3 | DEFENDANT CAN'T TYPICALLY AVOID THE INTRODUCTION OF OTHER

4 | EVIDENCE OF A PARTICULAR ELEMENT OF THE OFFENSE BY STIPULATION,

5 | IS THAT THE GOVERNMENT MUST BE GIVEN THE OPPORTUNITY TO PRESENT

6 | TO THE JURY A PICTURE OF THE EVENTS RELIED UPON TO SUBSTITUTE

7 | INFORMATION SUCH AS A PICTURE.  A NAKED ADMISSION MIGHT HAVE

8 | THE EFFECT TO ROB THE EVIDENCE OF MUCH OF ITS FAIR AND

9 | LEGITIMATE WEIGHT.  THAT'S CITING OLCHEY (PHONETIC) VERSUS U.S.

10 | AND ALSO IN U.S. VERSUS MCVEIGH, 5TH CIRCUIT THE COURT THERE

11 | ADDRESSED A RULE 403 CHALLENGE ON THE ADMISSION IN A MURDER

12 | TRIAL OF A NUMBER OF PHOTOGRAPHS OF THE VICTIMS, OF THE DEATH

13 | SCENE WHICH THE DISTRICT COURT HAD DESCRIBED AS DISTASTEFUL, ET

14 | CETERA, AND LET IT GO IN.  IN DISTINGUISHING THAT CASE WHERE

15 | THE COURT DID NOT LET IT IN -- EXCUSE ME.  I BELIEVE THE COURT

16 | DID LET IT IN.  BUT QUOTE, IN HOLDING THAT THE ADMISSION OF THE

17 | PHOTOGRAPHS DID NOT VIOLATE RULE 403, THE 5TH CIRCUIT OBSERVED

18 | THAT RELEVANT EVIDENCE IS INHERENTLY PREJUDICIAL BUT IT IS ONLY

19 | UNFAIR AND PREJUDICE SUBSTANTIALLY OUTWEIGHING THE PROBATIVE

20 | VALUE WHICH PERMITS EXCLUSION OF RELEVANT MATTER UNDER RULE

21 | 403.  UNLESS TRIALS ARE TO BE CONDUCTED ON SCENARIOS, ON UNREAL

22 | FACTS AND THE EVIDENCED SANITIZED FOR THE OCCASION, THE

23 | APPLICATION OF RULE 403 MUST BE CAUTIOUS AND SPARING, CITING

24 | ALL OF THE OTHER CASES IN HERE.  WITH THE CONCLUSION THAT THE

25 | PROBATIVE VALUE OF THE PHOTOGRAPHS WAS NOT, AND IS NOT IN THIS

1  CASE, SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR

2  PREJUDICE.  AND ALSO CITING U.S. VERSUS REZAQ, R-E-Z-A-Q,

3  FOLLOWING THE DISTRICT COURT'S ADMISSION OF AN AUTOPSY

4  PHOTOGRAPH SHOWING THE REMOVING OF THE BULLET FROM A HIJACKING

5  VICTIM'S HEAD.  THESE PHOTOGRAPHS ESSENTIALLY GO TO EVIDENCE

6  SHOWING THE EVIDENCE ABOUT HOW A CRIME OCCURRED, THE FEROCITY

7  OF THE CRIME, THE INTENSITY OF THE ATTACK, THE REDUNDANCY OF

8  THE BLOWS, EVEN IF UNCONTESTED THEY SHOW AND THEY ARE ADMITTED

9  INTO EVIDENCE.

10        I HAVE REACHED MY RULING THEY ARE ADMITTED.

11             (END OF BENCH CONFERENCE)

12        THE COURT:  ALL RIGHT, COUNSEL.

13        MR. STEVENS:  YOUR HONOR, WE MOVE AGAIN INTO EVIDENCE

14  GOVERNMENT'S EXHIBITS.

15        THE COURT:  SEVENTEEN, 18, 19-A, B AND C?

16        MR. STEVENS:  YES, YOUR HONOR.

17        THE COURT:  THEY ARE ADMITTED.

18        MR. STEVENS:  THANK YOU.

19        MR. STEVENS:  AND WE WILL DISPLAY FOR THE JURY'S

20  CONVENIENCE ON THE BIG SCREEN THIS IS THE FIRST PHOTOGRAPH OF

21  THAT SERIES OF EXHIBITS.

22  Q.   (BY MR. STEVENS)  WHAT IS IT SHOWING, SIR?

23  A.    THIS SHOWS A FACE ON VIEW OF THE DECEDENT WITH THE

24  CLOTHING STILL ON.  IT HAS BEEN CUT AWAY FROM THE BODY AND ALSO

25  THE MEDICAL PARAPHERNALIA THAT WAS PRESENT ON THE BODY AS IT

160

1    CAME INTO THE MORGUE.  IT ALSO SHOWS SOME DRIED BLOOD AROUND

2    HIS FACE AND UPPER NECK.  A TRACHEOSTOMY TUBE IS INSERTED IN

3    THE LOWER NECK.  AND THERE'S, ALSO, ONE CAN SEE BILATERAL

4    HEMORRHAGES ABOUT THE EYES AND, ALSO, A SLIGHT DEVIATION OF THE

5    NOSE TOWARD THE RIGHT AND A BRUISE ACROSS THE NOSE.

6         THERE'S ALSO A LARGE BRUISE ON THE LOWER LEFT SIDE OF

7    THE LIP.  ESSENTIALLY, THAT'S ALL THAT I SEE ON THIS.

8    Q.    IT MAY HELP YOU.  THERE IS A LASER PEN THERE SOMEWHERE

9    THAT MIGHT HELP.

10         THE COURT:  JUST KEEP THAT HANDY UP THERE FROM NOW

11   ON.

12   Q.    (BY MR. STEVENS)  OKAY.  IS THERE ANYTHING YOU WANT TO

13   DIRECT US TO WITH THE LASER NOW ON THIS PARTICULAR PHOTOGRAPH?

14   A.    I'M SORRY, I CAN'T SEE THE END OF THE LASER.  I'M

15   RED/GREEN COLOR BLIND.  OH, THERE'S SOMETHING.

16   Q.    YOU MAY NEED TO USE TWO HANDS TO KEEP IT STEADY.

17   A.    OKAY. THE CLOTHING HAS BEEN CUT AWAY HERE AND THE

18   TRACHEOSTOMY TUBE IS HERE IN THE LOWER CENTER OF THE NECK.

19   DRIED BLOOD OWN THE FACE.  CONTUSIONS HERE OF THE LOWER LIP.

20   DEVIATION OF THE NOSE MORE TOWARD THE RIGHT SIDE, HIS RIGHT.

21   ALSO, THERE'S BILATERAL PERIORBITAL HEMORRHAGE OR BLACK EYES.

22   Q.    ON THE NOSE PORTION, HIS NOSE IS BROKEN?

23   A.    THAT'S CORRECT.

24   Q.    WHAT?

25   A.    THE SMALL BONES OF THE NOSE ARE BROKEN, YES.

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT

1    Q.    OKAY.  NEXT EXHIBIT, PLEASE.

2    A.    THE UPPER LIP IS REFLECTED BACK SHOWING THE CONTUSIONS,

3    ABRASIONS AND LACERATIONS OF THE UPPER LIP ON THE INSIDE.

4         ALSO ON THE LOWER LIP, YOU SEE A LARGE BRUISE OR

5    CONTUSION OF THE LOWER LEFT SIDE OF THE LIP.

6    Q.    DR. BROWN, I WANT TO ASK YOU: IF SOMEONE IS DECEASED DO

7    THEY BRUISE?

8    A.    NO.

9    Q.    SO --

10   A.    ONE HAS TO HAVE BLOOD PRESSURE IN ORDER TO BRUISE.  HE

11   HAS BRUISES SO HE HAS BLOOD PRESSURE AT THIS TIME.

12   Q.    OKAY.  SO DISCOLORATION IS SHOWING INJURIES THAT WERE

13   OCCURRING BEFORE HE DIED?

14   A.    YES.

15   Q.    OKAY.  NEXT.

16   A.    THIS IS THE SIDE-VIEW SHOWING THE LEFT SIDE OF THE FACE.

17   AND ONE CAN APPRECIATE SOME PARALLEL MARKS HERE ALONG THE LEFT

18   SIDE OF THE FACE.

19   Q.    BLOW THAT UP.

20   A.    THERE'S ALSO SOME -- ONE CAN SEE THE HEMORRHAGE HERE

21   AND, ALSO, ONE CAN SEE THE DEPRESSION OF THE NASAL OR THE UPPER

22   BONES OF THE NOSE, MAKES THE NOSE STICK OUT AND UP MORE.

23   THERE'S ALSO A BRUISE HERE ON THE LEFT LOWER LIP.  THERE WAS

24   ALSO A LACERATION ALONG THE OUTSIDE OF THE LOWER CHIN THAT'S

25   NOT SEEN HERE.

162

1    Q.    NEXT PHOTOGRAPH.

2          NEXT PHOTOGRAPH.  I'M READY THIS TIME.

3              THE COURT:  OKAY.  MR. BLACK.

4              MR. STEVENS:  THAT'S FINE.

5          YOUR HONOR --

6              THE COURT:  YOU HAVEN'T RESTED ON THIS WITNESS?

7              MR. STEVENS:  NO, SIR, I CAN -- WE CAN FINISH UP.

8              THE COURT:  REFERRING TO THE --

9              MR. STEVENS:  NO, I CAN FINISH UP HERE, IF I MAY JUST

10   ASK FROM THIS LOCATION.

11   Q.    (BY MR. STEVENS)  ON GOVERNMENT EXHIBIT NO. 19-A, WHICH

12   I'M SHOWING, THERE LOOKS LIKE THERE'S A HOLE IN THE CHEEK; IS

13   THAT RIGHT?

14   A.    NO, IT WAS A -- THOSE ARE ABRASIONS.

15   Q.    ABRASIONS?

16   A.    THOSE ARE THE RIBBED TYPE OF ABRASIONS THAT I DISCUSSED

17   EARLIER THAT APPEARED TO BE FROM THE SOLE OF A SHOE.

18   Q.    ON GOVERNMENT'S EXHIBIT 19-A, ON THE SIDE OF HIS FACE IT

19   LOOKS LIKE WHAT WOULD BE THE UNDERSIDE OF A SHOE, ABRASIONS

20   FROM THE UNDERSIDE OF A SHOE?

21   A.    YES, SIR.

22   Q.    THAT WOULD BE ON HIS LEFT CHEEK?

23   A.    YES, SIR.

24             MR. STEVENS:  YOUR HONOR, I'M GOING TO PASS SOME OF

25   THESE TO THE JURORS.

| | |
|---|---|
| 1 | THE COURT:  YOU MAY PUBLISH THE EXHIBITS. |
| 2 | Q.    (BY MR. STEVENS)  AND ALSO ON GOVERNMENT'S EXHIBIT 19-B |
| 3 | ON THE RIGHT CHEEK, DOES IT APPEAR TO HAVE SIMILAR MARKINGS ON |
| 4 | THE CHEEK? |
| 5 | A.    YES, SIR.  THERE WAS TWO PARALLEL MARKS ALONG THE RIGHT |
| 6 | LOWER CHEEK ADJACENT TO THE NOSE THERE. |
| 7 | Q.    AND YOU HAVE STATED FROM YOUR FINDINGS AND YOUR |
| 8 | DETERMINATIONS ARE THESE INJURIES INDICATIVE OF NUMEROUS BLOWS |
| 9 | TO THE NECK AND FACE? |
| 10 | A.    YES. |
| 11 | Q.    DR. BROWN, WERE YOU ABLE TO MEASURE LUTHER PLANT FOR |
| 12 | SIZE, HOW TALL HE WAS? |
| 13 | A.    HE WAS 68 INCHES TALL, 5 FEET 8 INCHES. |
| 14 | Q.    AND HOW MUCH DID HE WEIGH, SIR? |
| 15 | A.    170 POUNDS. |
| 16 | Q.    SIR, WAS THERE ALSO A TOXICOLOGY TEST DONE TO DETERMINE |
| 17 | IF THERE WERE ANY DRUGS IN HIS SYSTEM AT THE TIME HE DIED? |
| 18 | A.    THERE WAS. |
| 19 | Q.    AND WHAT WAS THE RESULT? |
| 20 | A.    THE RESULTS OF THE TOXICOLOGY TEST WERE NEGATIVE, HE HAD |
| 21 | NO ILLEGAL DRUGS OR PHARMACEUTICAL DRUGS WITHIN HIS SYSTEM. |
| 22 | MR. STEVENS:  THANK YOU.  WE PASS THIS WITNESS. |
| 23 | CROSS-EXAMINATION |
| 24 | MR. BLACK: |
| 25 | Q.    DR. BROWN, DID I UNDERSTAND YOU CORRECTLY TO SAY THAT IT |

164

1    WAS POSSIBLE THAT MR. LUTHER PLANT'S LIFE COULD HAVE BEEN SAVED

2    IF HE HAD RECEIVED DIFFERENT MEDICAL CARE?

3    A.    IF HE HAD -- IF HE HAD BEEN IN THE EMERGENCY ROOM OR

4    JUST OUTSIDE THE EMERGENCY ROOM.  IN OTHER WORDS, IT WAS -- THE

5    TIMELINESS OF THE MEDICAL INTERACTION, PERHAPS, COULD HAVE

6    SAVED HIM.  I DON'T KNOW IF HE COULD HAVE NOT -- COULD HAVE OR

7    NOT.

8    Q.    OKAY.  THANK YOU, DOCTOR.

9          IN REGARD TO THE TOXICOLOGY TEST THAT YOU ORDERED, IT

10   WAS NOT YOUR OFFICE THAT PERFORMED THOSE TESTS; IS THAT

11   CORRECT?

12   A.    THAT'S CORRECT.

13   Q.    I BELIEVE THAT YOUR OFFICE SENT IT TO A LAB IN MIDLAND,

14   TEXAS?

15   A.    YES, SIR.

16   Q.    OKAY.  DO YOU KNOW WHETHER OR NOT THAT LAB TESTED

17   SPECIFICALLY FOR HEROIN?

18   A.    FOR WHAT, SIR?

19   Q.    HEROIN?

20   A.    YES, SIR, THEY TEST FOR HEROIN.

21   Q.    OKAY.  DO YOU KNOW WHAT DETECTION CRITERIA THEY USE AT

22   THAT LAB?

23   A.    NO, I DON'T.

24   Q.    DO YOU KNOW WHAT TYPE OF TESTING PROCEDURE OR ACTUAL

25   TEST THEY USE?

165

1    A.      NO.

2    Q.      IN THESE TYPE OF TESTS, SPECIFICALLY DRUG TESTS, THERE'S

3    DIFFERENT LEVELS OR TRACES THAT A LAB CAN TEST FOR; IS THAT

4    CORRECT?

5    A.      THAT'S CORRECT.

6    Q.      OKAY.  BUT YOU DON'T KNOW WHAT THE LAB IN MIDLAND,

7    TEXAS, DID OR WHAT PROCEDURES THEY USED?

8    A.      I DON'T KNOW WHAT PROCEDURES THEY USED.  THEY HAVE A

9    THRESHOLD LEVEL, BELOW THAT LEVEL THEN NO DRUGS ARE REPORTED.

10   Q.      DO YOU KNOW WHAT THAT THRESHOLD LEVEL WAS THAT THEY

11   UTILIZED?

12   A.      NO, SIR.

13   Q.      IT'S ROUTINE, IS IT NOT, THAT YOU ORDER A TOXICOLOGY

14   TEST DONE IN THESE TYPE OF CASES?

15   A.      YES, SIR.

16   Q.      OKAY.  AT THE TIME THAT YOU ORDERED THE TEST, OR HAVE

17   YOU LEARNED SINCE THEN, THAT MR. PLANT TESTED POSITIVE FOR

18   HEROIN AS AN INMATE ONLY 15 DAYS PRIOR TO HIS DEATH?

19   A.      I'M NOT AWARE OF THAT.

20   Q.      OKAY.  WERE YOU AWARE THAT THE BUREAU OF PRISONS HAD

21   CLASSIFIED HIM AS A CHRONIC AND SEVERE DRUG USER WITHIN THE

22   B.O.P.?

23   A.      NO, SIR.

24   Q.      DO YOU KNOW HOW LONG THE DRUG HEROIN WILL STAY IN THE

25   BODY?

166

1    A.    I'M NOT SURE OF THE HALF LIFE ON IT.  BUT AFTER IT GOES

2    TO TWO OR THREE DAYS, I THINK THAT IT'S DISSIPATED FROM THE

3    BODY.

4    Q.    APPROXIMATELY 72 HOURS IS SORT OF THE NORM, IS IT NOT?

5    A.    YES, SIR.

6    Q.    WHAT AFFECTS DOES HEROIN HAVE ON THE BODY?

7    A.    WELL, IT'S AN ADDICTIVE DRUG.  OF COURSE, IT CAUSES LESS

8    PAIN, IT'S AN OPIATE IN WHICH ONE TRIES TO DIMINISH PAIN.  IT

9    CAN CAUSE A MARKED CRAVING BY THE INDIVIDUAL FROM ADDICTION.

10       I DON'T -- IT HAS A NUMBER OF DIFFERENT THINGS THAT IT

11   DOES, THAT DOES OCCUR.  BUT MAIN THING IS THE ADDICTIVE QUALITY

12   OF HEROIN.

13   Q.    OKAY.  SO IT'S -- AND MORPHINE IS OF THE SAME FAMILY, IS

14   IT NOT?

15   A.    YES.  HEROIN BREAKS DOWN INTO CODEINE AND MORPHINE VERY

16   QUICKLY.  AND SO ONE DOES NOT USUALLY DEFECT HEROIN IN

17   BLOODSTREAM.  IF IT WAS DELIVERED IN A SHORT PERIOD, IT BREAKS

18   DOWN INTO CODEINE AND MORPHINE.

19   Q.    AND I TAKE IT FROM YOUR TESTIMONY, THEN, THAT IT WOULD

20   BE ACCURATE TO SAY THAT HEROIN IS A VERY ADDICTIVE DRUG?

21   A.    YES.

22   Q.    OKAY.  IF AN INDIVIDUAL HAS BEEN USING HEROIN FOR A

23   SUBSTANTIAL PERIOD OF TIME AND HE SUDDENLY STOPPED USING IT OR

24   HIS ABILITY TO OBTAIN IT WAS CUT OFF, WHAT AFFECTS WOULD IT

25   HAVE ON THE HUMAN BODY?

1  A.      IF HE WAS ADDICTED?

2  Q.      YES, SIR.

3  A.      HE HAS WITHDRAWAL SYMPTOMS, IN THAT, HE BECOMES

4  TREMULOUS AND HE WANTS -- DESIRES THE DRUG AND, OF COURSE, ALL

5  THE CELLS CRAVE THE DRUG AND IT'S MORE DIFFICULT FOR HIM TO GET

6  ESTABLISHED FOR A PERIOD OF TIME WITHOUT THE DRUG.

7  Q.      OKAY.   THE WITHDRAWAL PROCESS AN INDIVIDUAL WOULD GO

8  THROUGH IN CIRCUMSTANCES YOU DESCRIBED, IS IT ALSO POSSIBLE

9  THAT IT COULD EVEN AFFECT HIS BEHAVIOR?

10  A.      PERHAPS.   WITHDRAWAL USUALLY CAUSES A LOT OF STOMACH

11  PAIN AND PAIN FROM THE REACTION OF THE BODY NOT HAVING THE

12  DRUG.

13  Q.      BECAUSE IT'S NATURAL, PHYSICAL PAIN, IS IT NOT, THAT THE

14  PERSON FEELS AS THE RESULT OF NOT HAVING ACCESS TO THE DRUG

15  ANYMORE; IS THAT CORRECT?

16  A.      AGAIN PLEASE.

17  Q.      THAT THE PERSON ACTUALLY FEELS PHYSICAL PAIN WHEN HE'S

18  GOING THROUGH THE WITHDRAWAL SYMPTOMS; IS THAT CORRECT?

19  A.      YES.

20  Q.      OKAY.   AND ARE YOU AWARE OF INSTANCES OR STUDIES WHERE

21  IT HAS SHOWN THAT A PERSON WHO IS GOING THROUGH SEVERE

22  WITHDRAWALS ALSO HAS THEIR BEHAVIOR ACTUALLY AFFECTED IN SOME

23  MANNER?

24  A.      NO, SIR.

25  Q.      HAVE YOU EVER SEEN AN INDIVIDUAL GOING THROUGH DRUG

1   WITHDRAWALS BEFORE?

2   A.      NO, SIR, NOT TO MY KNOWLEDGE.

3   Q.      OKAY.  BUT THE WITHDRAWAL IS A DIFFICULT PROCESS, IS IT

4   NOT?

5   A.      IT IS.

6          MR. BLACK:  OKAY.  PASS THE WITNESS, YOUR HONOR.

7          MR. STEVENS:  NOTHING MORE.  THANK YOU.

8          THE COURT:  ALL RIGHT, SIR, YOU'RE RELEASED.

9          NEXT WITNESS.

10         MR. STEVENS:  DR. KOLCUM, PLEASE, MICHAEL KOLCUM.

11         MICHAEL KOLCUM, M.D., GOVERNMENT'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13  MR. STEVENS:

14  Q.      TELL US YOUR FULL NAME, SIR.

15  A.      DR. MICHAEL KOLCUM.

16  Q.      AND, SIR, HOW ARE YOU EMPLOYED, WHAT IS YOUR OCCUPATION?

17  A.      I DO EMERGENCY MEDICINE AT MID-JEFFERSON HOSPITAL IN

18  NEDERLAND.

19  Q.      YOU'RE A PHYSICIAN?

20  A.      YES, SIR.

21  Q.      HOW LONG HAVE YOU BEEN A DOCTOR?

22  A.      I'VE BEEN DOING IT MORE THAN 20 YEARS RIGHT NOW.

23  Q.      CAN YOU GIVE US A BRIEF DESCRIPTION OF YOUR MEDICAL

24  BACKGROUND?

25  A.      I GRADUATED HIGH SCHOOL FROM FELL (PHONETIC) HIGH SCHOOL

1   UP IN PENNSYLVANIA, AND WENT TO THE UNIVERSITY OF SCRANTON IN

2   PENNSYLVANIA.  I DID SOME -- DID MEDICAL SCHOOL AT THE

3   UNIVERSITY OF GUADALAJARA IN MEXICO.  I DID TRAINING AT BAYLOR

4   UNIVERSITY IN ANESTHESIA OVER IN HOUSTON; AND I DID SOME

5   TRAINING WITH EMERGENCY MEDICINE OVER THERE, ALSO.  AND

6   BASICALLY I'VE BEEN WORKING EVER SINCE I GOT OUT.

7   Q.     SIR, DO YOU REMEMBER AN INCIDENT ON JANUARY 5TH, 2001,

8   INVOLVING ATTENDING TO A VICTIM OF AN ASSAULT, THE VICTIM WAS

9   LUTHER PLANT?

10  A.     YES, I DO.

11  Q.     AND CAN YOU PLEASE TELL US, SIR, WHAT YOU WERE DOING

12  THEN?  WERE YOU IN THE MEDICAL -- WERE YOU IN THE EMERGENCY

13  ROOM AT MID JEFFERSON WHEN THE VICTIM ARRIVED?

14  A.     YES, SIR.  I WAS THE ATTENDING E.R. DOCTOR THEN.  AND A

15  PATIENT CAME IN FROM THE PRISON.  THEY CALLED US AHEAD STATING

16  THAT THEY HAD A CASE OUT THERE THAT THE PATIENT GOT BEAT UP

17  PRETTY BAD AND WAS -- DID NOT HAVE ANY SIGNS OF LIFE.  AND WE

18  GOT UP TO THE EMERGENCY ROOM; WE WORKED ON HIM AS MUCH AS MUCH

19  AS I COULD.  WE DID FULL A.C.L.S. PROTOCOLS, TRIED TO -- YOU

20  KNOW, WE SECURED AN AIRWAY AND TRY TO GET HIS HEART BEATING,

21  BUT HE JUST HAD SO MANY MULTIPLE INJURIES TO HIS HEAD AND FACE

22  THAT I REALLY COULDN'T REVIVE HIM AT ALL.

23  Q.     OKAY.  AND DID YOU PRONOUNCE HIM DEAD AT THE HOSPITAL?

24  A.     YES, I DID, SIR.

25  Q.     AND I GUESS THAT WAS ABOUT 12:30, THEN, THAT DAY THAT HE

1   WAS PRONOUNCED DEAD?

2   A.      IF THAT'S IN THE RECORD, YES, SIR.

3   Q.      OKAY.   THE INJURIES THAT THE VICTIM HAD RECEIVED IN YOUR

4   OPINION WERE THOSE FATAL INJURIES?

5   A.      YES, THEY WERE, SIR.

6   Q.      AND YOUR STAFF WORKED ON HIM FOR A WHILE, BUT TO NO

7   AVAIL?

8   A.      YES, WE DID.

9   Q.      CAN -- DO YOU RECALL, IN SUMMARY, THE EXTENT OF HIS

10  INJURIES THAT CAUSED HIM TO DIE, AS YOU RECALL?

11  A.      FROM WHAT I RECALL, IT WAS JUST MULTIPLE FACIAL AND

12  SKULL, SKULL INJURIES.  I NEVER DID GET THE COMPLETE AUTOPSY

13  REPORT.  BUT THE CASE WENT OVER TO THE MEDICAL EXAMINER.

14  Q.      AND YOUR OFFICE TREATED HIM AS BEST YOU COULD?

15  A.      YES, SIR, WE TRIED EVERY DRUG THAT WE -- THAT I COULD TO

16  TRY TO GET HIM BACK, AND HE REALLY JUST DID NOT RESPOND AT ALL.

17  Q.      OKAY.   AND YOU HAD BEEN ALERTED THAT HE WAS

18  NONRESPONSIVE OR WAS SUFFERING EXTREMELY SERIOUS INJURIES ON

19  THE WAY OVER?

20  A.      YES, SIR.

21  Q.      AND IS IT YOUR DETERMINATION THAT THE DEFENDANT DIED

22  FROM THE INJURIES THAT HE HAD SUFFERED?  THE VICTIM, LUTHER

23  PLANT, DIED OF THE INJURIES THAT HE HAD SUFFERED?

24  A.      YES HE DID, SIR.

25          MR. STEVENS:  OKAY.  THANK YOU.  WE PASS THIS

171

1    WITNESS.

2                          CROSS-EXAMINATION

3    MR. BLACK:

4    Q.      DOCTOR, I NOTICE IN YOUR EMERGENCY ROOM REPORT DATED

5    JANUARY 5TH OF 2001, YOU INDICATED AT SOME POINT THE PATIENT,

6    QUOTE, DID COME BACK, DO YOU RECALL THAT?

7    A.      THERE WAS AT ONE POINT THAT WE HAD A LITTLE POSSIBLE

8    CARDIAC ACTIVITY, YES, SIR.

9    Q.      OKAY.  ALSO NOTICED IN YOUR REPORT YOU INDICATED THAT

10   YOU SPOKE TO THE OFFICERS AT THE BUREAU OF PRISONS IN REGARD TO

11   THIS PATIENT, DO YOU RECALL THAT?

12   A.      THE POLICE OFFICER YOU'RE SAYING, SIR, OR WHAT?

13   Q.      THAT'S WHAT I'M ASKING YOU.  YOUR REPORT SAYS: "I SPOKE

14   TO THE OFFICERS IN CHARGE AND ALL MEMBERS OF THE PRISON."

15   A.      WELL, FROM MY RECOLLECTION, THERE WAS SOME OFFICERS THAT

16   CAME WITH THE PATIENT, YES, SIR.  I THINK IT WAS THE GUARDS.

17   USUALLY THE PROTOCOL IS SOME POLICE OFFICERS FROM THE PRISON

18   COME WITH ALL PATIENTS FROM THE PRISON, YES, SIR.

19   Q.      AND I ALSO NOTED IN YOUR REPORT YOU INDICATED THAT THE

20   PATIENT WAS KNOWN TO HAVE HEPATITIS C, DO YOU RECALL THAT?

21   A.      YES, SIR.

22   Q.      OKAY.  WHEN YOU RECEIVED THE INFORMATION ABOUT THE

23   HEPATITIS C, DID YOU RECEIVE ANY INFORMATION FROM THE PRISON

24   ABOUT POSSIBLE DRUG USE BY THIS INDIVIDUAL?

25   A.      CAN YOU SAY THAT AGAIN, SIR?  WHAT WAS THAT QUESTION?

172

1    Q.    WHEN YOU RECEIVED THE INFORMATION FROM THE PRISON

2    OFFICIALS ABOUT MR. LUTHER PLANT, DID YOU ALSO RECEIVE ANY

3    INFORMATION ABOUT POSSIBLE DRUG USE BY MR. PLANT?

4    A.    WELL, THINGS WERE HAPPENING SO QUICKLY AT THE TIME I

5    WASN'T SURE IF THEY -- THEY DID TELL ME HEPATITIS C.  BUT I MAY

6    HAVE ASKED THEM IF THERE WAS ANY POSSIBLE DRUGS INVOLVED, BUT

7    I'M NOT SURE IF THEY TOLD ME THAT OR NOT.

8              MR. BLACK:  OKAY.  NO FURTHER QUESTIONS, YOUR HONOR.

9              MR. STEVENS:  JUST A COUPLE.

10                        REDIRECT EXAMINATION

11   MR. STEVENS:

12   Q.    LUTHER PLANT DID NOT DIE OF HEPATITIS C, DID HE?

13   A.    NOT AT THAT TIME, NO, SIR.

14   Q.    HE DIED OF THE INJURIES THAT HE WAS BROUGHT IN FOR, THE

15   SEVERE INJURIES THAT HE RECEIVED AT THE BUREAU OF PRISONS?

16   A.    THAT'S CORRECT.

17             MR. STEVENS:  OKAY.  THANK YOU.  THAT'S ALL.

18             MR. BLACK:  NOTHING FURTHER, YOUR HONOR.

19             THE COURT:  ALL RIGHT, SIR.  THANK YOU.  YOU'RE

20   RELEASED.

21             MR. STEVENS:  YOUR HONOR, WE, AT THIS TIME, ARE GOING

22   TO REST FOR TODAY.  WE HAVE SOME WITNESSES COMING IN FROM OUT

23   OF TOWN.  WE'VE EXHAUSTED THE WITNESSES TODAY BECAUSE OF OUR

24   ACCELERATED TIMETABLE AND WE WOULD ASK TO START BRIGHT AND

25   EARLY IN THE MORNING.

173

1          THE COURT:  WE WILL DO JUST THAT.

2          MEMBERS OF THE JURY, WE WILL GIVE YOU BACK SOME TIME

3   TODAY AND BE BACK HERE AS PROMPTLY AS YOU WERE TODAY, PLEASE.

4   WE WILL SEE YOU THEN.  YOU'RE EXCUSED FOR THE DAY.

5          (RECESS AT 4:00 P.M. UNTIL JULY 7, 2004, AT 9:20 A.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FRANK MCMILLAN, OFFICIAL COURT REPORTER U.S. DISTRICT COURT